CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC | : | |
| COMPANY, | : | |
| Plaintiff, | : | Case No. 98-126C |
| v. | : | Senior Judge |
| | : | Merow |
| THE UNITED STATES, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - X

Washington, D.C.

Friday, June 4, 1999

Deposition of CHRISTOPHER A. KOUTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:00 a.m., Friday, June 4, 1999, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

was the first.

Q. Do you know where that date came from, how that date came to be included in the presentation?

A. I was not directly involved in the development of that report, so I couldn't say.

Q. Do you know who was involved?

A. I believe the staff person at the time was Vic Trevules, that's T-r-e-v-u-l-e-s.

Q. Does he currently work for DOE?

A. Yes, he works for the Yucca Mountain project.

Q. Do you have any understanding at all of where the 2010 number came from, how it was derived, what the basis for that number is?

A. It was developed through working with the repository program, which was an area of the program I wasn't working with at the time, so I don't have any direct knowledge as to how that date was developed.

Q. Do you have any indirect knowledge?

A. No.

Q. When do you believe that spent nuclear fuel will start to be picked up from nuclear utilities?

A. I believe, assuming we get the resources, that it can be done by 2010.

Q. Do you believe it will be done by 2010?

A. I can't really say.

Q. Any particular reason why you can't say?

A. It's predicated upon preceeding budgets, it's predicated upon many, many different variables. I think our schedules are reasonably based, but there are many variables associated with it.

Q. What do you expect to happen? Do you expect that you will get the budgetary -- all these variables will fall into the place and that the 2010 date will be met?

A. I don't know. I couldn't say.

Q. What will be the initial rate of acceptance for spent nuclear fuel when the program begins accepting the utility's spent nuclear fuel?

A. My sense is it would be the same acceptance rate that's outlined in the annual capacity reports that we've issued over the years.

Q. You said reports plural. Did you say

report or reports?

A. I thought I said reports. I thought there were more than one ACRs issued.

Q. I asked that question because the numbers have changed over the years, so which particular annual capacity report are you referring to?

A. The latest one, whichever one that was.

Q. Is there more than one scenario of acceptance currently being evaluated by DOE? What I mean by that is, is it a repository only acceptance or is it a repository with some interim storage or something else?

A. Our baseline program is acceptance in 2010 at a repository.

Q. Is there any plan or provision for interim storage?

A. Lacking authority, no.

Q. Even without the authority, are there any plans being made in the event that authority is granted?

A. The Department has taken steps to allow itself to implement interim storage as quickly as possible, assuming it was given authority. The topical safety analysis report on the interim

*CERTIFICATE OF REPORTER*

*UNITED STATES OF AMERICA ) ss.:*

*DISTRICT OF COLUMBIA )*

I, **MARY GRACE CASTLEBERRY, RPR,** the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Mary Grace Castleberry

*Notary Public in and for*

*the District of Columbia*

*My commission expires: 06/30/2001*

United States General Accounting Office

GAO

Report to Congressional Requesters

December 2001

# NUCLEAR WASTE

# Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project

GAO

Accountability * Integrity * Reliability

GAO-02-191

# Contents


**Letter** 1

Results in Brief 3
Background 5
It May Be Premature for DOE to Make a Site Recommendation 7
DOE Is Unlikely to Open a Repository in 2010 as Planned 16
Conclusions 22
Recommendations for Executive Action 23
Agency Comments and Our Evaluation 24
Scope and Methodology 27

**Appendix I** **Objectives, Scope, and Methodology** 29

**Appendix II** **Comments From the Department of Energy** 31

**Appendix III** **GAO Contact and Staff Acknowledgments** 35

GAO Contact 35
Acknowledgments 35

**Figure**

Figure 1: Comparison of Statutory Site Approval Process With DOE's Projected Schedule 16


**Abbreviations**

| | |
|---|---|
| DOE | Department of Energy |
| EPA | Environmental Protection Agency |
| GAO | General Accounting Office |
| NRC | Nuclear Regulatory Commission |
| OCRWM | Office of Civilian Radioactive Waste Management |
| USGS | U.S. Geological Survey |

GAO

Accountability * Integrity * Reliability

United States General Accounting Office
Washington, DC 20548

December 21, 2001

The Honorable Harry Reid
Chairman, Subcommittee on Transportation, Infrastructure, and Nuclear Safety
Committee on Environment and Public Works
United States Senate

The Honorable Shelley Berkley
House of Representatives

As reflected in the administration's energy policy, there is renewed interest in expanding nuclear power as a source of electricity. At the same time, the nation currently does not have a facility to permanently dispose of the highly radioactive spent (used) fuel from existing commercial nuclear power plants. In lieu of such a facility, plant owners are currently holding about 40,000 metric tons of spent fuel in temporary storage at 72 plant sites in 36 states. In addition, the Department of Energy (DOE) estimates that it has over 100 million gallons of highly radioactive waste and 2,500 metric tons of spent fuel from the development of nuclear weapons and from research activities in temporary storage. Because these wastes contain radioactive elements that remain active for hundreds of thousands of years, the permanent isolation of the wastes is critical for safeguarding public health, cleaning up DOE's nuclear facilities, and providing a reasonable basis for increasing the number of nuclear power plants.

As required by the Nuclear Waste Policy Act of 1982, as amended in 1987, DOE has been studying one site at Yucca Mountain, Nevada, to determine its suitability for disposing of highly radioactive wastes in a mined geologic repository. If the Secretary of Energy decides to recommend this site to the President, the recommendation would begin a statutory process for the approval or disapproval of the site that will involve the President, the state of Nevada, and the Congress. In addition, a subsequent presidential site recommendation would trigger statutory time frames for action by the state, the Congress, DOE, and the Nuclear Regulatory Commission (NRC). If the site is recommended and approved, DOE must apply to NRC for a license to construct a repository. If the site is not recommended and approved for a license application, or if NRC denied a license to construct a repository, the administration and the Congress would have to consider other options for the long-term management of existing and future nuclear wastes.

Site investigation activities at Yucca Mountain include studies of the physical characteristics of the mountain and potential waste containers. The investigation also includes the development and use of mathematical models to measure the probability that various combinations of natural and engineered (man-made) features of a repository could safely contain wastes for 10,000 years. The Environmental Protection Agency (EPA) has set health and safety standards for a repository at Yucca Mountain that require a high probability of safety for at least that period of time. DOE's criteria for determining if the site is suitable for a repository and the NRC's licensing regulations are consistent with these standards. DOE has designated the nuclear waste program, including the site investigation, as a "major" program that is subject to senior management's attention and to its agencywide guidelines for managing such programs and projects. The guidelines require the development of a cost and schedule baseline, a system for managing changes to the baseline, and independent cost and schedule reviews. DOE is using a management contractor to carry out the work on the program. DOE's management contractor develops and maintains the baseline, but senior DOE managers must approve significant changes to cost or schedule estimates. In February 2001, DOE hired Bechtel SAIC Company, LLC (Bechtel), to manage the program and required the contractor to reassess the remaining technical work and the estimated schedule and cost to complete this work.

In 1996, the U.S. Court of Appeals for the District of Columbia Circuit ruled that the Nuclear Waste Policy Act obligated DOE to start disposing of the spent fuel from commercial nuclear power plants no later than January 31, 1998. In 1998, because DOE could not meet this deadline, the U.S. Court of Appeals for the Federal Circuit held in another case that plant owners are entitled to damages. One of the major issues in the determination of damages is the schedule under which DOE will begin accepting the spent fuel. DOE does not expect to complete the sequence of site approval, licensing, and construction of enough of the repository facilities at Yucca Mountain to open it until at least 2010. Courts in these 2 cases and 16 cases brought by other utilities are currently assessing the amount of damages that DOE owes the plant owners for delaying the disposal of their wastes by the estimated 12-year delay. Estimates of the potential damages vary widely, from DOE's estimate of about $2 billion to the nuclear industry's estimate of $50 billion.

Given these circumstances and questions raised about DOE's investigation of the Yucca Mountain site, you asked us to determine the extent to which

- DOE has completed the work necessary to support a site recommendation for the development of a repository at Yucca Mountain and
- DOE's goal of opening a repository at Yucca Mountain in 2010 is reasonable.

## Results in Brief

Recommending to the President that the Yucca Mountain site is suitable for a repository is within the discretion of the Secretary of Energy but, for the reasons noted below, may be premature. Once the President considers the site qualified for a license application and recommends the site to the Congress, the Nuclear Waste Policy Act requires DOE to submit a license application to NRC within about 5 to 8 months.[1] On the basis of information we reviewed, DOE will not be able to submit an acceptable application to NRC[2] within the express statutory time frames for several years because it will take that long to resolve many technical issues. Specifically, DOE is currently gathering and analyzing technical information required to satisfy 293 agreements that it made with NRC. According to NRC, completing this ongoing technical work is essential for it to accept a license application from DOE. Some of these agreements, for example, provide for the additional study of how water would flow through the repository area to the underlying groundwater and the durability of waste containers to last for thousands of years. Many of the technical issues that were the subject of these agreements have also been of concern to the U.S. Nuclear Waste Technical Review Board, which was established by the Nuclear Waste Policy Act to review the technical and scientific validity of DOE's investigation of Yucca Mountain. Bechtel's September 2001 detailed reassessment of the work required to submit a license application, including the 293 agreements with NRC and assuming expected funding levels, concluded that DOE would be in a position to submit a license application to NRC in January 2006, or about 4 years from now. Under the Nuclear Waste Policy Act and DOE's siting guidelines,

[1] If the President makes a recommendation to the Congress, Nevada has 60 days to disapprove the site. If disapproved, the Congress has 90 days of continuous session to enact legislation overriding a disapproval. If the Congress overrides the state's disapproval, the Secretary is required to submit a license application to NRC within 90 days after the site recommendation is effective. These time frames provide about 150 to 240 days, or about 5 to 8 months, from the time the President recommends the site until DOE submits a license application.

[2] The acceptance of a license application is not the same as approving an application. A decision to approve or disapprove any application would be made by NRC following extensive review and testing.

while a site recommendation and a license application are separate processes, DOE will need to use essentially the same data for both.

On the basis of the information we reviewed, DOE is unlikely to achieve its goal of opening a repository at Yucca Mountain by 2010 and currently does not have a reliable estimate of when, and at what cost, such a repository can be opened. Since DOE stopped using the cost and schedule baseline to manage the site investigation in 1997, the repository program's baseline has not reflected changes in the program. For example, when the program's fiscal year 2000 appropriation was $57.8 million less than requested, DOE deferred some planned technical work without adjusting the baseline to reflect this action. As a result, it was not clearly visible when, and at what cost, the site investigation would be completed and a license application submitted to NRC. Bechtel, in its September 2001 detailed reassessment, concluded, on the basis of expected program funding, that DOE could submit the application in January 2006 at a total cost of $5.5 billion. This date is approximately 4 years later, and the $5.5 billion figure is about $1.4 billion more than DOE's projection in 1997. Using Bechtel's estimate, sufficient time would not be available for DOE to obtain a license from NRC and construct enough of the repository to open it in 2010. Therefore, DOE is exploring alternative approaches to opening a repository in 2010, such as developing surface facilities for storing waste at the site until sufficient underground disposal facilities can be constructed.

We are recommending that the Secretary of Energy fully consider the timing of the statutory process before he decides when to make a site recommendation to the President. We are also making recommendations to DOE to better manage the nuclear waste program and to prepare estimates of the schedule and costs for opening a repository at Yucca Mountain that are tied to a new baseline for the program.

DOE disagreed that it may be premature for the Secretary of Energy to make a site recommendation to the President on the grounds that we did not understand the statutory and regulatory requirements for a site recommendation. (See app. II.) We agree that the Secretary has the discretion to make such a recommendation at this time; however, we question the prudence and practicality of making such a recommendation at this time, given the express statutory time frames for a license application and the significant amount of work remaining to be done for NRC to accept a license application from DOE. Our conclusion is based on the relationship between a site recommendation and DOE's readiness to submit an acceptable license application to NRC, as set out in law and

DOE's siting guidelines. Although we have clarified our discussion of the statutory and regulatory requirements for site recommendation, approval, and licensing, we continue to believe that the Secretary of Energy should consider the timing of this statutory process as he decides when to make a site recommendation to the President. Therefore, while we have modified the language, we have not changed the intent of our recommendation on this matter. (See p. 24 for our evaluation of DOE's comments.)

## Background

Recognizing the critical need to address the issue of nuclear waste disposal, the Congress enacted the Nuclear Waste Policy Act of 1982 to establish a comprehensive policy and program for the safe, permanent disposal of commercial spent fuel and other highly radioactive wastes in one or more mined geologic repositories. In the act, the Congress stated that federal efforts to devise a permanent solution for disposing of radioactive waste had been inadequate. The act charged DOE with (1) establishing criteria for the recommendation of sites for repositories; (2) "characterizing" (investigating) three sites to determine each site's suitability for a repository; (3) recommending one suitable site to the President who, if he considers the site is qualified for a license application, submits a recommendation of such site to the Congress; and (4) upon approval of a recommended site, seeking a license from NRC to construct and operate a repository at the approved site. The act created the Office of Civilian Radioactive Waste Management within DOE to manage its nuclear waste program. When the act was passed, it was expected that a repository could be operational in 1998. Amendments to the act in 1987 directed DOE to investigate only the Yucca Mountain site. These amendments also established the Nuclear Waste Technical Review Board (the Board). The Board's mission is to review the technical and scientific validity of DOE's activities associated with investigating the site and packaging and transporting wastes, and to report its findings and recommendations to the Congress and DOE at least twice each year. The act does not require DOE to implement the Board's recommendations.

The Nuclear Waste Policy Act also set out important and complementary roles for other federal agencies. It required EPA to establish health and safety standards for the disposal of these wastes in repositories. EPA issued the standards for the Yucca Mountain site in June 2001.[3] The act

[3] The Energy Policy Act of 1992 required EPA to establish specific health and safety standards for a repository at Yucca Mountain.

also made NRC responsible for licensing and regulating repositories to ensure their compliance with EPA's standard. If the Yucca Mountain site is recommended to the President and approved, upon accepting a license application from DOE, NRC has, according to the act, 3 to 4 years to review the application and decide whether to issue a license to construct, and then to operate, a repository at the site. The act also required that, before the Secretary of Energy may recommend the site to the President, he or she must obtain NRC's preliminary comments on the sufficiency of DOE's site investigation for the purpose of a license application. NRC provided these comments in writing on November 13, 2001. From the beginning of the formal investigation of Yucca Mountain, therefore, NRC has been reviewing DOE's investigation activities, concentrating on the scientific and technical issues that need to be understood and clarified so that DOE will have adequate information for a license application. Finally, the Board's principal charge is to evaluate the technical and scientific validity of DOE's investigation of Yucca Mountain to ensure that the investigation is technically sound and scientifically credible. The Board must report to the Congress and the Secretary of Energy at least twice a year on issues surrounding the site investigation. Each of the Board's 11 members is appointed by the President from a list of candidates recommended by the National Academy of Sciences. Board members serve part-time and are assisted by a permanent staff.

In addition to the investigation of Yucca Mountain, the nuclear waste program includes preparations for eventually accepting and transporting spent fuel and other highly radioactive wastes from storage sites. Upon receipt of wastes at the site, DOE would put the wastes in metal containers and put the loaded containers in the repository. Both the natural features of the site and the design and materials of the waste containers and other engineered components of the repository system would contribute to restricting the release of radioactive materials from the repository over the 10,000-year period required by EPA's health and safety standards.

If DOE determines that the site is suitable for the development of a repository, according to the Nuclear Waste Policy Act, the Secretary may then recommend the site to the President at least 30 days after notifying the state of Nevada of the impending recommendation. However, before the Secretary may recommend the site to the President, the act requires that he hold local public hearings to inform the residents of the area and receive their comments on a possible site recommendation. DOE held the public hearings from May 2001 to December 2001. In addition, according to the Nuclear Waste Policy Act, the Secretary must prepare a

comprehensive statement of the basis for the site's recommendation that includes, among other things, the following:

- NRC's preliminary comments on the sufficiency of the site investigation for a license application.
- Descriptions of the proposed repository and waste form or packaging and a discussion of the information obtained from the site investigation.
- An environmental impact statement prepared for the site along with the comments on the statement by the Department of the Interior, the Council for Environmental Quality, the EPA, and NRC.
- The views and comments of Nevada's governor and legislature and the Secretary's response to them.

If, after receiving a site recommendation from the Secretary of Energy, the President considers the Yucca Mountain site qualified for an application for construction authorization (a license) for a repository, then the President shall submit a recommendation of the site to the Congress. The Nuclear Waste Policy Act does not specify a time frame in which the President must act. However, the President's recommendation, if made, is automatically approved after 60 days unless Nevada's governor and legislature notify the Congress of their disapproval of the site. In that event, the site would not be approved unless the Congress enacted, within 90 days of continuous session, legislation overriding the state's disapproval. If the site is recommended and approved, the act requires the Secretary to submit a license application to NRC not later than 90 days after the effective date of the site's approval. NRC is required to issue or deny a license not later than 3 years after receiving a license application, unless it extends this period by not more than 1 year by reporting its reasons for doing so to the Secretary and the Congress.

## It May Be Premature for DOE to Make a Site Recommendation

Although within his discretion, it may be premature for the Secretary of Energy to make a site recommendation in the near future because DOE is currently not prepared to submit an acceptable license application to NRC within the statutory limits that would take effect if the President recommended the site to the Congress within the next several years. DOE has entered into almost 300 agreements with NRC to gather and/or analyze additional technical information in preparation for a license application. DOE is also continuing to address technical issues raised by the Board. In September 2001, Bechtel completed a detailed reassessment of the plan for completing the necessary technical work for DOE and proposed January 2006 as the date when DOE would be ready to submit an acceptable license application to NRC. DOE has not accepted this estimate

because, according to program officials, it would extend the license application date too far into the future. Instead, DOE is considering accepting only the planned work for fiscal year 2002 and asking the contractor to replan the work remaining to be completed after that fiscal year until the submission of a license application to NRC. Under the Nuclear Waste Policy Act and DOE's guidelines, while a site recommendation and a license application are separate processes, DOE will need to use essentially the same data for both.[4] Also, the act states that the recommendation that the President would make to the Congress is that he considers the site qualified for an application to NRC for a license. The President's recommendation also triggers an express statutory time frame that requires DOE to submit a license application to NRC within about 5 to 8 months. As a result, we believe that DOE should consider these factors in deciding when to make a site recommendation to the President. On the basis of the information we reviewed, DOE will not be able to submit an acceptable application to NRC within the express statutory time frames for several years because it will take that long to resolve many technical issues.

## DOE Lacks Information for a License Application

Over the last 2 years, staff of DOE and NRC negotiated 293 agreements covering specific pieces of additional technical work that DOE agreed to perform as a part of preparing a license application that NRC would accept. Such agreements address areas of study within the program where NRC's staff determined that DOE needs to collect more scientific data and/or improve its technical assessment of the data. According to NRC's tracking system for the 293 agreements, as of November 30, 2001, NRC had received and is reviewing the information related to 47 of these agreements and DOE had completed work on another 15 of the agreements to NRC's satisfaction. Many of the technical issues that were the subject of the 293 agreements between DOE and NRC have also been of concern to the Board since it began reporting on the Yucca Mountain project in 1990. According to officials from NRC's waste management division, these issues generally relate to uncertainties about three aspects of the long-term performance of the proposed repository: (1) the expected lifetime of engineered barriers, particularly the waste containers; (2) the physical properties of the Yucca Mountain site; and (3) the supporting

[4] See *General Guidelines for the Recommendation of Sites for Nuclear Waste Repositories; Yucca Mountain Site Suitability Guidelines* (preamble), 66 *Fed. Reg.* 57298, 57322 (Nov. 14, 2001).

information for the mathematical models used to evaluate the performance of the planned repository at the site.

The uncertainties related to engineered barriers revolve largely around the longevity of the waste containers that would be used to isolate the wastes. DOE currently expects that these containers would be constructed with a nickel-chromium alloy that would isolate the wastes from the environment for more than 10,000 years. Minimizing uncertainties about the container materials and the predicted performance of the waste containers over this long time period is especially critical because DOE's estimates of the repository system's performance depend heavily on the waste containers, in addition to the natural features of the site, to meet NRC's licensing regulations and EPA's health and safety standards. As part of its agreements with NRC, DOE will continue its research on the expected rate of corrosion of the container material and the anticipated effects of corrosion on the performance of the repository system. In addition, DOE formed a peer review panel to address uncertainties about how materials for waste containers would be expected to perform over time in the repository.[5] A September 2001 interim report by the panel found no evidence thus far to rule out the use of the proposed container materials but noted that significant work is needed to substantiate the technical basis for predicting the stability of these materials. The report also stated that the uncertainty about the containers' long-term performance probably could be reduced substantially through further experiments and analysis.

The uncertainties related to the physical characteristics of the site involve a wide variety of issues. According to DOE officials, while some of these issues have been and are continuing to be studied by DOE, remaining uncertainties include

- the faulting and fracturing of the repository rock over time;
- the flow of water through the heated portion of the repository;
- the flow of water through the saturated and unsaturated zones of the repository under natural (prerepository) conditions;[6]
- the stability of the repository under natural conditions, heated conditions, and conditions involving seismic events;

[5] The peer review comprised recognized experts from industry and academia.

[6] The saturated zone is that area beneath the repository that is saturated with groundwater. The unsaturated zone is above the water table.