- the movement of radioactive material through the repository in the event of a release of this material;
- the effect of volcanic activity on the repository; and
- the combined effects of heat, water, and chemical processes in and around the tunnels where the waste containers would be placed.

According to officials in DOE's repository project office, the amount of current scientific uncertainty within each of these areas varies. For example, the flow of water under natural conditions through the area where the repository would be located is relatively well understood. In contrast, there is much more current uncertainty about how the combination of heat, water, and chemical processes caused by the presence of nuclear waste in the repository would affect the flow of water through the repository.

The NRC staff's concerns over the supporting information for the mathematical models that DOE would use as its primary tool for assessing the performance of the repository revolved primarily around validating the models and verifying the information used in the models. Performance assessment is an analytical method that relies on computers to operate mathematical models to assess the performance of the repository against EPA's health and safety standards, NRC's licensing regulations, and DOE's guidelines for determining if the Yucca Mountain site is suitable for a repository. DOE uses the data collected during site characterization activities to model how a repository system, comprising both natural and engineered features, would perform at the Yucca Mountain site. Some of DOE's mathematical models describe the behavior of individual physical and chemical processes, such as how quickly water might travel from the surface to the repository. DOE then links the results of these individual models together into a computer model representing the performance of the overall repository system. DOE then uses this model, called a "performance assessment model," to estimate the release of radioactivity from a repository under a range of conditions and over thousands of years. The model also enables DOE to forecast the dose of radiation to hypothetical persons living in the vicinity of the repository and compare them with EPA's health and safety standards. DOE's agreements with NRC are centered on validating the models—presenting information to provide confidence that the models are valid for their intended use—and verifying the information that has been collected during the site investigation and used in these models.

In addition to the NRC staff's concerns about DOE's models, NRC's Advisory Committee on Nuclear Waste has raised concerns about the

adequacy of the performance assessment model that DOE used to support the information discussed in the technical documents it has issued to support a site recommendation.[7] In a September 18, 2001, letter to the chairman of NRC, the committee concluded that the model did not provide a basis for estimating performance and did not inspire confidence in the modeling process. The committee's conclusions were based on its concern that the modeling

- is guided by an inconsistent set of assumptions, including a mixture of conservative and nonconservative bounding assumptions, that do not represent realistic conditions and
- relies on many assumption-based computations and analyses that do not support or link the assumptions with available evidence.

According to the director of DOE's repository project office, the additional work surrounding the 293 agreements with NRC's staff is an insignificant addition to the extensive amount of technical work already completed. Moreover, this official does not expect that completing the additional technical work will change DOE's current performance assessment of a repository at Yucca Mountain. Also, in commenting on a draft of our report, DOE stated that it has compiled an enormous body of scientific and technical work over the last 2 decades including some 600 papers cited in one of the recently published reports. The Department also cited a substantial body of analytic literature it has published in recent years.[8]

From NRC's perspective, however, the agreements provided the basis for it to give DOE, as required by the Nuclear Waste Policy Act, its preliminary comments on the sufficiency of DOE's investigation of the Yucca Mountain site for inclusion in a future license application. In a November 13, 2001, letter to the Under Secretary of Energy, the Chairman of the NRC commented that

"[a]lthough significant additional work is needed prior to the submission of a possible license application, we believe that agreements reached between DOE and NRC staff

[7] The committee, established by NRC to advise it on nuclear waste regulatory issues, comprises experts in several disciplines, including risk assessment.

[8] DOE mentioned its Viability Assessment (1998), Preliminary Site Suitability Evaluation (2001), Supplemental Science and Performance Analyses (2001), Draft Environmental Impact Statement (1999), and Supplement to the draft EIS (2001).

regarding the collection of additional information provide the basis for concluding that development of an acceptable license application is achievable."

The NRC Chairman's letter also pointed out that NRC's Advisory Committee on Nuclear Waste noted, similar to the NRC staff, that substantial additional work by DOE is needed prior to its submission of a license application.

Since its first report to the Congress and Secretary of Energy in 1990, the Board has consistently raised issues and concerns over DOE's understanding of the expected lifetime of the waste containers, the significance of the uncertainties involved in the modeling of the scientific data, and the need for an evaluation and comparison of a repository design having a higher temperature with a design having a lower temperature. The Board continues to reiterate these concerns in correspondence to DOE's director of the nuclear waste program and in its reports to the Congress and the Secretary of Energy. For example, in an August 2000 letter to the Subcommittee on Energy and Power, House Committee on Commerce, the Board reported that the technical basis for DOE's long-term projections of repository performance had "critical weaknesses." The Board explained that some of the large uncertainties about the proposed repository's performance over thousands of years—including the estimated corrosion rates of waste containers and predicted behavior of the geologic system—were greater at the higher temperatures that would result from DOE's design of the repository. At a January 2001 public meeting with DOE, the Board told DOE that to determine whether the Yucca Mountain site is suitable for use as a repository, DOE must focus its attention on four priority issues: (1) quantifying the uncertainties in the models used to estimate the repository's performance; (2) gaining a further understanding of the processes related to the corrosion of waste containers; (3) evaluating and comparing a repository design having a higher temperature with a design that has a lower temperature; and (4) developing evidence other than performance assessment modeling to support the estimates of repository performance.

In October 2001, the Board reported that, despite DOE's progress in responding to the Board's concerns, gaps in data and analyses make evaluation of DOE's technical bases on whether to recommend the site more difficult. The Board provided several examples of these gaps. First, the Board noted that DOE has not yet completed a comparison, promised in a May 30, 2001, letter to the Board, between a high-temperature and a low-temperature repository design. The Board explained that a design with a lower temperature has the potential to reduce the level of

uncertainty in DOE's modeling results. Second, DOE does not appear to have implemented the Board's suggestion, made in two previous letters to DOE, to examine more closely the contribution that each piece of natural and engineered barriers makes to the repository's overall performance. Third, the Board observed that DOE had not presented a clear and persuasive rationale for going forward with a site recommendation before resolving the important issue of the potential consequences to the repository from volcanic activity. Last, the Board asked that, if the analyses referred to in the letter would not be available before DOE's decision on whether to recommend the site to the President, DOE provide its rationale explaining why the analyses are not important for site recommendation as well as any plans for subsequently conducting the work if the site were recommended and approved for repository development.

Recent reports to DOE by the U.S. Geological Survey and an international peer review team provide further insights into DOE's site investigation. An October 2001 letter from the U.S. Geological Survey (USGS), which has long played an active role in the site investigation, stated that the scientific work performed to date supports a decision to recommend the site for development as a repository. However, USGS qualified its position by noting that it was commenting only within the scope of its earth science expertise and was neutral regarding other information the Secretary might consider. USGS also pointed out that additional studies need to be performed even after a site recommendation.

In November 2001 an international peer review panel released an executive summary of the results of its review of DOE's performance assessment modeling for a potential site recommendation. The panel, which performed the review at DOE's request, was organized by the Nuclear Energy Agency of the Organization for Economic Cooperation and Development and the International Atomic Energy Agency of the United Nations. The panel did not comment on the results of DOE's modeling efforts but found that DOE's methodology is soundly based and implemented in a competent manner. Overall, the panel stated, DOE's approach provides an adequate basis for supporting a statement on likely compliance within the regulatory period of 10,000 years and for a site recommendation decision. The panel also qualified its findings, however, by stating that the findings were based on a brief review and not an in-depth analysis. The panel also called for a number of improvements in DOE's approach to performance assessment, including demonstrating an understanding of the behavior of the overall repository system rather than

focusing on the numerical results of the assessment, and identifying and treating all types of uncertainty in the modeling.

As recently as May 2001, DOE projected that it could submit a license application to NRC in 2003. It now appears, however, that DOE may not complete all of the additional technical work that it has agreed to do to prepare an acceptable license application until January 2006. In September 2001, Bechtel completed, at DOE's direction, a detailed reassessment in an effort to reestablish a cost and schedule baseline. Bechtel estimated that DOE could complete the outstanding technical work agreed to with NRC and submit a license application in January 2006. This estimate was based on guidance from DOE that, in part, directed the contractor to assume annual funding for the nuclear waste program of $410 million in fiscal year 2002, $455 million in fiscal year 2003, and $465 million in fiscal year 2004 and thereafter. DOE has not accepted this estimate because, according to program officials, the estimate would extend the date for submitting a license application too far into the future. Instead, DOE is now considering accepting only the fiscal year 2002 portion of Bechtel's detailed work plan and requesting Bechtel to prepare another work plan for fiscal year 2003 through submission of a license application.

## Essentially the Same Information Is Needed for a Site Recommendation and a License Application

Under the Nuclear Waste Policy Act and DOE's site suitability guidelines, while the site recommendation and a license application are separate processes, DOE will need to use essentially the same data for both. Further, site recommendation and license application are connected by law with specific timeframes that require DOE to submit a license application to NRC within about 5 to 8 months once the President considers the site qualified for a license application and makes a site recommendation to the Congress.

Under the act, DOE's site characterization activities are to provide information necessary to evaluate the Yucca Mountain site's suitability for submitting a license application to NRC for placing a repository at the site. In implementing the act, DOE's guidelines provide that the site will be suitable as a waste repository if the site is likely to meet the radiation protection standards that NRC would use to reach a licensing decision on the proposed repository. Thus, as stated in the preamble (introduction) to DOE's guidelines, DOE expects to use essentially the same data for the site recommendation and the license application.

In addition, the act specifies that, having received a site recommendation from the Secretary, the President shall submit a recommendation of the

site to the Congress if the President considers the site qualified for a license application. Under the process laid out in the Nuclear Waste Policy Act, once the Secretary makes a site recommendation, there is no time limit under which the President must act on the Secretary's recommendation. However, once the President makes a recommendation to the Congress that it approve the site, specific statutory time frames are triggered for the next steps in the process. Figure 1 shows the approximate statutory time needed between a site recommendation and submission of a license application and the additional time needed for DOE to meet the conditions for an acceptable license application. For illustrative purposes, figure 1 assumes that the Secretary recommends the site to the President on January 30, 2002 and the President recommends the site to the Congress 6 months later on July 30, 2002. The figure also assumes that Nevada disapproves the site but that the Congress overrides the state's disapproval. As shown in the figure, Nevada has 60 days to disapprove the site, and if disapproved, the Congress has 90 days (of continuous session) in which to enact legislation overriding the state's disapproval. If the Congress overrides the state's disapproval and the site designation takes effect, the next step is for the Secretary to submit a license application to NRC within 90 days after the site designation is effective. On the basis of Bechtel's latest program reassessment, DOE would be in a position to submit a license application to NRC in January 2006.

These statutory time frames provide about 150 to 240 days, or about 5 to 8 months, from the time the President makes a recommendation to DOE's submittal of a license application. DOE, however, will not be ready to file an acceptable application with NRC for several years.[9] (See fig. 1.) Therefore, the Secretary of Energy should consider the timing of this statutory process as he decides when to make a site recommendation to the President.

[9] In the congressional conference report on fiscal year 2002 appropriations for energy and water development, the conferees stated that they expect DOE to deliver the final site recommendation report and environmental impact statement to the Congress by Feb. 28, 2002. They recognized that certain scientific and engineering work is directly related to the site's recommendation and to resolving technical concerns of NRC and the Board, and that "such work should not automatically terminate upon submission of the site recommendation." H.R.Rep. No. 107-258, at 122 (2001).

**Figure 1: Comparison of Statutory Site Approval Process With DOE's Projected Schedule**




[a]No prescribed statutory time frame.

[b]90 calendar days of continuous session of the Congress.

## DOE Is Unlikely to Open a Repository in 2010 as Planned

DOE, in a document that would support a potential site recommendation, states that it may be able to open a repository at Yucca Mountain in 2010. This expectation is predicated on the submission of a license application to NRC in 2003, receipt of the construction authorization in 2006, and construction of enough surface and underground facilities to begin putting wastes into the repository in 2010. However, according to Bechtel's September 2001 detailed reassessment of the nuclear waste program, in which it proposed to reestablish a baseline for the program, a more realistic date for submitting the license application may be January 2006. Reestablishing the program's baseline is necessary because DOE stopped using the baseline to manage the program in March 1997. Since then, program officials have used revised estimates for the license application date in various internal and external reports, but none of these changes were approved as required and the program's cost and schedule baseline has never been revised to reflect these changes. As a result, DOE does not have a baseline estimate of the program's schedule and cost that is based on all the work that it expects to complete through the submission of a license application. Because of uncertainty over when DOE may be able to open the repository, the Department is exploring alternatives that might still permit it to begin accepting commercial spent fuel in 2010.

## DOE's Current License Application Milestone Date Is Not Supported by the Program's Baseline

In its most recent report on the program's estimated cost, DOE states that it expects to submit the application to NRC in 2003.[10] This date reflects a delay in the license application milestone date last approved by DOE in March 1997 that targeted March 2002 for submitting a license application. The 2003 date was not formally approved by DOE's senior managers or incorporated into the program's cost and schedule baseline, as required by the management procedures that were in effect for the program. At least three extensions for the license application date have been proposed, but none of the three proposals have been approved as required.

DOE designates some of its programs and projects, such as the nuclear waste program, to receive special attention from senior DOE managers because of the complexity or estimated costs of the programs and projects. DOE's guidance for managing these designated programs and projects requires, among other things, that senior managers establish a baseline for managing the program or project. The baseline describes the program's mission—in this case, the safe disposal of highly radioactive waste in a geologic repository—and the expected technical requirements, schedule, and cost to complete the program. Procedures for controlling changes to an approved baseline are designed to ensure that program managers consider the expected effects of adding, deleting, or modifying technical work, as well as the effects of unanticipated events, such as funding shortfalls, on the project's mission and baseline. In this way, alternative courses of action can be assessed on the basis of each action's potential effect on the baseline. DOE's procedures for managing the nuclear waste program require that program managers revise the baseline, as appropriate, to reflect any significant changes to the program.

After March 1997, according to DOE officials, they did not always follow these control procedures to account for proposed changes to the program's baseline, including the changes proposed to extend the date for license application. According to these same officials, they stopped following the control procedures because the Secretary of Energy did not approve proposed extensions to the license application milestone. As a result, the official baseline did not accurately reflect the program's cost and schedule to complete the remaining work necessary to submit a license application.

[10] See *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program* (DOE/RW-0533, May 2001).

In November 1999, the Yucca Mountain site investigation office proposed extending the license application milestone date by 10 months, from March to December 2002, to compensate for a $57.8 million drop in funding for fiscal year 2000. According to the specific management procedures that DOE adopted for the nuclear waste program, a proposed extension in the license application milestone required the approval of both the Director of the nuclear waste program and the Secretary of Energy. Neither of these officials approved this proposed change nor was the baseline revised to reflect this change even though the Director subsequently began reporting the December 2002 date in quarterly performance reports to the Deputy Secretary of Energy.

Less than a year later, in September 2000, the site investigation office once again proposed an extension to the license application milestone to July 2003 because of reduced funding and added technical work. Then, in February 2001, the site investigation office proposed another extension in the milestone, to December 2003. As with the November 1999 extension request, neither the Director of the nuclear waste program nor the Secretary of Energy approved either of the latter two requests, nor was either extension date for the license application milestone incorporated into the baseline for the program. Furthermore, as with the November 1999 proposed change, DOE began to use the unapproved milestone dates in both internal and external reports and communications. For example, the Director used the unapproved 2003 date for submitting a license application twice in congressional testimony in May 2001. Later, in a September 2001 memorandum to the DOE Under Secretary discussing the goals of the nuclear waste program through January 2005, the Director established 2004 as his goal for submitting a license application.

Because senior managers did not approve these proposed changes for incorporation into the baseline for the program, program managers did not adjust the program's cost and schedule baseline. By not accounting for these and other changes to the program's technical work, milestone dates, and estimated costs in the program's baseline since March 1997, DOE has not had baseline estimates of all of the technical work that it expected to

complete through submission of a license application and the estimated schedule and cost to complete this work.[11]

When Bechtel was contracted to manage the nuclear waste program, one of its first assignments was to document the remaining technical work that had to be completed to support the submission of a license application and to estimate the time and cost to complete this work. The contractor's revised, unofficial baseline for the program shows that it will take until January 2006 to complete essential technical work and submit an acceptable license application. DOE also estimated that completing the remaining technical work would add about $1.4 billion to the cumulative cost of the program, bringing the total cost of the Yucca Mountain project's portion of the nuclear waste program to $5.5 billion.[12] As noted above, DOE has not accepted Bechtel's proposed new baseline extending out until January 2006. Instead, DOE is considering accepting, at present, only that portion of the baseline that Bechtel proposed to complete in fiscal year 2002.

## Extension of License Application Date Will Likely Postpone 2010 Repository Goal

An extension of the license application date to 2006 would almost certainly preclude DOE from achieving its long-standing goal of opening a repository in 2010. According to DOE's May 2001 report on the program's estimated cost, after submitting a license application in 2003, DOE estimates that it could receive an authorization to construct the repository in 2006 and complete the construction of enough surface and underground facilities to open the repository in 2010, or 7 years after submitting the license application. This 7-year estimate from submittal of the license application to the initial construction and operation of the repository assumes that NRC would grant an authorization to construct the facility in 3 years, followed by 4 years of construction. Assuming these same estimates of time, submitting a license application in January 2006 would extend the opening date for the repository until about 2013.

[11] In 1998 and 2000, independent cost and schedule reviews of the program were performed by DOE contractors. On the latter review, the contractor concluded that DOE's schedule for licensing, constructing, and opening the repository by 2010 was optimistic by about 2 years and that DOE's estimate of the total cost of the program over its 100-plus-year lifetime—$58 billion (2000 dollars)—was understated by about $3 billion.

[12] DOE estimated that the program cost $4.1 billion, on the basis of year-of-expenditure dollars from the program's inception in 1983 through March 2002. The $5.5 billion estimate for the license application is based on year-of-expenditure dollars from 1983 through January 2006.

Furthermore, opening the repository in 2013 may be questionable for several reasons. First, a repository at Yucca Mountain would be a first-of-a-kind facility, meaning that any schedule projections may be optimistic. DOE has deferred its original target date for opening a repository from 1998 to 2003 to 2010. Second, although the Nuclear Waste Policy Act states that NRC has 3 years to decide on a construction license, a fourth year may be added if NRC certifies that it is necessary. Third, the 4-year time period for construction that DOE's current schedule allows from the issuance of a construction authorization to the opening of the repository may be too short. For example, a contractor hired by DOE to independently review the estimated costs and schedule for the nuclear waste program reported that the 4-year construction period was too optimistic and recommended that the construction phase be extended by a year-and-a-half.[13] Bechtel anticipates a 5-year period of construction between the receipt of a construction authorization from NRC to the opening of the repository. Thus, on the bases of a 4-year licensing period and a 5-year period for initial construction, the repository might not be ready to open until about 2015 if DOE does not apply for a license until January 2006.

Finally, these simple projections do not account for any other factors that could adversely affect this 7- to 9-year schedule for licensing, constructing, and opening the repository. Annual appropriations for the program in recent years have been less than $400 million. In contrast, according to DOE, it needs between $750 million to $1.5 billion in annual appropriations during most of the 7- to 9-year licensing and construction period in order to open the repository on that schedule. In its August 2001 report on alternative means for financing and managing the program, DOE stated that unless the program's funding is increased, the budget might become the "determining factor" whether DOE will be able to accept wastes in 2010.[14]

[13] See *Independent Cost Estimate Review of the Civilian Radioactive Waste Management Program, 2001 Total System Life Cycle Cost* (Jan. 2001).

[14] See *Alternative Means of Financing and Managing the Civilian Radioactive Waste Management Program* (DOE/RW-0546, Aug. 2001).

## DOE Is Reviewing Alternative Ways to Accept Wastes in 2010

Because of the uncertainty of achieving the 2010 goal for opening the Yucca Mountain repository, DOE is examining alternative approaches that would permit it to meet the goal. In May 2001, DOE released a report on potential options for constructing and operating the repository.[15] It is also sponsoring a National Research Council study on possible approaches to developing a repository in stages over a longer duration.

DOE's May report evaluates a range of approaches to developing and operating the repository system and strategies for implementing these approaches. For example, to reduce the uncertainties of receiving substantially higher appropriations needed to open the repository as planned, DOE examined approaches that might permit it to begin accepting wastes at the repository site in 2010 while spreading out the construction of repository facilities over a longer time period. The study recommended developing the repository on a modular basis, separating the rate of accepting wastes at the repository site from the rate of waste emplacement in the underground disposal areas by relying on the surface storage of received wastes until the capacity to move wastes into the repository has been increased. For example, relatively modest-sized surface facilities to handle wastes could be expanded later to handle larger volumes of waste. Such a modular approach, according to the study results, would permit partial construction and limited waste emplacement in the repository, at lower than earlier estimated annual costs, in advance of the more costly construction of the facility as originally planned. Also, by implementing a modular approach, DOE would be capable of accepting wastes at the repository earlier than if it constructed the repository described in documents, such as the Science and Engineering Report that the Secretary would use to support a site recommendation.

In addition, DOE has contracted with the National Research Council to provide recommendations on design and operating strategies for developing a geologic repository in stages, which is to include reviewing DOE's modular approach. The Council is addressing such issues as the

- technical, policy, and societal objectives and risks for developing a staged repository;

[15] See *CRWMS Modular Design/Construction and Operation Options Report* (DOE/OCRWM, TDR-CRW-MD-000002, Rev. 03, May 2001).

- effects of developing a staged repository on the safety and security of the facility and the effects on the cost and public acceptance of such a facility; and
- strategies for developing a staged system including the design, construction, operation, and closing of such a facility.

The Council expects to publish interim and final reports on the study in about March 2002 and December 2002, respectively.

In part, DOE's desire to meet the 2010 goal is linked to the court decisions that the Nuclear Waste Policy Act, as implemented by DOE's contracts with owners of commercial spent fuel, obligated DOE to begin accepting spent fuel from contract holders not later than January 31, 1998, or be held liable for damages. Courts are currently assessing the amount of damages that DOE must pay to holders of spent fuel disposal contracts. Estimates of potential damages for the estimated 12-year delay from 1998 to 2010 range widely from the Department's estimate of $2 billion to $3 billion to the nuclear industry's estimate of at least $50 billion. The damage estimates are based in part on the expectation that DOE would begin accepting spent fuel from contract holders in 2010. The actual damages could be higher or lower, depending on when DOE begins accepting spent fuel.

## Conclusions

In addition to studying the Yucca Mountain site, DOE is taking the other steps, such as public hearings and obtaining NRC's sufficiency comments, that are required for the Secretary to make a site recommendation in the near future. Making a site recommendation at this time, however, may be premature. Under the Nuclear Waste Policy Act and DOE's siting guidelines, a site recommendation and a license application will need to be based on essentially the same data. Furthermore, the act lays out a process with specific time frames that requires DOE to submit a license application to NRC within about 5 to 8 months after the President makes a site recommendation to the Congress. DOE's contractor estimates that it will not have all of the additional information that NRC has said will be needed for an acceptable license application for another 4 years. Waiting until DOE is closer to submitting a license application for the additional information would put DOE in a position to be able to submit a license application that is acceptable to NRC within the time frames set out in the law, and to be able to better respond to questions and challenges that may emanate from the statutory review process subsequent to the President's recommendation.

Another benefit of waiting for the additional technical information is that the repository's design and development schedule described in the documents that support a site recommendation may not describe the facilities that DOE would actually develop. These documents generally describe surface and underground facilities that DOE would design and build on a schedule permitting it to open the repository in 2010. This schedule, however, is unrealistic if one assumes that DOE's existing prelicensing and construction time frames continue to be valid. This uncertainty is compounded by questions about whether DOE can obtain the increases in annual funding required to meet its schedule. On the other hand, a compelling incentive exists to open the repository in 2010 because DOE is liable for damages, in amounts not yet determined by the courts, for not beginning to accept utilities' spent fuel by 1998. The damage amounts will in part be based on when DOE can begin to accept and deliver spent fuel to the repository. For these reasons, DOE is exploring alternative approaches to developing a repository, such as initially storing spent fuel at the repository site before constructing underground disposal facilities that could still enable it to accept spent fuel by 2010. Thus, deferring a site recommendation until DOE has substantially completed the remaining technical work needed for an acceptable license application would also enable DOE to complete its consideration of alternative approaches to developing a repository at Yucca Mountain. DOE could then ensure that the site recommendation is based on the approach that the Department intends to follow. This would enable DOE to develop the estimated schedule to design and build the preferred approach and estimate its cost, including the annual funding requirements, as part of the information on which to make a site recommendation.

DOE needs to reestablish a baseline for the nuclear waste program that accounts for all of the outstanding technical work needed to prepare an acceptable license application and the estimated schedule and cost to achieve this milestone. In conjunction with reestablishing a baseline for the program, DOE needs to resume using the baseline as a tool for managing the program, in accordance with the Department's policies and procedures for managing major projects.

## Recommendations for Executive Action

To ensure that DOE will be prepared to submit an acceptable license application within the timeframes set out in the Nuclear Waste Policy Act, the Secretary of Energy should consider (1) deferring a site recommendation until it can meet the express statutory time frames that are triggered by a site recommendation by the President to the Congress and (2) including the results of DOE's ongoing technical work for NRC and