# In the United States Court of Federal Claims

No. 98-126 C
(Filed May 19, 2004)

******************************
YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,

v.

THE UNITED STATES, Defendant.
******************************

**ORDER**[1/]

On May 13, 2004, the court held a pre-trial conference at which several motions *in limine* were argued, along with plaintiffs' Motion for Leave to Substitute Ivan F. Stuart as an Expert Witness in Place of Charles W. Pennington and to Subpoena Dan M. Collier.

**DISCUSSION**

I. Motions in Limine

Defendant seeks to prevent plaintiffs from introducing evidence of either the fair rental value or fair market value of plaintiffs' real property in support of plaintiffs' takings damage claim. In response, plaintiffs concede that because they will not be pursuing a fair rental value damage claim at trial, evidence of fair rental value will not and should not be presented. On the other hand, plaintiffs insist that evidence of fair market value is probative on damages, and the tax assessment records to be proffered as supportive exhibits are appropriate.

---

[1/] This should also be deemed applicable in *Connecticut Yankee v. United States*, No. 98-154 and *Maine Yankee v. United States*, No. 98-474.

A. Fair rental value

As plaintiffs represent they have withdrawn their request for damages based on the fair rental value of the property allegedly taken by defendant's failure to commence pick-up of spent nuclear fuel, the government's motion *in limine* is so granted in part.

B. Fair market value

Defendant's motion *in limine* also seeks to exclude evidence of the fair market value of plaintiffs' property allegedly taken by the defendant's indefinite and perhaps permanent storage of plaintiffs' spent nuclear fuel ("SNF") and Greater-Than-Class C ("GTCC") waste in Independent Spent Fuel Storage Installations ("ISFSIs") which are permanent, fixed, dry storage structures on the respective plaintiffs' real property. Defendant argues first that evidence of the fair market value of the property is inadmissible because plaintiffs are asserting a partial breach of contract, which is akin to a temporary rather than a permanent taking. Defendant posits that the remedy for a temporary taking is fair rental value (evidence of which is inadmissible by virtue of this Order) and fair market value is the remedy for a permanent taking which this case does not present. Secondly, defendant requests the court strike plaintiffs' proposed exhibits on fair market value asserting they are inadmissible.

Plaintiffs taking claims remain viable. See Order of June 26, 2003. Plaintiffs argue their claim is for a permanent, not a temporary taking, which is not inconsistent with their theory of partial breach of contract. Even if plaintiffs' claim is for partial rather than total breach, however, the total/partial segment label may or may not apply *ipso facto* to a takings analysis, and defendant's argument and authorities are inapplicable. The presence of issues regarding the government's long term policy with respect to the disposition of Greater than Class C waste, SNF and/or other High Level Nuclear Waste counsels against resolving the nature and extent of any damages prior to the conclusion of trial proceedings. Accordingly, pending review of the trial testimony, exhibits and argument thereon, the court is not prepared to determine whether or not fair market value evidence would result in any "taking" determination.

As for the admissibility of the particular exhibits targeted by defendant's motion, plaintiffs' proposed exhibits on fair market value are:

(1) for plaintiff Maine Yankee, an appraisal report by Norman A. Gosline and Gosline + Company (dated April 1, 1997 and April 1, 1998) and a supplemental report by the same company;

(2) for plaintiff Yankee Atomic, tax bills from the Rowe, Massachusetts Office of the Collector of Taxes and an equalized valuation for each city and town in Massachusetts by the Massachusetts Department of Revenue; and

(3) for plaintiff Connecticut Yankee, a valuation analysis prepared by Sylvester & Company, LLC.

Plaintiffs plan on introducing these documents through their Vice Presidents and Chief Financial Officers, Thomas W. Bennet, Jr. for Yankee Atomic and Connecticut Yankee, and Michael E. Thomas for Maine Yankee, identified as lay witnesses in various topics including ". . . valuation matters pertaining to the taking of Yankee Atomic's real property." Plaintiffs' Witness List dated March 28, 2003. Plaintiffs assert these documents can provide a basis for their testimony whether or not they are actually admitted into evidence, because as a property owner, these corporate officers may testify as to the value of their company's property. Fed. R. Evid. 702 (Advisory Committee Notes to 1972 Proposed Rules noting in part, certain "skilled" witnesses such as landowners may testify as to land values).

While conceding that a landowner may testify to its valuation, defendant counters that the underlying basis for the valuation must in any event be reliable. Here, defendant asserts that the underlying valuation documents are unreliable because the tax assessments are not akin to fair market value and may be motivated by a corporate desire to accommodate the remaining taxed citizenry. As for the Maine Yankee appraisals, defendant asserts they value the property in its hypothetical raw unimproved state, and assume the fiction that there are no hazardous waste sites on or nearby that would negatively impact valuation. As for Connecticut Yankee, defendant assails the appraisals again as they were for tax assessment purposes. Defendant complains that the tax records evidence for Yankee Atomic is not self-authenticating unless it is under seal and properly certified, citing Fed. R. Evid. 902(1). The court concludes these documents may be admissible under the business or public records exceptions to the hearsay rule and will not be excluded at this stage of the proceedings. Fed. R. Evid. 803(6) and (8).

Defendant's objection that the respective corporate Vice Presidents and Chief Financial Officers were not identified as experts is not well taken; defendant was duly notified that they will testify on real property valuation matters. Moreover, the parties should be able to resolve issues concerning the authentication of the tax records through stipulation, or else compliance with Fed. R. Evid. 902. It is also noted that plaintiffs intend to comply with Fed. R. Evid. 902(1) should defendant continue to question authentication of documents offered. While remaining questions of admissibility will be resolved at trial, the court will not at this juncture preclude plaintiffs from attempting to introduce this evidence and defendant's motion *in limine* on the foregoing grounds is denied. On the submissions to date it is concluded that defendant's objections go to the weight of the evidence, not its admissibility. Although defendant is apparently not offering alternative valuations on the real properties, the areas of appraisal or tax concern may, of course, be explored in cross-examination.

II. Motion for Leave to Substitute Expert Witness and to Subpoena Fact Witness

Plaintiffs also seek to substitute Ivan F. Stuart ("Stuart") as an expert witness in lieu of Charles W. Pennington ("Pennington"), because Pennington's employer, NAC International ("NAC"), wishes to discontinue providing expert witnesses in all spent fuel litigation. Pursuant to RCFC 45(b)(2) plaintiffs also request leave to subpoena Dan M. Collier ("Collier"), a fact witness who resides outside the 100 mile subpoena radius.

Pennington became one of plaintiffs' expert witnesses when the court allowed his substitution for James P. Malone ("Malone") in its September 4, 2001 Order. Previously employed by NAC, Malone went to work for Exelon which at that time had one SNF case in the court but now has several. Exelon's general counsel, Robert E. Helfrich ("Helfrich"), asked for Malone's withdrawal. Helfrich, now NAC's general counsel, recently requested Pennington's withdrawal based on concerns of potential organizational conflict of interest raised, according to plaintiffs, in a government contract solicitation dated March 11, 2004, that states in part that the Department of Energy ("DOE") intends to award multiple fixed-price purchase orders for SNF casks and "may potentially exclude contractors 'who have been or are now involved in litigation, either administrative or judicial, against the DOE involving the Standard Contract of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR Part 961).'" Plaintiffs' Motion for Leave at 4. *See generally LeBoeuf, Lamb, Green &*

*MacRae, LLP v. Abraham*, 347 F.3d 315, 320-23 (D.C. Cir. 2003); *Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl.371, 2004 WL 905324 @ *6-7 (April 27, 2004). NAC does not want to take action which may impact its chance to obtain future government contracts with the DOE worth millions of dollars.

Stuart no longer works for NAC, thus eliminating concern of any institutional conflict with respect to his participation as a witness for plaintiffs. Plaintiffs represent that Stuart will adopt not only Pennington's expert report, but also all his (Pennington's) underlying factual support, and submitted Stuart's "Supplemental Expert Witness Report" with the Motion to Substitute. Pennington's report, based largely on data compiled by NAC according to plaintiffs, supplies data used in the expert witness report of Frank C. Graves ("Graves") and opines that the data is reliable.

Defendant does not object to a court-ordered subpoena for Collier, but does vehemently object to the substitution of Stuart, asserting that this is another example of plaintiffs' repeated attempts to burden the government with significant and previously undisclosed discovery while at the same time adhering to an aggressive trial schedule. Alternatively, defendant requests postponement of the trial date by six weeks, and an award of costs associated with the additional discovery necessitated by the substitution. Trial in this matter is set to commence on July 12, 2004.

Defendant also points out that although NAC's new business policy to end its expert witness services in spent fuel cases effective March 31, 2004 was in an April 6, 2004 letter from Helfrich to plaintiffs' counsel, plaintiffs' counsel did not disclose this fact in an April 12, 2004 status conference. At that conference, the court acknowledged defendant's concern with the final trial preparation period, but granted plaintiffs' request to take ten additional depositions with limitations as to their completion time. Despite knowledge of NAC's business decision obtained at the latest on April 6, 2004, the date of the letter, plaintiffs waited more than two weeks to file their motion to substitute.

According to defendant, Malones' original expert report related to costs associated with dry and wet storage, dry storage cask capacity, handling and transportation and fuel discharge. After his substitution as expert, Pennington was deposed for three days, from October 24 to October 26, 2001. Most of the examination was on the substance of his opinion rather than his qualifications. Stuart,

previously identified as an expert for plaintiffs, albeit not on the topics addressed by Malone, was also deposed concerning his qualifications and the bases for his expert opinions regarding the Department of Energy's ability to implement an acceptance schedule that would "ramp up" to up 3,000 metric tons per year. According to defendant, if Stuart is substituted for Pennington, to the extent he adopts the latter's expert opinions, Stuart will need to be deposed concerning that opinion and his qualifications for adopting them. Although Stuart has been deposed on acceptance issues, he has never been deposed on the substance of, and the underlying support for, Pennington's expert cost report. If Stuart were substituted at trial, he could not be impeached by Pennington's deposition; accordingly, a thorough deposition of Stuart would be necessary, akin to the three days granted for a supplemental deposition of defendant's technical expert, Edward Abbott ("Abbott"), the government points out.

Despite NAC's business concern about the nature, extent and economic ramifications of any potential organizational conflict of interest, Pennington has already provided extensive expert services in this case including three days of deposition. He has already "been . . . involved in litigation . . . against the DOE involving the Standard Contract of Spend Nuclear Fuel and/or High Level Radioactive Waste." The expert report was largely a company effort by NAC. The activity, which is considered to have a potential adverse impact, already exists. Were this activity subsequently considered to actually impact a contract award, the merits of the matter could be resolved in the context of a bid-protest. With trial less than two months away, the government would be prejudiced in the instant case by the substitution of an expert witness at this late date, particularly in view of the substantial additional pre-trial discovery burdens the court recently granted over the government's objection. *See Trilogy Communications v. Times Fiber Communications, Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997). Defendant represents that in his deposition, Pennington was unable to explain or support some underlying data, the "meat" of his expert opinion. If substitution were allowed, Stuart may have an opportunity to alter the approach to deal with the perceived omissions. Also, defendant would be unable to effectively impeach Stuart with Pennington's deposition. Therefore, even though plaintiffs represent Stuart would testify to the same opinion and the same underlying support as Pennington did, defendant would have to be afforded the right to explore both by deposing Stuart.

Moreover, plaintiffs request leave to subpoena Collier as a trial witness pursuant to RCFC 45(b)(2), a request the government does not oppose. Mr. Collier, a Senior

Vice President of NAC, is a fact witness, according to plaintiffs, residing in Atlanta. NAC asked that Collier be subpoenaed consistent with the same business policy concern about future contract awards. According to Plaintiffs' Witness List submitted on March 28, 2003, Collier will testify "'concerning the experiences of commercial nuclear utilities in trading commodities unique to their industry, particularly commodities that are part of the nuclear fuel cycle.'" Plaintiffs' Motion at 6. While testimony concerning commodity trading may or may not directly conflict with DOE's interest in litigation over the Standard Contract, any difference is one of degree. Presumably, Collier will testify in aid of plaintiffs and as such could be considered supportive of the utilities in litigation against DOE, the business concern plaintiffs report.[2/] As a subpoena is compulsion for a lay witness to testify, so it is for an expert. While plaintiffs assert it may be "potentially awkward" to subpoena Pennington, it may also be "awkward" to subpoena Collier.

Pennington's expert opinion is supportive; it goes to the accuracy of data relied upon by Graves, another expert witness. Fed. R. Evid. 703. To that extent, if plaintiffs determine this evidence is essential, but Pennington will not voluntarily appear to testify, then plaintiffs **are directed** to subpoena Pennington so as to obtain his reported expert testimony to assist the court in reaching a resolution of this complex litigation. Fed. R. Evid. 702.

Defendant's request for an updated deposition by Pennington to cover NAC's recently announced business decision concerning avoiding any potential organizational conflict of interest is denied. If defendant has time for another Pennington deposition, the argument against another Stuart deposition loses some substance. The basis for any reluctance to testify, if any, by Pennington, can be explored on cross-examination, to the extent this may be relevant to the expert testimony involved.

## CONCLUSION

Accordingly, for the reasons stated above, it is **ORDERED** that:

---

[2/] The court also notes that until March 31, 2004, Stuart, the proposed substitute expert, was an independent contractor for NAC.

(1) Defendant's Motion *in Limine* Regarding Takings Damages, filed February 19, 2004, is **GRANTED IN PART**, and **DENIED IN PART**, to the extent discussed above;

(2) Plaintiffs' Motion for Leave (1) to Substitute Ivan F. Stuart as an expert Witness in Place of Charles W. Pennington; and, (2) to Subpoena Dan M. Collier, filed April 23, 2004, is **GRANTED IN PART**, and **DENIED IN PART**, to the extent discussed above;

(3) The court will hear oral argument on the following motions on **Tuesday, June 21, 2004 at 2:00 p.m.** :

> (a) Defendant's Motion for Partial Summary Judgment Regarding Priority for Shutdown Reactors filed February 19, 2004;
>
> (b) Plaintiffs' Motion to Compel Production of Documents Pursuant to the Court's August 25, 2003 Order, filed March 12, 2004;
>
> (c) Defendant's Motion *in Limine* to Exclude Testimony and Evidence Regarding Plaintiffs' Request for Pre-Breach Damages filed February 20, 2004;
>
> (d) Defendant's Motion *in Limine* to Preclude the Presentation of Dr. Graves' Speculative Theory of 'Exchanges' at Trial in Support of Yankee Atomic's Claim for Damages filed February 20, 2004;
>
> (e) Defendant's Motion *in Limine* to Exclude the Expert Report and Testimony of John Bartlett filed February 19, 2004;

(4) Additional motions *in limine* mentioned by plaintiffs' counsel at the pre-trial conference and motions concerning future damages referenced by defendant's counsel shall be filed on or before **June 1, 2004**; Responses shall be filed on or before **June 11, 2004;** Replies shall be filed on or before **June 18, 2004.** The court will hear oral argument on these motions on **June 21, 2004 at 2:00 p.m.**;

(5) The Final Pre-Trial Conference will be held on **Tuesday, June 29, 2004 at 2:00 p.m.**

/s James F. Merow
James F. Merow
Senior Judge