**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-154 C<br>(Senior Judge Merow)<br><br>Filed electronically November 17, 2004 |

**CONNECTICUT YANKEE'S**
**PROPOSED FINDINGS OF FACT**

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
CONNECTICUT YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: November 17, 2004

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND OVERVIEW ....................................................................1

II. GENERAL FINDINGS ....................................................................3

III. TRIAL WITNESSES ....................................................................9

IV. DOE CONTRACT ....................................................................16

A. Background and Purpose ....................................................................16

B. Contractual Understandings and Intentions of the Parties Regarding Scheduling Issues ....................................................................21

C. Spent Fuel Acceptance ....................................................................27

D. 3000 MTU is a Reasonable Rate. ....................................................................29

E. Sequence of Spent Fuel Removal ....................................................................36

F. Shutdown Priority ....................................................................41

V. ISFSI DEVELOPMENT ....................................................................42

VI. FUEL STORAGE AT GE MORRIS ....................................................................60

VII. RERACKING ....................................................................61

VIII. GTCC WASTE ....................................................................65

A. Connecticut Yankee's GTCC Waste Is Covered By the Contract. ....................................................................66

B. Regardless of Whether GTCC Waste Is Covered By the Contract, DOE Would Have Accepted GTCC from Connecticut Yankee If It Had Accepted SNF. ....................................................................73

IX. GOOD FAITH AND FAIR DEALING ....................................................................77

X. DAMAGES ....................................................................78

XI. TAKINGS ....................................................................105

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-154 C<br>(Senior Judge Merow)<br><br>Filed electronically November 17, 2004 |

**CONNECTICUT YANKEE'S**
**<u>PROPOSED FINDINGS OF FACT</u>**

Plaintiff Connecticut Yankee Atomic Power Company ("Connecticut Yankee") submits the following post-trial Proposed Findings of Fact ("PFF").[1]

## I. <u>INTRODUCTION AND OVERVIEW</u>

1. Connecticut Yankee has already paid the Department of Energy ("DOE") approximately $41 million in fees required under the parties' contract ("Contract"), and Connecticut Yankee has performed or is ready to perform all its other contract obligations. Trial Transcript ("Tr.") 2304:17-19; Tr. 2306:12-15 (Bennet).

2. In the aggregate, utilities having similar contracts with DOE have paid the government over $20 billion (including accrued interest) to cover all appropriate costs of DOE's spent nuclear fuel ("spent fuel") and high level radioactive waste ("HLW") (together, "SNF") disposition program, but less than half that amount has been appropriated to the program. *See*

---

[1] Sections I-IV and VIII below are substantially similar to the Proposed Findings in *Yankee Atomic v. U.S.*, No. 98-126C and *Maine Yankee v. U.S.*, No. 98-474C.

Tr. 4088:1-4089:7 (Pollog); Ron Howe, Michigan Public Service Commission, *Nuclear Waste Fund Ratepayer Payments By State Through 3-31-04*, at http://www.cis.state.mis.us/mpsc/lic-enf/nuclear/rep304.pdf (Mar. 31, 2004).

3. DOE breached its reciprocal contract obligation to Connecticut Yankee and others – the "quid pro quo created by Congress" in the D.C. Circuit's words – to commence acceptance of SNF by January 31, 1998, and thereafter to remove SNF from contracting utilities including Connecticut Yankee in an economically efficient, reasonable manner. *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272 (D.C. Cir. 1996).

– *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). *See* PFF ¶¶ 54, 55, 60-64, 66 below (addressing DOE performance obligations).

4. Because of the government's breach, Connecticut Yankee has incurred and is continuing to incur very substantial damages for continued on-site storage of SNF. As detailed below, DOE's partial breach of the parties' Contract has caused Connecticut Yankee to incur damages in the minimum amount of $198,293,973 through the year 2010. *See* Section X, "Damages," below at PFF ¶ 150.

– *See* P2043.16 (Wise Demonstrative) (accompanying the record as identified and adopted by Dr. Wise). *See* Tr. 7599:5-7 ("THE COURT: So 2043 and 2043-A shall accompany the record as identified and adopted by the witness.").

a. Damages are now expected to accrue in the years beyond 2010 at the reasonably constant rate of approximately $10.2 million per year in 2002 dollars. *See* PFF ¶ 173 below.

– Tr. 3267:3-3270:22 (Wise); P2043A.24.

## II. GENERAL FINDINGS

5. Connecticut Yankee is an electric utility company incorporated under the laws of the State of Connecticut, whose stock is owned by nine utilities.

> – Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 6 (re incorporation under the laws of Connecticut).
>
> – Tr. 2299:14-2300:6 (Bennet).

6. Connecticut Yankee's only electricity generating facility was a nuclear power plant located in Haddam, Connecticut, which is now permanently shut down.

> – Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 7.
>
> – Tr. 2299:14-17 (Bennet).

7. Connecticut Yankee commenced commercial operation of its nuclear power plant in January 1968.

> – Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 8.
>
> – Tr. 2300:7-10 (Bennet).

8. Nuclear fuel used in commercial reactors, including the Connecticut Yankee reactor, is configured into "fuel assemblies," which consist of numerous metallic rods that each contain nuclear fuel pellets and are held together with metallic bindings.

> – Tr. 1550:12-22 (Bennet) (a fuel assembly is "basically a long rectangular metal cage which holds individual fuel elements or fuel pins, as we call them. They're also known as fuel rods. Those fuel rods are metal and are placed in an array and contain the nuclear fuel pellets that have been placed in there during the fabrication process.").
>
> – P1926.001 (demonstrative photograph of fuel assembly).

9. When it was operating, Connecticut Yankee's nuclear reactor held and used 157 fuel assemblies in the reactor "core" where fission occurred and generated heat to power steam turbines, which in turn generated electricity.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 15.

– Tr. 2300:11-14 (Bennet).

– Tr. 1550:23-1551:5 (Bennet).

10. Fuel assemblies that are discharged from the reactor after use are generally referred to as spent nuclear fuel or spent fuel.

– Tr. 1551:6-9 (Bennet).

11. Spent fuel remains highly radioactive for many years, and is potentially hazardous to humans if not properly handled.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 10.

12. Connecticut Yankee's nuclear power plant was constructed with a fuel pool near the nuclear reactor, to be used for temporary storage of nuclear fuel after its use in the reactor ("spent fuel").

– Tr. 2588:18-2589:2 (Mellor).

13. The Connecticut Yankee fuel pool is filled with water, which provided a radiation shield and protected both the spent fuel in the pool and the environment.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 12.

– Tr. 2165:15-24 (Heider).

– Tr. 1552:13-21 (Bennet).

14. Connecticut Yankee's fuel pool contains fuel storage racks, comprised of individual cells, which can hold one fuel assembly per cell. The racks also contain a neutron poison and provide appropriate spacing for the assemblies, both of which help to prevent criticality.

– Tr. 2165:5-14 (Heider).

15. Connecticut Yankee expanded the capacity of its spent fuel pool in 1996 through "reracking" by adding racks with a higher density (higher number of cells per rack) to the spent fuel pool. *See* Section VII, "Reracking."

– Tr. 2306:16-2307:8 (Bennet).

16. Connecticut Yankee last operated its nuclear power plant in July 1996.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 16.

17. In December of 1996, Connecticut Yankee permanently ceased operation of its plant.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 18.

– Tr. 2302:8-16 (Bennet).

18. As of November 1996, all fuel assemblies then in Connecticut Yankee's reactor had been moved into the fuel pool.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 17.

– Tr. 2300:18-2302:6 (Bennet).

19. The total number of fuel assemblies in Connecticut Yankee's fuel pool after the plant had been shut down permanently and all fuel unloaded from the reactor was 1,019 assemblies, plus approximately five metal canisters of various failed fuel rods.

– Tr. 2302:17-2303:4 (Bennet).

20. Connecticut Yankee is also presently storing 82 spent fuel assemblies that it had shipped in the late 1970s to a site in Morris, Illinois for reprocessing under a contractual arrangement with General Electric ("GE"), the owner of the Morris facility.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶¶ 24, 25.

– Tr. 2300:18-2302:7 (Bennet).

21. When the Connecticut Yankee plant permanently shut-down its operations in December of 1996, the business of the company changed. The focus at the plant became decommissioning the site and storing SNF.

– Tr. 2502:2-8 (Ms. Jewell-Kelleher).

– Tr. 2310:21-2311:4 (Bennet).

22. Decommissioning involves the dismantlement and decontamination of the plant and site in a manner that satisfies Nuclear Regulatory Commission ("NRC") requirements and the requirements of other Federal regulators, such as the Environmental Protection Agency ("EPA"), and state regulators.

– Tr. 1558:20-1559:25 (Bennet).

– Tr. 2244:4-2248:16 (Heider).

23. Decommissioning of Connecticut Yankee's site cannot be completed until all SNF is removed from the pool.

– Tr. 2402:4-7 (Bennet).

– Tr. 1564:13-1565:4 (Bennet).

– Tr. 2151:15-22 (Heider).

24. Connecticut Yankee has greater-than-Class C ("GTCC") waste, which includes metal material known as "reactor internals," that was located near the core of a nuclear reactor and became highly irradiated during the operation of the reactor.

– Tr. 1565:5-1566:17; Tr. 2314:25-2315:6 (Bennet).

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 141.a. (re GTCC waste includes material known as "reactor internals").

25. No site is licensed for disposal of Connecticut Yankee's GTCC waste.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 141.c.

26. Connecticut Yankee has completed development, licensing and construction of its Independent Spent Fuel Storage Installation ("ISFSI"), including licensing and purchase of all necessary dry storage containers.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Connecticut Yankee's March 2003 PFF ¶ 186.

27. During 2002 and early 2003, Connecticut Yankee constructed its ISFSI facility, which is located between ¾ to 1 mile from the plant. As of trial, Connecticut Yankee had loaded ten (10) spent fuel casks and two (2) GTCC waste casks on to the pad, and was working towards completing the ISFSI fuel loading process by early 2005.

– Tr. 2345:7-11; Tr. 2355:3-25; Tr. 2359:12-15 (Bennet).

28. Until Connecticut Yankee's NRC licenses are terminated, Connecticut Yankee must maintain its corporate existence, and termination of Connecticut Yankee's licenses and regulation cannot occur until all SNF is removed from the site or Connecticut Yankee's responsibility for SNF is otherwise eliminated.

– Tr. 2744:12-18 (Thomas) (until "high-level waste [and] fuel is ultimately dispositioned and leaves the site, is taken, if you will, by the DOE, we

need to maintain [existence] as an NRC licensee to store the fuel and high-level waste.").

29. When it was operating, Connecticut Yankee sold the electricity generated by its nuclear power plant to its nine sponsor/owner utilities under wholesale power contracts regulated by the Federal Energy Regulatory Commission ("FERC"). Pursuant to the operation of the power contracts, Connecticut Yankee was entitled to recover the costs of generating that electricity, and remains entitled to recover all costs of decommissioning and SNF storage, provided that all such costs could only be recovered at rates approved in proceedings before the FERC under the Federal Power Act.

– Tr. 1582:15-1583:17 (Bennet) (re Yankee Atomic's owners).

– Tr. 1540:10-16 (Bennet) (rate applications to FERC).

– Tr. 2299:22-2300:6 (Bennet) (ownership structure, arrangement with owners and power contracts all generally the same at Connecticut Yankee as at Yankee Atomic, although ownership percentages are somewhat different, and there are some unique owners of Connecticut Yankee).

– Tr. 2371:25-2372:4 (Bennet) (purpose and nature of FERC's oversight of Connecticut Yankee's economic activities is exactly the same as its oversight of Yankee Atomic).

30. Connecticut Yankee typically makes a FERC rate case filing every 3-5 years. Connecticut Yankee applied for a funding plan from the FERC in December 1996, which the FERC approved in April 2000, to provide for the costs of decommissioning and fuel storage.

– Tr. 2372:5-22 (Bennet) (Connecticut Yankee typically makes a FERC filing every 3 to 5 years; the next filing date is often prescribed in the settlement agreement resolving prior rate proceeding; there was a settlement agreement of Connecticut Yankee's 1996 FERC case in April of 2000, that settlement agreement specified that Connecticut Yankee's next case be filed July 21, 2004, and it was filed on that date).

– Tr. 2315:12-18 (Bennet) (Connecticut Yankee had filed a FERC rate case in December of 1996 and it was still pending when Bennet arrived in December 1997); Tr. 2333:25-2334:11 (Bennet) (April 2000 settlement of

Connecticut Yankee's 1996 FERC rate case based on January 1, 2000 to-go cost estimate).

– Tr. 1650:14-21 (Bennet) (FERC's normal practice and normal policy is five years for rate case filings, "[b]ut in many instances, the terms of the settlement agreement that you've arrived at in your prior rate case has a specified date or specified duration such as, you know, 3, 4, 5 years when the next filing would be due.").

– Tr. 1650:1-13 (Bennet) (FERC sets the tariff or level of costs that can be charged under the power contracts).

## III. TRIAL WITNESSES

At trial, Connecticut Yankee presented the evidence supporting its damages claim through the following witnesses:

31. **Loring Mills**, who had a long career in the nuclear industry, testified about the development of the Nuclear Waste Policy Act of 1982 ("NWPA") and the DOE waste disposal contracts, and his role in both. Tr. 263:24-299:14; 330:1-455:7.

a. From 1958 to 1976, Mr. Mills worked on various aspects of the nuclear fuel cycle at General Electric Company ("GE"), Kerr-McGee Corporation, and Nuclear Fuel Services. Tr. 264:12-265:9; Tr. 265:17-22; Tr. 266:16-267:24. He served for a time as quality assurance manager for Nuclear Fuel Services' reprocessing plant in West Valley, NY. Tr. 266:16-268:2.

b. In 1976, Mr. Mills became a senior executive of the Edison Electric Institute ("EEI") in Washington, DC – a trade association for investor-owned electric utility companies, *see* D02.034 at 1 – where he worked on nuclear fuel cycle issues, including both "front end" issues concerning fresh fuel and, increasingly after reprocessing ceased in 1976-77, "back end" issues concerning spent fuel disposition. Tr. 267:25-269:21. Mr. Mills was actively involved in the late 1970s in developing the Environmental Impact Statement that selected geological disposal for SNF, Tr. 279:11-

18, and subsequently in developing the NWPA and then the DOE waste disposal contracts. Tr. 270:5-11; Tr. 279:11-16; Tr. 288:4-289:8 (recounting that Mr. Mills suggested the amount of the contractual "one mill" fee). He worked to promote appropriate implementation of the DOE contracts until his retirement in 1993. Tr. 270:16-271:1.

32. **Dr. John Bartlett** has studied nuclear engineering and worked to design and implement nuclear technologies since early in the Atomic Age. Tr. 578:10-602:3. He testified both as a fact witness, regarding the DOE spent fuel contracts and programs, and as an expert, offering opinions about an appropriate acceptance rate and schedule for the DOE program.

a. Dr. Bartlett taught nuclear engineering at the University of Rochester, served as a Fulbright scholar teaching nuclear courses in Istanbul, Turkey, Tr. 582:7-17, and assisted in the development of Turkey's nuclear program, Tr. 583:5-10.

b. For most of 1969-1978, Dr. Bartlett worked for Battelle at Pacific Northwest National Laboratory, where he became Manager of Systems Studies in the Nuclear Waste Program Office, a predecessor to DOE's Office of Civilian Radioactive Waste Management ("OCRWM"). Tr. 583:11-18; Tr. 584:11-14. In 1974, Dr. Bartlett led the development of the voluminous Technical Alternatives Document, which compiled information about all technologies used in the management of radioactive waste from the receipt at a storage location to ultimate disposal. Tr. 586:7-22. This document became the basis for DOE's 1980 programmatic environmental impact statement for the national disposal program, which OCRWM now runs. Tr. 586:24-587:4. A principal focus of Dr. Bartlett's work throughout his career has been the measurement of nuclear waste.

c. From early 1990 until January 1993, Dr. Bartlett served as the presidentially-appointed Director of OCRWM. Tr. 590:2-24.

d. Dr. Bartlett's consulting career since 1993 has included work on developing an international spent fuel repository in Australia. Tr. 595:7-597:3; *see* Tr. 596:9-20 (noting work on receipt of spent fuel from reactors across the world, transportation methods and design of the disposal facility). Dr. Bartlett's experience also includes reactor decommissioning projects, development of NRC regulations, and providing technical support to the EPA in developing standards applicable to Yucca Mountain. Tr. 600:19-602:3.

33. **Frank Graves**, an economist expert in analyzing and modeling the performance of markets, particularly utility-related markets, testified regarding what would have been an economically reasonable schedule for spent fuel acceptance had DOE begun performing in 1998. Tr. 741:23-765:4 (Graves) (Mr. Graves' credentials); Tr. 767:8-788:18; Tr. 797:13-798:6 ("must-move" fuel analysis); Tr. 777:14-781:7 (reasonable acceptance rate analysis); Tr. 800:6-865:11 (modeling of the exchanges market). Based upon his economic models, Mr. Graves also calculated the time when each Yankee utility's SNF would have been removed if DOE had performed. Tr. 825:10-827:6.

34. **Charles Pennington**, Vice President of Marketing and Business Development for NAC International ("NAC"), has long been involved in the development, design, and pricing of multi-purpose canister systems for storage and transport of SNF and in evaluating the costs of designing and constructing dry storage facilities at utility sites. Tr. 1051:9-20; Tr. 1052:24-1054:2. Mr. Pennington provided expert testimony supporting inputs that Mr. Graves used in his analysis, concerning average or representative costs to implement and operate dry storage and

costs of wet fuel pool storage, as well as historical and projected fuel discharges and remaining spent fuel storage capacities at all domestic commercial nuclear plants. Tr. 1077:23-1112:16.

35. **Daniel Collier**, Vice President of NAC's consulting operations, was previously responsible for NAC's brokerage business, where he arranged purchases of nuclear fuel cycle materials and services, matching buyers and sellers. Tr. 1221:22-1222:2. Mr. Collier testified regarding the acceptability among nuclear utilities, based on prior experience, of exchanging various goods and services. Tr. 1219:17-1263:12.

36. **Ivan Stuart** has substantial expertise, and experience, with the technical and practical aspects of spent fuel storage and transportation.

a. During nearly 30 years at GE's Nuclear Division, Mr. Stuart served as Manager of Licensing for almost a decade (supervising over 100 engineers), then Manager of Training (again supervising over 100 engineers), and beginning in 1987, as Manager of Waste Management Service, where he had particular responsibility for the Vallecitos Laboratory in California (which studied damaged or failed nuclear fuel and other radioactive material) and the Morris Fuel Storage Facility in Illinois. Tr. 1293:9-1311:17.

b. In March of 1990, Mr. Stuart became Vice President of Engineering at NAC International, where he had overall responsibility for design and licensing for all of the casks that NAC owned and was selling. Tr. 1341:18-1342:8; Tr. 1343:2-19. He also worked on numerous projects at NAC involving transportation of spent fuel and GTCC waste, including directing one where DOE had contracted with NAC to take research reactor fuel from around the world back to the United States to be stored in South

Carolina. Tr. 1369:23-1370:1; *see* Tr. 1362:24-1363:24 (noting work on the Owl Creek Private Storage Project, a private dry storage facility for storage of SNF).

c. Mr. Stuart testified as an expert that there were no technical impediments to DOE's implementation and operation, beginning not later than January 1998, of a robust program for acceptance, transportation and disposal of spent fuel and GTCC waste. Tr. 1376:18-1377:5.

37. **Tom Bennet** joined Connecticut Yankee in 1997 as the Vice President, Chief Financial Officer ("CFO") and Treasurer (after nine years as a financial manager at Vermont Yankee and holding the same Vice President and CFO positions at Yankee Atomic since 1995). Mr. Bennet testified at trial as the Vice President and CFO at both Yankee Atomic and Connecticut Yankee. Tr. 1531:1-4; Tr. 1531:14-18; Tr. 2297:14-20.

a. In those positions, Mr. Bennet had overall responsibility for all financial matters at both companies, including preparation of annual long-term cost estimates as well as those submitted to FERC and the October 29, 2002 cost estimate submitted with the damages claim in this case. Tr. 1642:6-22; Tr. 2366:6-19; Tr. 2370:5-19.

b. Mr. Bennet testified about decision-making leading to dry storage at both companies, the process of procuring and implementing dry storage facilities at both companies, and the costs both companies incurred and expect to incur as a result of the government's breach as well as the manner in which both companies account for those costs in the context of their overall accounting for decommissioning activities generally. Tr. 1815:9-1827:13; Tr. 1834:16-1843:2 (Yankee Atomic); Tr. 2293:17-2335:15; Tr. 2342:13-2389:24; Tr. 2462:12-2485:12 (Connecticut Yankee).

38. **Kathleen Jewell-Kelleher** became Connecticut Yankee's Assistant Treasurer in 1999, assuming the Controller position at Yankee Atomic in 1997 and after 17 years at Vermont Yankee in various financial positions, including Controller, progressing to Treasurer in 2000 and adding the Controller title in 2003. Today, she serves as Treasurer and Controller of both Yankee Atomic and Connecticut Yankee. Tr. 1845:10-1849:25; Tr. 2499:25-2500:17.

a. As Controller, Ms. Kelleher is responsible at each company for its books and records, the corporate accounting function, accounts payable, accounts receivable, project accounting, billing, internal and external audit functions, trust fund accounting, and corporate tax accounting, as well as budgeting and long-term forecasting. Tr. 1850:1-12; Tr. 2500:18-2501:5. As Treasurer, Ms. Kelleher is responsible for overseeing the trusts of each company including investment management, as well as cash management of both the corporation and its trusts. Tr. 1850:13-18; Tr. 2501:10-2502:1.

b. Ms. Kelleher testified about the costs Yankee Atomic and Connecticut Yankee have incurred as a result of the government's breach, as well as the manner in which both companies have accounted for such costs that have already been incurred and estimated such costs that are expected to incur in the future. Tr. 1850:1-1900:11; Tr. 2043:3-2056:25 (Yankee Atomic); Tr. 2499:25-2537:20; Tr. 2558:11-2567:4 (Connecticut Yankee).

39. **Kenneth Heider** has worked in the nuclear field for over 15 years, beginning at Yankee Atomic in 1988 at the Rowe, Massachusetts site. Tr. 2120:6-10. Mr. Heider has extensive experience with operations, management, spent fuel storage and decommissioning at nuclear power plants. He has held the position of Reactor Engineer at Yankee Atomic (from 1988 to 1990), Tr. 2120:21-2121:16; Manager of the Reactor Engineering Department at Yankee

Atomic (from 1990 to 1992), Tr. 2122:23-2123:16; Principal Engineer for Yankee Nuclear Services Division ("YNSD") (from 1992 to 1993), Tr. 2124:6-2127:11; Engineering and Licensing Manager for YNSD (from 1994 to 1995), Tr. 2127:14-2133:20; Yankee Rowe Site Manager (from 1995 to 1998), Tr. 2133:21-2134:24; Connecticut Yankee Decommissioning Director (from 1998 to 2000), Tr. 2134:25-2136:19; and Vice President of Yankee Atomic and Connecticut Yankee (from 2000 to present for Connecticut Yankee and 2000 to 2003 for Yankee Atomic), Tr. 2136:20-2140:18, Tr. 2636:13-2637:1. Mr. Heider also has extensive experience in preparing long-term cost estimates, in particular in the areas of fuel storage staffing, security, and regulatory fees. Tr. 2128:17-2129:7; Tr. 2131:8-2133:20; Tr. 2156:6-2157:6; Tr. 2170:22-2171:15; Tr. 2641:3-2643:1. Mr. Heider testified about the operations, in a heavily regulated environment, of the shut-down nuclear facilities at Yankee Atomic and Connecticut Yankee, as well as about the companies' spent fuel storage issues, decommissioning environment, in particular the impact of decommissioning with spent nuclear fuel on-site, plant security, and the costs incurred by the companies resulting from the continued storage of SNF on-site. Tr. 2141:8-2200:13 (Yankee Atomic); Tr. 2640:7-2641:2; 2643:2-2661:6 (Connecticut Yankee).

40. **Russell Mellor** testified about Connecticut Yankee's second reracking of its spent fuel pool, which was completed in the summer of 1996. Prior to his retirement in April 2003, Mr. Mellor was employed at Connecticut Yankee for approximately six years from March 1997, including as Director of Operations and Decommissioning, Vice President of Operations and Decommissioning, and finally as President and Chief Executive Officer. Tr. 2584:5-2585:11. Mr. Mellor's responsibilities included oversight of the spent fuel, and operations of the spent fuel pool. Tr. 2585:17-25.

41. **Kenneth Wise** is an expert in economics and the determination of economic damages. Dr. Wise holds a bachelor's degree in physics from Harvey Mudd College and a doctorate in economics from the Massachusetts Institute of Technology. Tr. 3188:1-4. Dr. Wise is a principal and founder of the Brattle Group, where he works as a consultant and expert in commercial damages cases, arising from breach of contract, deceptive trade practices, takings, products liability, as well as in environmental cases, involving the allocation of environmental liabilities, insurance recoveries, the economic benefits of noncompliance, and property value impacts. Tr. 3189:25-3191:1. Much of the damages work Dr. Wise has done involves the application of engineering to support his analysis. Tr. 3190:18-21. Dr. Wise has testified on damages issues on 30 different occasions, in federal court, sate court, and before mediators and administrative law judges and arbitrators. Tr. 3190:22-3191:2. At trial in this case, Dr. Wise presented his calculation of the minimum damages Connecticut Yankee is entitled to recover as a result of the government's failure to remove spent nuclear fuel from the plant site. To arrive at damages, Dr. Wise worked closely with the company personnel at Connecticut Yankee to identify and properly calculate the incremental costs that resulted from the government's breach. Tr. 3193:24-3239:10.

## IV. <u>DOE CONTRACT</u>

### A. <u>Background and Purpose</u>

42. Since the beginning of the commercial nuclear power industry in this country, the federal government has been responsible for the disposition of spent fuel.

– 10 C.F.R., Pt. 50, App. F. (2004) ("Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government.").

– Tr. 276:3-7 (Mills) ("[F]rom the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program.");

276:18-24 (Mills) ("And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they [the government] would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that.").

– Tr. 1680:17-1681:4 (Bennet) ("Well, it's always been our understanding that the federal government would be responsible for disposal of spent fuel. As I described early on, they actually owned the spent fuel. And until commercial power reactors were allowed to own it, that was the primary understanding. But with the high-level waste policy put in place, that put in place the mechanism by which they do that, that's the – that set up a reliance we had on their responsibility for spent fuel.").

– 42 U.S.C. § 10131(a)(4) (2000).

43. A government solution to the growing backlog of spent nuclear fuel became urgent in the 1970s after President Carter issued an executive Order in 1977 that effectively halted reprocessing of spent nuclear fuel.

– Tr. 274:14-275:23 (Mills) ("in 1977, President Carter at the time stated in April of 1977 that reprocessing of civilian nuclear fuel would be indefinitely deferred.").

44. To provide for the disposition of SNF from commercial reactors, the government enacted the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, codified at 42 U.S.C. §§ 10101 (2000) *et seq.* ("NWPA"); *see* 42 U.S.C. § 10131 (2000) (Findings and Purposes for NWPA).

(a) Findings

The Congress finds that –

(1) radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal;

(2) a national problem has been created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources;

(3) Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate.

* * *

(b) Purposes

The purposes of this part are –

(1) to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;

(2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel.

45. To assure that the government fulfilled its obligations for the disposition of SNF, the NWPA established a program under which the government would be responsible for disposition of commercial SNF, in a geologic repository and/or other federal facility(ies), and nuclear utilities would pay substantial fees designed to cover the costs of that program. *See* 42 U.S.C. §§ 10101 (2000) *et seq.*; *see* 42 U.S.C. § 10131(b) (2000).

46. To assure that the government fulfilled its obligations for the disposition of SNF, the NWPA required DOE to implement the SNF disposal program by entering into contracts with nuclear utility companies.

– 42 U.S.C. § 10222(a) (2000).

– Tr. 337:20-338:22 (Mills) ("We [utilities] wanted a firm contract to accomplish the task.").

47. After the NWPA became law, DOE developed a form of "Standard Contract" for acceptance and disposition of SNF.

– P29 at 5458-5459 (February 4, 1983 Notice of Proposed Rulemaking for Standard Contract); P31 at 16597-98 (April 18, 1983 Final Rule for Standard Contract).

– Tr. 344:11-351:22 (Mills) ("the Department of Energy made the decision that they were going to have the contract in the form of a regulation.").

48. DOE was the drafter of the Standard Contract.

– P31; *see* Tr. 347:6-22 (Mills).

49. On June 22, 1983, Connecticut Yankee and the DOE entered into such a contract (the "Contract").

– P1CY.

50. In the NWPA, Congress legislated a firm deadline of January 31, 1998 for the government to begin accepting and disposing of SNF from commercial reactors. 42 U.S.C. § 10222(a)(5)(B) (2000) ("in return for the payment of fees . . . the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel. . . .").

51. Congress intended that DOE's acceptance of SNF, beginning in 1998, would be expeditious and timely.

– The NWPA mandated that the Contracts provide that DOE "shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel." 42 U.S.C. § 10222(a)(5) (2000) (emphasis added).

– Tr. 3686:18-22 (Morgan) (believed intent of Congress and NWPA was for DOE to remove spent fuel from utilities as fast as it reasonably could).

– (6/28/04) Dep. Desig. 5/10/02 Barrett, 1163:10-1166:7 ("Q. Why did you want to work off that [backlog] inventory of spent nuclear fuel as soon as practicable? A. Because I believe that's the intent of the act.").

52. Congress mandated that the activities contemplated by the NWPA be conducted in a timely manner.

– See PFF ¶¶ 50-51 above.

– The NWPA specified a timetable for siting and licensing repositories. These statutory deadlines required that within 180 days after enactment of the NWPA [*i.e.*, by July 1998], the Secretary of Energy must recommend to the President five sites for possible repository characterization, *see* 42 U.S.C. § 10132(b)(1)(A) (2000); by January 1, 1985, the Secretary must recommend to the President three sites for actual characterization, *see id.* § 10132(b)(1)(B); by March 31, 1987, the President must recommend to Congress one site for repository construction authorization, *see* id. § 10134(a)(2)(A); and by January 31, 1989 (with limited exceptions), the NRC must issue a final decision on construction authorization, *see id.* § 10134(d).

– (6/28/04) Dep. Desig. 4/24/02 Susan Klein, 172:7-14 (DOE's Rule 30(b)(6) witness) ("Q. Do you agree that the Nuclear Waste Policy Act contemplated that process of siting, licensing, and constructing a repository would have been completed by January 1998? [objection omitted] A. I'm thinking. Yes.").

53. The legislative record reflects that an important purpose of the NWPA was to assure that utilities, including Connecticut Yankee, would not have to incur additional costs to construct or maintain additional on-site storage of SNF after January 31, 1998. *See also* PFF ¶ 63.

– In enacting the NWPA, Congress specifically found that:

> "A national problem has been created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive wastes from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources." 42 U.S.C. § 10131(a)(2) (2000).

– Congress further found that:

> "Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate." 42 U.S.C. §10131(a)(3) (2000).

– The NWPA was enacted in response to the "spent fuel bottleneck." H. Rep. No. 97-491, pt. 1 at 28 *1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3794; *see also* H. Rep. No. 97-785, pt.1 at 50 (1982) (House Report to predecessor bill of the NWPA) ("Continued delays in establishing that radioactive materials can be disposed of safely . . . can no longer be tolerated. This is important . . .

> because it is no longer acceptable to allow increasing quantities of nuclear waste to be stored on an interim basis.").

**B. Contractual Understandings and Intentions of the Parties Regarding Scheduling Issues**

54. The Contract provides, as required by the NWPA, that DOE "shall begin" performing the required services under the Contract "not later than January 31, 1998." P1CY, Art. II. *See* 42 U.S.C. § 10222(a) (2000).

55. The Contract requires that the DOE shall "continue" the required services, after commencing not later than January 31, 1998, "until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A … has been disposed of."). P1CY, Art. II.

56. The Contract is silent on the specific acceptance rate under which DOE must accept SNF from Connecticut Yankee. P1CY.

57. The Contract does not provide a mechanism to determine an acceptance schedule under which DOE must accept SNF from Connecticut Yankee. *See* P1CY.

58. The Contract is silent on the specific acceptance schedule under which DOE must accept and dispose of SNF from Connecticut Yankee. *See* P1CY.

59. The Contract does not provide a mechanism to determine an acceptance schedule under which DOE must accept and dispose of SNF from Connecticut Yankee. *See* P1CY.

60. The Contract states that DOE is responsible "to take title to the spent nuclear fuel or high-level radioactive waste as expeditiously as practicable upon the request of the generator or owner of such waste or nuclear spent fuel" upon commencement of the repository provided for in the Act. P1CY at 1, second "whereas" clause.

61. At the time the Contract was entered into in 1983, the parties anticipated and intended that a repository would be operational in time for DOE to begin acceptance of SNF no later than January 31, 1998.

> – Tr. 383:24-384:14 (Mills) ("And there was expectations as indicated by the members of the Department of Energy. I came [*sic*] name Frank Kaufman specifically, stating that yes, we can satisfy that date. Actually, we believed we can have a repository before that time. And we fully believed that the 15-year advance time was sufficient for this program to actually carry out what was requested.").
>
> – P978 (June 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste) at 8-9 (In June of 1983 – contemporaneous with the execution of the Contract – DOE prepared its first fee adequacy report, an annual analysis required by the NWPA, 42 U.S.C. § 10222(a)(4) (2000), which stated "[I]t is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002, respectively. Each repository has a design receipt rate of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT is assumed for the first five years.").
>
> – *See* (7/14/04) Dep. Desig. 5/8/02 Barrett, 1050:1-9 (his understanding is consistent with the statement that "When the nuclear waste policy [act] was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utilit[ies] to begin accepting waste in 1998 on that basis.").
>
> – *See* P516 at 21794 (DOE 5/3/95 Notice re Waste Acceptance Issues) ("the Act originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998"); P951 at 27008 (DOE 5/25/94 Notice of Inquiry) ("When the Act was passed, the Department anticipated that a geologic repository would be in operation . . . by January 31, 1998").
>
> – *See* PFF ¶ 52.

62. In 1983, the parties anticipated and intended that if a repository was not operational in time for DOE to begin acceptance of SNF by January 31, 1998, then DOE would either construct an alternative facility at which to accept SNF or compensate utilities for the failure to timely accept SNF. P633, attachment at 1-3 (September 1983 DOE Mission Plan

Strategy Memorandum) ("the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel.").

63. At the time of formation of the Contract, the parties recognized that the rate of DOE's acceptance of utilities' SNF should achieve two objectives: (1) to prevent the nuclear utilities from having to construct or maintain additional at-reactor storage facilities for SNF after January 31, 1998; and (2) to accept SNF at a rate that permitted DOE to keep up with the rate of production of SNF and reduce the existing SNF backlog.

– Tr. 341:7-343:2 (Mills) (discussing understanding of utility representatives and high-level DOE officials).

– P633 (September 15, 1983 Mission Plan Strategy Memorandum), attachment at 1 (DOE explained its waste acceptance strategy for the SNF program as using "an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998.").

– P678 (December 1983 Morgan Program Overview) (Mr. Morgan publically described the SNF program's strategy as follows: "[B]eginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that *no utility would have to add any further storage facilities* either on site or at another location.") (emphasis added); Tr. 3682:12-3683:19 (Morgan) (confirming that when he directed the SNF program, he thought it appropriate to have enough waste acceptance capability to meet the discharge rate from utilities and to work off the backlog).

– P636 at 2-1 (December 1983 Draft Mission Plan) ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.").

– P647, enclosure 1 at 1 (July 23, 1984 DOE Richland Operations Office comments on Draft Mission Plan) ("Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.").

– *See* (6/28/04) Dep. Desig. 4/22/02 Barrett, at 55-56 (agreeing that "the policy behind the act" would call for reductions of the backlog within a reasonable amount of time) ("Our intention was to design a system that would reduce the backlog to a reasonable sense."); (7/14/04) Dep. Desig. 5/1/02 Milner, 73:20-22 ("At the point I joined the program [in April 1984, Tr. 4711:23-4712:20], my understanding of the intent was to work off the backlog.").

– (7/14/04) Dep. Desig. 5/8/02 Barrett, at 1064-65 (intent of the act was that the utilities would pay once into the waste fund and the utilities "would not have to pay again directly out of their own pockets to provide for such storage and disposal during the period that the department failed to comply. . . .").

a. During the notice and comment period on the Standard Contract, the Edison Electric Institute noted that the Contract was silent on the industry-wide rate of acceptance of SNF. D02.034 at 8, Attachment A, at 2. EEI told DOE that "[w]e believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog." *Id.*

b. In publication of the Standard Contract as a final rule, DOE did not address the acceptance rate comments or disavow the utilities' expressed understanding. P31 (April 18, 1983 publication of Final Rule in Federal Registry).

64. At the time of formation of the Contract, the parties understood that an industry-wide acceptance rate of 3000 MTU per year would be appropriate to accomplish the objectives identified in PFF ¶ 63 above.

– Tr. 509:15-511:15 (Mills) (parties anticipated annual industry discharges of 2,000 to 2,500 MTU and that DOE would work off backlog of already discharged spent fuel at a rate of about 1,000 MTU per year); Tr. 511:22-512:12 (Mills) (parties anticipated in 1983 that repository would have capacity of 3,000 MTU per year); Tr. 343:4-14 (Mills) (DOE officials planned spent fuel acceptance from utilities in 1983 at about 3,000 MTU per year).

– P420 (July 1983 DOE Report on Financing Disposal of Commercial SNF) at 8 (each repository designed to receive 3,000 MTU per year).

– P458 (May 4, 1983 Mills statement on importance of provisions of NWPA) at 4 (expectation that DOE receive about 3,000 MTU per year).

– P978 (June 1983 DOE Report on Financing Disposal of Commercial Spent Nuclear Fuel) at 11.

– *See also* (6/28/04) Dep. Desig. 4/22/02 Barrett, 59:4-11 (agreeing that "the 3,000 rate would be consistent with [Mr. Barrett's] understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation . . ."); *id.* at 56-67 (Mr. Barrett understood in 1986 that the 3,000 rate would accomplish the goal of reducing the backlog).

65. At the time of the formation of the Contract, the parties understood that DOE would accept about 3000 MTU of commercial spent fuel per year and that this acceptance rate would be achievable by 1998.

– Tr. 343:4-14 (Mills) ("Well, there was considerable discussion of what should the capacity be for receiving this waste or spent fuel at a repository. And the capacity that was discussed at that time and has been documented in many ways was the planned activity would be at a quantity of about 3,000 metric ton per year.").

– Tr. 385:14-387:7 (Mills) ("And there were discussions on what was a reasonable rate of receipt at a repository from a design standpoint. This is the Department of Energy identifying what is a reasonable design quantity for a repository. And it was discussed. That quantity was discussed while the legislation was being developed. And it was understood that the design rate would be about 3,000 metric ton per year.").

– Tr. 386:1-387:7 (Mills) ("Q. Did you have discussions about the 3,000-ton rate with DOE officials at that time? A. Yes, I did. Q. Do you recall specifically with whom? A. I am convinced I had those discussions with Frank Kaufman, with Wade Ballard, with Mike Lawrence. And you know, this was over several years' time that this was being developed. So the number of people that were involved in the program at that time were changing. And I believe at that particular time that Shelby Brewer was the assistant secretary for nuclear energy. And I recall having conversations with Mr. Brewer. There was another individual who had responsibility for the program just before the Nuclear Waste Policy Act, which was Shelley Myers. And I remember having similar conversations with Mr. Meyers. Q. These were conversations in which the 3,000-ton rate was discussed? A. There were many issues discussed. And I am convinced that many times we discussed that rate of 3,000 metric tons. It shows up in many different ways. Q. Okay. And it's your understanding from those conversations that the Department of Energy officials, at least the ones that you mentioned and discussed this with, expected the 3,000-ton rate to be achieved by 1998; is that right? A. They – they had said the geologic repository receiving rate would be designed for 3,000-ton per year and they had expected they would be able to achieve that by 1998.").

a. The parties' intent and understanding is shown by DOE reports on an appropriate fee to charge utilities for disposal services, which pre-dated the NWPA and the Contract. These reports reflected rates for the acceptance of commercial spent fuel consistent with, or even greater than, the 3000 MTU. P7 at 18, 21 (1978 Estimate of Charges for DOE Services uses 1800 MTU for first five years, 6000 MTU per year thereafter); P1959 at 9 (1980 Report on Fee uses a rate of 1800 MTU for the first five years and 6000 MTU per year thereafter); P978 at 8 (reporting on prior acceptance rates); *see* Tr. 390:24-391:17 (Mills) (the 3000 MTU rate for the first repository pre-dated the passage of the NWPA).

b. The intent of parties to Standard Contracts at the time of contract formation that DOE would accept about 3000 MTU of commercial spent fuel per year is reflected in Loring Mills' May 5, 1983 presentation at a conference attended by the industry and DOE. P458; Tr. 357:19-359:1 (Mills) (P458 accurately reflects the substance of his remarks at a conference attended by both nuclear utilities and members of DOE).

c. In June of 1983 – contemporaneous with the execution of the Contract – DOE prepared its first fee adequacy report, an annual analysis required by the NWPA, 42 U.S.C. § 10222(a)(4) (2000). DOE calculated costs based on a program that would accept spent fuel from utilities at a steady state rate of 3000 MTU per year by the sixth year of operations. P978 (June 1983 Report on Financing the Disposal of Commercial Spent Fuel) at 8 and 9 ("It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002,

respectively. Each repository has a design receipt rate of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT is assumed for the first five years.").

## C. Spent Fuel Acceptance

66. The pace and sequence of DOE's acceptance of SNF from utilities should be efficient in order to minimize the total cost to utilities of storing and disposing of SNF.

– Tr. 609:5-19 (Bartlett) ("The principal goal, if I had to capture it in one word, would be efficiency, to make the system – the program efficient.").

– Tr. 633:25-634:17 (Bartlett) ("[The acceptance rate for spent fuel] would be efficient in terms of making proper use of the equipment facilities and everything associated with the system so that there's nothing wasted or insufficient with respect to the accomplishment of the objective. . . . When the system is operating efficiently at maximum efficiency, if I can use the phrase, it is operating at minimum cost.") (question omitted).

– Tr. 643:6-21 (Bartlett).

– P95 at 15 (1985 DOE Mission Plan) identifies timely and efficient acceptance of spent fuel as one of the NWPA's prime objectives:

"[T]he program must vigorously pursue the Act's directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998, and to continue to dispose of the waste in a *highly efficient manner* consistent with the continued orderly operation of the Nation's nuclear power-generation plants." (Emphasis added).

– Tr. 3739:4-20 (Morgan) (he agreed with view expressed in Mission Plan that the program must be conducted in a cost-effective manner).

– (6/28/04) Dep. Desig. 5/8/02 Milner, 266:23-267:4 (an OCRWM employee since April 1984, including Chief Operating Officer for the past four years); Tr. 4711:23-4712:3 ("Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency? A. Yes. Q. And that's been an objective throughout your time in RW? A. Yeah, I believe it has. Q. And when you consider efficiency in operating the waste management system, is it also proper in your view to take into account utility costs? A. My personal opinion, that should be a consideration.")).

67. Structuring the DOE SNF acceptance program to minimize utilities' total costs of storing and disposing of SNF is consistent with the full cost recovery nature of the Standard Contracts.

– Tr. 618:19-619:18; Tr. 635:9-636:7 (Bartlett) ("[G]iven the full-cost recovery as the basis [for operation of the DOE system], you want to operate as efficiently as possible to minimize the costs that are incurred, both by the Department and by the reactors.").

– P1CY, Art. VIII.A.4 and at 2 (fourth "whereas" clause).

– (6/28/04) Dep. Desig. 5/14/02 Barrett, 178:3-12 ("Q. What is your understanding of the relationship between the objective of economic efficiency and the fuel cost recovery nature of the contracts? [objection omitted] A. I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.").

– Tr. 3739:4-20 (Rusche) (the program must be conducted in a cost-effective manner with full cost recovery).

– P95 at 423 (1985 Mission Plan definition of "full cost recovery").

– (6/28/04) Dep. Desig. 5/8/02 Milner, 267:23-268:25 ("In my personal opinion, I think it – the department should and in fact I think the department did consider utility costs, and that's factored in many decisions what the impacts would be on utility costs.").

– *See* (7/14/04) Dep. Desig. 4/19/02 Trebules, 4:22-5:14 (when working on the Mission Plan in 1984-1985, "I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.").

68. The total cost to utilities of storing and disposing of SNF can be divided into three parts: at-reactor SNF storage costs; the costs that each utility will incur to load its SNF into casks provided by the government pursuant to the Standard Contracts for transport to a government facility; and the costs of the DOE disposal program (the sum of the fees the utilities have or will pay to the government for the services specified in the Standard Contracts).

– Tr. 619:3-18 (Bartlett) ("The program is a full-cost recovery system, or operates under full-cost recovery. And that means that you want to minimize the burden of cost for the Department to receive – the cost it incurs to receive the

things. But you also have the responsibility to minimize the costs to the reactors, to avoid the need for the reactors to expand their spent fuel capacity, to have excess costs associated with the transfer operations, or to have to spend excess monies just for program costs into the Nuclear Waste Fund. So you minimize costs on both sides, everywhere, and the effective full-cost recovery system.").

– Tr. 634:18-635:8 (Bartlett) ("The reactors incur what are called program costs, which are the costs that correspond to the fees that are paid into the system to have the fuel received and disposed. They also have the at-reactor storage costs, the costs they incur just to operate and store spent fuel on the site. And they also have the cost associated with their cost associated with the transfer operations to remove spent fuel from storage.").

69. A utility's at-reactor SNF storage costs rise precipitously in two events: (1) if it is forced to add to its at-reactor storage capacity because its pool fills up, and (2) if it is forced to extend at-reactor storage of SNF after its reactor permanently shuts down and all of its spent fuel has discharged or "cooled" for at least five years. The amount of spent fuel that would trigger one of these events can be thought of as "Must-Move Fuel." Tr. 639:24-643:2 (Bartlett); Tr. 767:8-768:24 (Graves).

## D. <u>3000 MTU is a Reasonable Rate.</u>

70. In the 1980s and 1990s, the aggregate amount of Must-Move Fuel at commercial nuclear reactors could be projected to grow at a rate of about 3000 MTU per year starting in 1998.

– Tr. 777:14-778:10 (Graves) ("But on average, over that whole time frame, about a 3,000 metric-ton-per-year rate is the approximate annual average increase in spent – in must-move spent nuclear fuel. So that's a benchmark for a reasonable acceptance rate.").

71. Had DOE begun acceptance of spent fuel from utilities by January 31, 1998 at a rate reasonably ramping up to 3000 MTU per year, the backlog of utility Must-Move Fuel would have been eliminated by 2002, and very few utilities would have been required to obtain or maintain additional at-reactor SNF storage capacity after January 31, 1998.

– Tr. 611:18-612:1; Tr. 643:22-645:1 (Bartlett).

– *See* (6/28/04) Dep. Desig. 5/10/02 Barrett, at 1368-69 (agreeing that in a "general sense," DOE had established that the 3,000 MTU rate would achieve the objectives of "avoid[ing] not only spent-fuel overflows but pool rerackings to [*sic* and] allow shut-down reactors to empty their sites."); *see also id.* at 1370-71 (3,000 MTU rate is consistent with these objectives).

72. In the 1980s and 1990s, the aggregate amount of spent fuel discharges at commercial nuclear reactors could be projected to be about 2000 MTU per year starting in 1998. Tr. 612:2-5 (Bartlett); Tr. 769:18-771:1 (Graves); P175 (August 17, 1993 PNL Throughput Rate Analysis) (contractor-generated document) at 4-5.

73. An annual acceptance rate of about 3000 MTU of commercial spent fuel would tend to minimize the costs of the DOE disposal program.

– Tr. 633:18-634:12; Tr. 636:25-637:14 (Bartlett) (3000 MTU rate would be efficient).

– Tr. 609:20-611:11 (Bartlett) (3000 MTU per year is maximum rate at which spent fuel can be placed into a geologic repository).

– Tr. 645:2-12 (Bartlett) (an acceptance rate higher than 3000 MTU per year would be unnecessary and wasteful, because not all of the capacity could be effectively used).

– Tr. 612:17-613:8 (Bartlett); Tr. 782:10-783:3 (Graves) (DOE studies show that an annual acceptance rate of 3000 to 4000 MTU would minimize program costs).

– P175 (August 17, 1993 PNL Throughput Rate Analysis) (contractor-generated document) at 4-12 to 4-13 (an annual acceptance rate of 3000 to 5000 MTU would minimize program costs).

– (6/28/04) Dep. Desig. 4/22/02 Barrett, at 197-198 (various system studies done in the eighties and early nineties supported the 3,000 MTU rate).

74. A reasonable acceptance rate for commercial spent fuel should include a buffer capacity above the minimum amount needed to handle the projected needs of utilities in order to be able to handle additional needs for spent fuel acceptance occasioned by previously unanticipated contingencies, such as early shutdowns of nuclear power plants.

– Tr. 612:6-16 (Bartlett) ("[Y]ou need flexibility and buffering in case there are unexpected discharges. And you also might need to, on an intense basis, at some point, accept a quantity for a shutdown reactor, which is incurring costs for storage that they shouldn't have to incur if the reactor is shut down.").

– Tr. 645:20-646:1 (Bartlett).

75. A reasonable acceptance rate should facilitate the use of acceptance campaigns (taking a sufficient amount of spent fuel from a single facility such that fewer DOE visits to the facility are needed) in order to minimize both utility transfer costs and DOE program costs.

– Tr. 1425:6-9 (Stuart) ("It is my opinion that [DOE] would have used campaigns because it is so obvious[ly] a benefit to the program that I can't think of any technical reason not to use a campaign.")

– Tr. 1425:16-1426:22 (Stuart) (the use of acceptance campaigns is much more efficient than frequent small pickups of SNF for both utilities and DOE).

– Tr. 637:15-639:15 (Bartlett) (utilities incur fixed costs in terms of training, preparation and disruption of operating reactor operations each time they deliver spent fuel to DOE, and campaigns minimize utility transfer costs by minimizing the number of times these costs are incurred).

– Tr. 1426:16-22 (Stuart) (DOE uses campaigns and "In fact, it requires it," in transporting research reactor fuel).

– (6/28/04) Dep. Desig. 5/14/02 Barrett, at 174-175 (campaigning promotes efficiencies in transportation, loading, cask handling, receipt and turnaround).

76. An acceptance rate of 3000 MTU of spent fuel per year from commercial reactors would be sufficient to support the use of acceptance campaigns, but a significantly smaller acceptance rate would not. Tr. 639:16-23 (Bartlett) (3000 MTU per year acceptance rate is consistent with the use of acceptance campaigns but 1000 MTU per year acceptance rate would not be).

77. From the time of the formation of the Contract to the present, DOE has been planning to accept 3000 MTU of spent fuel from commercial utilities.

– DOE's draft Mission Plans, and the 1985 Mission Plan, all set forth acceptance rates of 3000 MTU year. P636 at 2-3 (1983 Draft); P683 at 2-2 (1984 Draft); P95, vol. I, at 26-27 (1985 Mission Plan).

– (6/28/04) Dep. Desig. 4/22/02 Barrett, at 119-120 (since Mr. Barrett's involvement in the program in 1985: "In '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate" and that rate is one that would ramp up towards 3000 MTU/year); *see id.* at 149 (3000 MTU rate was established before Mr. Barrett's arrival in 1985, and "[i]t seemed like a reasonable number to me then as it does today").

– Tr. 609:20-610:7 (Bartlett) (a DOE acceptance rate of 3000 MTU per year had been established for "quite a while" when he became director of DOE's Office of Civilian Radioactive Waste Management in 1990 and that was the rate his office worked toward achieving during his tenure as director).

– (6/28/04) Dep. Desig. 5/2/02 Milner, at 217 (DOE's intentions with respect to repository design receipt rate has stayed constant at 3000 MTU/year).

– DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE's TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period. P968 (contractor-generated document) at 2-3 (1984 Draft); P245 at 2-1 (1985); P976 at 14 (1986); P246 at 23 (1987); P247 at 2-11 (1989); P248 at 2 (1990 Addendum to 1989 TSLCC); P249 at 8 (1995); P982 at 15 (1998); P977 at 4-14 (2001).

– DOE has used the 3000 MTU rate in its fee adequacy reports. *E.g.*, P421 at 3 (1984); P415 at 3 (1985); P545 at 4 (1986).

– (6/28/04) Dep. Desig. 4/25/02 Klein, at 351-352, 354 (DOE uses the 3000 MTU rate to determine the adequacy of the contracts' fee).

– DOE's published 1988 Draft Mission Plan Amendment projected a steady state repository receipt rate of 3000 MTU by the sixth year of operations. P100 at 18, 19.

– The Standard Contracts required DOE, beginning not later than July 1, 1987 to issue an annual capacity report ("ACR") for planning purposes setting forth the projected annual receiving capacity for the DOE facility or facilities. In the 1980s, those reports used an annual steady-state acceptance rate at or near 3000 MTU year. P52 at 7 (1987 ACR: 2650 MTU rate); P54 at 5 (1988 ACR: 3000 MTU Rate); *see also* P59 at 7 (1990 ACR: Upper bounding rate 3000 MTU rate). DOE's most recent ACR, issued in July 2004, projects a steady state acceptance rate of 3000 MTU per year. P1952 at 2.

78. Technically, DOE could have readily accepted and transported 3000 MTU of spent fuel from utilities per year starting in 1998.

– Tr. 1376:18-1377:5; Tr. 1395:8-22 (Stuart) (there are no technical obstacles or impediments to DOE's program accepting and transporting 3000 MTU a year beginning in 1998); Tr. 1389:14-1390:19 (Stuart) (sufficient transportation casks would have been available); Tr. 1427:8-1430:1 (Stuart) (ample transportation resources other than casks, such as railcars, heavy haul trucks and cranes, would have been available to support a 3000 MTU per year acceptance rate); Tr. 1380:16-1383:5 (Stuart) (Western Europe has annually accepted spent fuel, from around the world, and transported it for reprocessing at rates near or in excess of 3000 MTU a year) ("I think this is probably the most convincing evidence that exists that that can be done.").

– Tr. 607:5-18 (Bartlett) ("The kinds of activities that were to be done had been done many times in other circumstances. So it was simply a matter of adapting existing things to the purpose.").

– Tr. 597:21-598:11 (Bartlett) (plan to accept 10,000 MTU per year in Australia).

– (6/28/04) Dep. Desig. 5/8/02 Milner, 275:1-276:9 (DOE could have developed transportation system to handle 3000 MTU within a few years after 1998).

– Tr. 1362:22-1367:3 (Stuart) (plan to accept 3,000 MTU per year at Owl Creek, a proposed spent fuel storage facility).

– Tr. 1430:2-1446:7 (Stuart) (studies performed by NAC for DOE in the early 1990s showed there were no site-specific impediments to achieving a 3000 MTU per year acceptance rate, and ample transportation infrastructure to do so).

79. An annual acceptance rate of 3000 MTU of commercial spent fuel would have been reasonable had DOE begun acceptance from utilities in 1998.

– *See* PFF ¶¶ 70-78 above.

– Tr. 3685:10-16; Tr. 3686:18-22 (Morgan) (DOE should accept spent fuel as fast as it reasonably could, consistent with the intent of Congress).

– Tr. 3748:18-23 (Rusche) (the waste acceptance schedule in the Improved Performance Plan of the 1985 Mission Plan (P95) at 27 showing acceptance of 3,000 MTU per year starting in 1998 was reasonable).

– (6/28/04) Dep. Desig. 5/14/02 Barrett, 120:22-121:10 ("Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract? [objection omitted] A. We would have operated our system . . . at 3000 metric tons per year after five years. That's what we were planning to do.") and ("That's what we would have done if we could have gotten the, you know, the sites approved, et cetera.").

– Tr. 4749:21-4750:6 (Milner).

– Tr. 617:4-22 (Bartlett) (if DOE were to accept much above 3000 MTU per year, then there would be excess capacity: "It's like leaving an airplane sitting at the dock rather than having it flying." But "if you don't have the 3,000, then you're not doing your job with respect to taking this spent fuel from the reactors at an appropriate rate to avoid their [in]curring costs for additional storage.").

– Tr. 646:2-12 (Bartlett) (a reasonable acceptance rate should be a steady state rate in order to make the best use of all the resources and to avoid the expenses and difficulties of downtime and restart).

– (6/28/04) Dep. Desig. 4/22/02 Lake Barrett, 117:1-122:6; (6/28/04) Dep. Desig. 5/10/02 Barrett, at 1333-34, 1370; *see also* (6/28/04) Dep. Desig. 4/22/02 Barrett, at 52-59 (Deputy Director of OCRWM at the time of his deposition testified that the 3000 MTU rate is a reasonable rate for DOE's performance).

– Tr. 1364:13-21 (Stuart) (Owl Creek planned 3000 MTU per year, "a reasonable receipt rate"); Tr. 1366:15-18 (Stuart).

– *See also* (6/28/04) Dep. Desig. 4/25/02 Klein, 291:2-11 (DOE considers a 3000 MTU rate to be a reasonable rate to run the SNF program).

80. A reasonable acceptance rate for commercial spent fuel would have ramped up to 3000 MTU no slower than annual acceptance in the first six years of program operations of 1200 MTU, 1200 MTU, 2000 MTU, 2000 MTU, 2700 MTU and 3000 MTU.

a. Reasonable spent fuel acceptance should ramp up to the steady state rate as quickly as reasonably possible in order to make the fullest possible use of the resources developed for DOE's acceptance of spent fuel from utilities and to relieve utilities of their costs of storing spent fuel. Tr. 784:8-785:3 (Graves) (noting this "standard principle of economics"); Tr. 618:19-620:18 (Bartlett) (when he was director,

OCRWM was trying to achieve a 3000 MTU full performance rate as quickly as possible in order to minimize costs for both utilities and the DOE program; the DOE program can use its funds more effectively with a faster ramp up rate).

b. DOE should have been able to attain a 3000 MTU per year steady state acceptance rate within about three years of starting spent fuel acceptance given the 15-year planning horizon between the formation of the Standard Contracts in 1983 and the January 31, 1998 deadline for spent fuel acceptance, and the ready availability of casks and equipment.

– Tr. 646:13-647:3 (Bartlett).

– Tr. 1364:5-12 (Stuart) (Owl Creek planned a ramp up starting at 1000 MTU the first year and increasing to 3000 MTU per year in the third year).

– Tr. 618:7-18 (Bartlett) (when Dr. Bartlett was director of OCRWM, he anticipated that DOE could achieve a 3000 MTU per year acceptance rate within three years of the start of waste acceptance).

– Tr. 783:4-784:7 (Graves) (reasonableness of this ramp-up rate is shown by its use in DOE documents, including the 1988 Mission Plan Amendment).

– P100 at 19 (1988 Mission Plan Amendment) (using this ramp-up rate).

– P254 at 15 (1999 Civilian Radioactive Waste Management System Requirements Document, Revision 5, projecting this ramp-up rate at centralized interim storage facility); a central storage facility was the sort of facility OCRWM was principally considering using during Dr. Bartlett's tenure as director in light of the repository schedule. Tr. 607:19-608:1 (Bartlett).

c. The parties understood and DOE planned that spent fuel acceptance would begin prior to 1998, such that by 1998 the acceptance rate already would have ramped up.

– Tr. 382:3-19 (Mills) ("[W]e really expected that the program would have started receiving spent fuel or nuclear waste a few years prior to 1998. And ramp up to a 1998 date in which the delivery amount that was due [sic] be accepted by the federal government, was equivalent to that amount discharged from the reactors in that year, plus some amount to work off the backlog. Q. Okay. And what was the basis of that expectation? A. Many discussions that

had occurred between myself and members of Congress when we were developing the waste program – or Waste Policy Act. And with individuals within the Department of Energy that worked on that particular program.").

– P95 at 27 (1985 Mission Plan) (showing spent fuel acceptance beginning prior to 1998 and acceptance of 3000 MTU in 1998).

**E. <u>Sequence of Spent Fuel Removal</u>**

81. At the time of Contract formation, the parties understood and intended that the Contract's provision concerning "oldest fuel first" ("OFF") would not be the sequence for DOE's actual acceptance of spent fuel, but only (at most) an initial allocation of priority that could be and would be exchanged.

– Tr. 430:10-431:5 (Mills) ("the OFF concept identified that some of the – a relatively small quantity of spent fuel would be allocated to several different locations. And it just did not make sense from running an efficient program to proceed to those particular utilities that had the oldest fuel first and take a small quantity from them and go to another, take a small quantity, go to a third and take a small quantity. That was not an efficient system. And it was known at that time that was not an efficient system."); *see also* Tr. 362:15-363:7 (Mills).

– P1CY, Art. VI.B.1. (provision indicates OFF would only come into play if utilities intended to deliver more spent fuel than system capacity could accommodate).

82. The Contract provides in Article V.E., for exchanges (or "swaps") between or among contracting utilities so that utilities could adjust the initial OFF allocations in a reasonable and efficient manner. P1CY, Art. V.E.

83. At the time of Contract formation, the parties understood and believed that the exchanges clause would "allow industry to optimize the allocation of . . . waste acceptance capacity to meet individual utility needs without the overt involvement of the department." Tr. 436:17-437:17 (Mills) (agreeing with statement in P145 (1995 letter from OCRWM Director, Daniel Dreyfus, to Yankee Atomic President Andrew Kadak)); *see also* P30 (April 8, 1983 approval memorandum for publication of Standard Contract in Federal Registry), Tab D at 1.

– P31 at 16592 (publication of Standard Contract as final rule in Federal Register) (explains that at the time of formation of the Standard Contracts many utilities requested that an exchanges provision be added to the contracts, and this was one of the few changes to the draft contract made by DOE).

84. Had DOE performed, utilities would have exchanged acceptance allocation consistent with their economic interests and developed an acceptance schedule that tended to optimize or otherwise effectively reallocate acceptance allocations in accordance with industry needs.

– P145 (1995 letter from Dan Dreyfus, OCRWM Director, to Andrew Kadak, President of Yankee Atomic) ("We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.").

– Tr. 4204:24-4205:3 (Zabransky) (noting his current agreement with expression in P145 that exchange provision will enable utilities to "optimize allocation of waste capacity.").

– *See* (7/14/04) Dep. Desig. 5/23/02 Brownstein, at 105-106 ("So you can see a natural imbalance to the utilities themselves and the value of receiving fuel at any particular time. And, if there was that imbalance, we assumed, certainly the contract allowed for, you know, a market to develop."); (7/14/04) Dep. Desig. 4/22/99 Slater, 289:20-23 ("I did anticipate that there would be some amount of DCS exchanges.").

a. There is a practice within the nuclear utility industry of finding efficient ways of trading rights and service and obligations to further their economic self-interests. Tr. 1241:18-1242:7 (Collier) (the nuclear utility "industry is fairly creative in the way it goes about its business. And it's certainly motivated to save money or to make money, whichever the case might be, as much as anybody I've ever seen.").

b. Under the contracts between the nuclear industry and DOE for fuel enrichment services, a robust and effective market developed for the exchange of DOE's delivery commitments. Tr. 1235:23-1241:17 (Collier). This successful market for DOE services pre-dated DOE's spent fuel contracts, and the nuclear utilities had a good idea of

how the mechanics of the spent fuel exchanges market would operate based on their experience in the market for DOE enrichment services. Tr. 433:14-21 (Mills).

c. Exchanges would have an enormous economic benefit to the utilities, and those savings are very large in comparison to either DOE's costs to consider exchange approval requests or the utilities' transaction costs to find trading partners and agree on terms for exchanges.

– Tr. 839:25-841:23 (Graves); Graves Demonstrative 84.

85. DOE would have been reasonable in its approval of exchange requests and DOE approval would not have been an impediment to an exchanges market.

– P30, Tab D (approval memorandum for publication of Standard Contract as a Final Rule) at 1. As the first Acting Director of the SNF reported to the Secretary of Energy at the time of contract formation:

> The majority of the utilities commented that they should have "exchange" or "swapping" rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex record keeping, this poses no great problem to us, and consequently, we have accepted this suggestion. It will require our approval, and we intend to be reasonable.

P30, Tab D at 1. Tr. 3640:1-10 (Morgan) (interpreting memorandum to mean that DOE would approve exchanges as long as "the fuel met the acceptance requirements").

– Tr. 4776:20-4777:1; Tr. 4777:11-23 (Milner, the Chief Operating Officer of OCRWM) (DOE would have liberally approved exchanges requests involving shutdown utilities).

– P145 (1995 letter from Dan Dreyfus, OCRWM Director, to Andrew Kadak, President of Yankee Atomic) (DOE stated that exchange provision in contracts should enable utilities to "optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.").

– Tr. 4204:24-4205:3 (Zabransky) (noting his current agreement with expression in P145 that exchange provision will enable utilities to "optimize allocation of waste capacity.").

– (7/14/04) Dep. Desig. 5/23/02 Brownstein, at 106 ("we wanted to do as little as possible in interfering with the market"); (7/14/04) Dep. Desig. 6/13/02 Slater, at 125 ("I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.").

a. Exchanges would have had substantial programatic benefits to DOE by reducing the number of different sites that DOE would have had to visit in a year, and creating more, efficient transportation campaigns that would have taken more substantial quantities of SNF at each site visit. Tr. 839:2-24 (Graves); Graves Demonstrative 91; Tr. 362:15-363:7 (Mills); Tr. 4206:25-4207:21 (Zabransky) (exchanges could lead to more efficient transportation of spent fuel than OFF).

b. DOE also would have benefited from exchanges because they would have increased DOE's access to populations of older, cooler fuel, like the fuel at the Yankee plants. Because utilities can deliver any fuel under the DOE contract that is five-year cooled, had DOE performed, utilities would have generally delivered their younger, hotter fuel with their allocations rather than their older, cooler fuel. Tr. 1395:23-1397:3 (Stuart). DOE would have desired to obtain cooler, older fuel because it would be easier to transport and could be blended with younger fuel to control the heat load of disposal packages at the repository. Tr. 1448:2-1449:21 (Stuart).

86. There are no significant technical or transportation impediments to exchanges by contracting utilities. Tr. 1446:8-1447:8 (Stuart).

87. Accepting spent fuel in an oldest-fuel-first sequence ("OFF") is not a reasonable or efficient schedule for the acceptance of spent fuel from utilities.

– Tr. 430:10-431:5 (Mills) (at time of formation of the Standard Contracts, parties did not expect spent fuel to be accepted according to OFF, because such an acceptance sequence would be inefficient).

– Tr. 621:14-622:8; Tr. 647:19-648:15 (Bartlett) (OFF acceptance would be inefficient because it would require frequent trips to reactors for relatively

small quantities of spent fuel); *see* (6/28/04) Dep. Desig. 5/14/02 Barrett, at 176-177 ("It would be inefficient.").

– Tr. 802:16-803:22 (Graves) (OFF would be an economically inefficient acceptance regime).

– Tr. 832:8-833:13 (Graves) (industry-wide, if DOE had started accepting spent fuel at a rate reasonably ramping up to 3000 MTU starting in 1998, utilities would have incurred far greater spent fuel storage costs under OFF acceptance than would have been the case if spent fuel acceptance were based on efficient exchanges of spent fuel acceptance allocations).

– Removal of spent fuel in an OFF order allocation system starting in 1998 at a reasonable acceptance rate would have resulted in a large amount of avoidable storage costs by utilities. Tr. 832:8-9 (Graves); *see* Tr. 831:19-839:24; Tr. 834:20-835:25 (Graves). (In the non-breach world, Mr. Graves calculated that approximately $2.4 billion of additional at-reactor storage costs would have been avoided if the market reallocated acceptance allocations to the utilities that needed them most rather than proceeding on an acceptance schedule based on OFF).

– Tr. 836:1-839:24 (Graves) (showing that the OFF sequence leads to many more trips by DOE to pick up spent fuel than a sequence with exchanges of allocations); *see also* Graves Demonstrative 91.

– (6/28/04) Dep. Desig. 5/14/02 Barrett, at 64 ("Q. [I]s it your understanding that . . . this listing of allocations of oldest fuel first is going to be the actual sequence in which the Department picks up spent fuel from the various contract holders? [objection omitted] A. I doubt it."); at 65 ("most likely" there would be arrangements for more efficient campaigns); *see id.* at 71-72 (from a cost perspective, it would be in the utilities and DOE's interests to re-arrange the sequence from OFF).

88. If DOE had performed, DOE would have completed removal of all Connecticut Yankee's SNF in August 2001.

– Tr. 825:10-826:1; Tr. 826:23-827:6 (Graves).

– *See* PFF ¶ 142 regarding GTCC waste.

89. Mr. Graves used highly reliable data to model the exchanges market that would have occurred absent DOE's breach. NAC International, a leading nuclear engineering firm that tracks such information, supplied the pool capacity, discharge data and storage cost data used by Mr. Graves. Mr. Graves also used data from DOE.

– Tr. 944:20-945:2 (Graves).

– Tr. 945:3-5 (Graves).

– Tr. 1034:23-1035:19 (Pennington).

– Tr. 1077:23-1079:15 (Pennington).

**F. <u>Shutdown Priority</u>**

90. The Contract provides for priority acceptance by DOE of SNF removed from a commercial reactor that is permanently shut down. P1CY, Art. VIB.1.

91. If DOE had performed at a reasonable acceptance rate beginning by January 31, 1998, DOE would have provided shutdown priority to Connecticut Yankee, if necessary, to prevent Connecticut Yankee from waiting a substantial period of time to complete its decommissioning.

– Tr. 441:24-442:25 (Mills) ("[I]t just seemed reasonable in that the industry would have an ability to decommission shutdown plants and be able to decommission them, return those particular sites to whatever use was appropriate, and to be able to do so in a reasonable time period after they were shut down."

– At the time of formation of the Standard Contracts, the parties understood and expected that DOE would implement priority acceptance of spent fuel and HLW from shutdown reactors, as provided in Article VI.B.1.(b), if and as necessary to prevent shutdown utilities from waiting a substantial period of time to complete their decommissioning. 48 Fed. Reg. 16590, 16593 (April 18, 1983).

– During the process of developing the Standard Contracts, DOE rejected requests by certain utilities to omit the Article VI.B.1.(b) priority acceptance provision, explaining "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16590, 16593 (April 18, 1983).

– *See* (6/28/04) Dep. Desig. 5/3/02 Milner, at 418-419 (DOE had an interest in and objective allowing shutdown reactors to timely decommission); *see also* (7/14/04) Dep. Desig. 5/15/02 Barrett, at 339-340 ("I felt that it was in the nation's interests to support utilities like Yankee who were trying to clean up their sites and return that real estate to useful societal purpose in that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies.").

## V. ISFSI DEVELOPMENT

92. DOE did not perform under the Contract as the parties understood and expected it would.

– Tr.1718:3-10 (Bennet).

– PFF ¶¶ 54-65 above re: parties' understanding and intentions.

– P1952 at 2 (2004 ACR/APR) (showing DOE does not anticipate any acceptance of SNF before 2010).

– PFF ¶¶ 93-107 below re: Maine Yankee's need to build additional at-reactor storage.

93. Beginning soon after the DOE spent fuel contracts were executed, DOE SNF program planning documents and public statements raised concerns within the nuclear utility industry, and among members of Congress, that DOE might be unable or unwilling to meet the January 1998 start date or otherwise to fulfill its contract commitments to utilities regarding acceptance and removal of SNF.

– Tr. 403:5-20 (Mills) (describing concerns raised by low acceptance rates in 1983 draft mission plan and by DOE's failure to meet the statutory deadline [of July 6, 1983 – 180 days following enactment of NWPA, 42 U.S.C. 10132(a) (2000)] for issuing repository siting guidelines).

– P1925 (November 17, 1983 letter from Members of Congress to Secretary of Energy questioning delayed repository start-up date in draft mission plan).

– Tr. 408:9-409:11 (Mills) ("great anxiety" caused by statements by Mr. Morgan at a December 1983 conference, which "did not satisfy our understanding earlier in the year when we signed the contract"); *see also* D1 at 11-12.

94. In the late 1980s and throughout the 1990s, DOE SNF program delays and other events caused contracting utilities, including Connecticut Yankee, to reasonably believe that DOE would neither (i) commence acceptance of SNF by the January 1998 start date, nor (ii)

proceed, after commencing acceptance, on a schedule that was reasonable and consistent with the purpose and intent of the DOE contracts and the NWPA as set forth above.

a. In its June 1987 Mission Plan Amendment, DOE stated it would not begin accepting spent fuel at a permanent repository until 2003, P99 at 6, 10, and in its November 1989 "Reassessment" Report to Congress, DOE stated it did not expect to take spent fuel for disposal at a repository until 2010, P101 at vii, 9-11. *See also* P99 at 61 (noting estimated receipt rate at repository in 2003 of only 400 MTU/year).

b. Although DOE suggested in both P99 and P101 that it still could meet the 1998 start date by accepting spent fuel at an interim storage facility ("MRS"), *see* P99 at 6; P101 at vii-viii, those suggestions lacked credibility. Under the 1987 amendments to the NWPA, an MRS could not be built until after the NRC authorized construction of a repository, 42 U.S.C. § 10168(d)(1), and in the 1989 Reassessment DOE estimated it would not receive construction authorization until 2004, *see* P101 at 10. *See also* P101 at x ("the current linkages between the repository and the MRS program make it impossible for the DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository"), 12 ("If the current statutory linkages to the repository are maintained, an additional delay of 5 years would result, with startup estimated at 2007 for the basic MRS facility."); Tr. 1718:17-1719:1 (Bennet) (1989 OCRWM report to Congress spelled out numerous operational problems with getting the repository on line and "really did a thorough assessment of the project as being in trouble. In fact, it remarked that the view at the time was that repository operations would be delayed until 2010. So 6 years into the contract, they were looking at a 12-year delay.").

c. In May 1994, DOE stated in a Federal Register notice that it would not be able to begin disposing of spent fuel in 1998 because a repository would not be operational until, at the earliest, 2010. P951, "Notice of Inquiry," 59 Fed. Reg. 27,007, 27,008 (1994).

d. In June 1994, in response to a letter from Yankee Atomic's President, Dr. Kadak, to Secretary of Energy O'Leary asking "when does DOE expect to begin the acceptance process?" and "[w]hat is your best estimate of the shipping schedule when you begin accepting spent fuel?," *see* D218 at YDK007566-67, DOE's response for the DOE Secretary (by Ronald Milner) included the following: "the earliest possible date for acceptance of waste for disposal at a repository is 2010," "[t]he 1992 Annual Capacity Report represents the best current estimate of the rate at which Yankee Atomic['s] spent nuclear fuel would be accepted . . . . assuming availability of an MRS . . . ," and "[d]eveloping a meaningful waste acceptance schedule for the period beyond the initial ten years is not possible at this time." *Id.* at YDK007572. *See* Tr. 2277:11-2291:17 (Heider) (discussing D218); Tr. 2342:13-23 (Bennet) (noting reliance on Kadak/Milner exchange in preparing 1995 FERC rate case).

e. In May 1995, DOE published its formal position that its obligation to commence spent fuel acceptance by January 1998 was conditional upon the existence of an operating repository or interim storage facility constructed under the NWPA, "Final Interpretation of Nuclear Waste Acceptance Issues," P516, 60 Fed. Reg. 21,793, 21,795 (1995), a position DOE had previously articulated in the course of approving delivery dates in delivery commitment schedules "dependent upon the existence of an operational repository or interim storage facility. . . ." D30.18 (transmitting DCS so legended to

Yankee Atomic). *See* D218 at YDK007570 (June 1994 response to Yankee Atomic for Secretary O'Leary stating "Department's preliminary view that it has no statutory obligation . . . to accept spent nuclear fuel beginning in 1998 the absence of an operational repository or other facility constructed under the [NWPA], though such an expectation may have been created through implementation of the Standard Contract").

95. From before 1996 to the present, no option has been available to Connecticut Yankee for storage or disposition of its spent fuel located at its Haddam Neck plant other than (a) removal by DOE pursuant to its contract with Connecticut Yankee, or (b) on-site storage either in its fuel pool or in a dry storage ISFSI.

– P287CY (March 1995 licensing submittal to NRC) at 2 ("At the present time, CYAPCO has contracted with the US Department of Energy to begin taking delivery of its spent fuel in 1998. However, DOE has indicated that all of CYAPCO's a spent fuel may remain on site until a repository is operational or until some other facility is constructed under the Nuclear Waste Policy Act (NWPA).

– *See* P1465YA at 75 (September 1992 spent fuel storage study: "Offsite storage at a host nuclear facility is another option which is potentially cost effective. It is not considered to be a near term solution due to the current lack of a willing host utility.").

– Tr. 3478:1-4 (Kouts) (DOE has no plan to accept commercial spent fuel that does not lead to the repository); Tr. 3522:17-23 (Kouts) (Private Fuel Storage has been trying to get its license for seven years and still does not have it).

96. Because of the anticipated breach by DOE, Connecticut Yankee evaluated options and began to take steps, both before and after it permanently shut down its plant in December 1996, to arrange a substitute for DOE performance and/or to mitigate the damages it expected as a result of DOE's anticipated failure to perform. This action was reasonable and appropriate.

– D236 at 38 (April 1996 Decommissioning Cost Study: "[p]ost-operation spent fuel storage can represent a significant expense" and "[b]oth direct and indirect costs for long-term fuel storage have been included in this

estimate [such as] costs for the isolation of the Fuel Building [and] in support of operation of the Fuel Building over the 18 years").

– D89 at 34, 38 (December 1996 Decommissioning Cost Study: spent fuel remains 25 years following recent plant shutdown and "CY will provide staffing throughout this time period to safeguard the fuel.").

– D266 at 3 (February 1998 Spent Fuel Storage Study prepared "to evaluate the long term options for spent fuel storage on the CY site.").

– *See* Tr. 1834:24-1836:24 (Bennet) ("looking at the situation as the industry saw it in '89 with one of the first major revelations that the program was in trouble, and by that, I mean the report by the OCRWM . . . to the Congress [P101] indicated that the program was in deep trouble. . . . And 6 years into the contract it was revealed that not only was the program struggling but the repository opening would be most likely delayed until 2010. And that brought to light some early information that we believed needed to be acted on early, rather than wait till actual occurrence. . . . All that required the utilities to act, really, independent of the DOE to address those risks early on.").

– Tr. 2307:18-22 (Bennet) ("Since the [DOE] . . . was believed to not be capable of removing fuel in 1998, and that would cause Connecticut Yankee to lose full-port [sic, core] discharge, approximately around the year 2000," Connecticut Yankee reracked its spent fuel pool in 1996.).

– Tr. 2315:12-2316:12 (Bennet) (Connecticut Yankee's FERC rate case filed in December 1996 was based on wet fuel storage out through 2022 or 2018).

– Tr. 2325:12-15 (Bennet) ("We had been studying dry storage for quite some time, going back to the studies that were commissioned at the time . . . I came to Connecticut Yankee in 1997.").

– Tr. 1718:3-10 (Bennet) ("Well, my understanding of the contract is that, by January 31st, 1998, they [DOE] were supposed to initiate spent fuel pickup. So that's an absolute breach. But all of the actions they took prior to that to not do anything – and as a businessman, I always interpret a contract in my favor – constituted breaches as well, breaches in the responsibility that they had in the contract.").

97. Even before Connecticut Yankee permanently shut down its nuclear plant in December 1996, Connecticut Yankee reasonably believed (i) that DOE would neither begin accepting SNF until well after January 31, 1998 nor proceed, after commencing acceptance, on a schedule that was reasonable and consistent with the purpose and intent of the DOE contracts

and the NWPA as set forth above and (ii) that there was significant uncertainty regarding the future date when DOE would begin such acceptance.

– *See* testimony and exhibits cited above in support of PFF ¶¶ 93-96.

– P1444CY (October 1992 "Spent Fuel Storage Strategy") at 12 ("There is less than a 25% probability that DOE will remove fuel from utility sites by 1998)" and at 13 ("There is some likelihood (perhaps 50%) that DOE may begin to remove fuel by 2010").

– P1445CY (December 1993 "Update of Spent Fuel Storage Strategy") at 1 ("DOE is not expected to meet its 1998 commitment to begin removing the spent fuel from our nuclear units. There is also no firm date by which DOE is expected to begin this removal.").

– P1448CY (July 1995 "Spent Fuel Storage Strategy") at 12 (making various recommendations "under the assumption that delays continue to plague DOE's program through 2025").

– D89 (December 1996 Connecticut Yankee decommissioning cost study) at 38 ("[A]ssumes that the DOE will begin taking CY fuel in 2006, and will finish by January 1, 2022. The 2006 assumption is based on the possibility that DOE will have access to a centralized interim storage facility by 2006."); *id.* at 25 (among "major assumptions": "Spent fuel will remain on-site for approximately 25 years following final plant shutdown," which had just occurred that month).

– D236 (April 1996 CY Decommissioning Cost Study) at 34, *see* Figure 4.2 on p. 44 (among "major assumptions": "Spent fuel will remain on-site for 18 years following final plant shutdown," assumed to occur at end of license life in 2007).

– Tr. 2299:8-13 (Bennet) (at time he joined Connecticut Yankee in 1997, "[w]e saw it [DOE's commencement of spent fuel pickup in 1998 or at a reasonable time thereafter] and I saw it as very unlikely.").

98. Based on DOE conduct and statements, and other events, uncertainty regarding the date when DOE will commence acceptance of SNF continued after 1996 to the present, and, as a result, it became reasonable for Connecticut Yankee to believe that DOE would not commence acceptance of SNF until after 2010, and perhaps never will.

– *See* testimony and exhibits cited above in support of PFF ¶¶ 93-97.

– Tr. 2363:22-2364:4 (Bennet) ("My understanding that we integrated into our decision making was that we didn't know absolutely when [DOE] would be coming. We had a lot of information that it would be a very long time . . . .").

– Tr. 2298:12-2299:13 (Bennet) (at time he joined Connecticut Yankee, his view was that DOE was very unlikely to commence spent fuel pickups in 1998 or at a reasonable time thereafter: "[I]n the time span from when I joined Yankee Atomic in '95 to when I joined Connecticut Yankee in '97, the Department of Energy had conducted their MPC procurement and terminated it. . . . And in 1997, when I came to Connecticut Yankee, I was aware of that and further information as to how things weren't going at Yucca Mountain in the repository process.").

– Tr. 1535:19-1537:2 (Bennet) (understood when he joined Yankee Atomic in 1995, based on "what DOE had published at that time," that DOE performance would be "very delayed" until "no sooner than 2010"); Tr. 1536-1537 (Bennet) ("I personally always understood it would be somewhat later than that, if not a great deal later than that. And I also had my own view that they very well may never perform."); Tr. 1537-1538 (Bennet) (noting comparable views held throughout the nuclear utility industry).

– Tr. 1718:1-1719:25 (Bennet) (outlining spent fuel program failures from the 1980s forward).

99. After its nuclear plant ceased operation in 1996, Connecticut Yankee initially pursued extended wet storage of its SNF in its fuel pool, and the funding plan initially presented in Connecticut Yankee's 1996 rate filing before the Federal Energy Regulatory Commission ("FERC") was premised on wet storage for an extended period. *See* D471 at 77. However, during the course of its 1996 FERC rate filing, Connecticut Yankee determined that the best and most cost-effective way to store its SNF until DOE accepts and removes it would be to implement dry storage at its reactor site. This determination was reasonable and appropriate.

a. From the outset of Connecticut Yankee's 1996 FERC filing, intervening parties, including the Connecticut Department of Public Utilities ("DPUC"), recognized the merits of dry storage over wet storage, and vigorously challenged Connecticut Yankee's assertions that wet storage was preferable (because of cost, technical and other concerns with dry storage technology). The DPUC also was a "forceful proponent" of a

decommissioning operations contract ("DOC"), a fixed price turnkey contract for the entire decommissioning process and for the fuel transfer process from wet to dry storage.

– D471 (August 1998 FERC ALJ Initial Decision, noting DPUC criticisms at pp. 77-80).

– Tr. 2316:19-20 (Bennet) ("There was a tremendous amount of opposition from the intervenors in that case.").

– Tr. 2317:21-2318:3 (Bennet) ("[Intervenors] weren't very happy about the use of wet storage for a long period of time. In particular, the D[PUC] . . . was not only unhappy with the use of wet storage, but they specifically stated that dry storage was the best way to store the fuel for such a long time.").

– Tr. 2318:6-11 (Bennet) (noting reasons for DPUC's position, including its "own express preference, based on experience of other utilities, that dry storage was the most favorable economic option").

– Tr. 2322:23-2323:6 (Bennet) (Connecticut DPUC were forceful proponents of a DOC contract for a number of reasons, "not the least of which that it would, under a fixed-price contract, account for a significant component of costs that previously had to go through cost estimates. And they liked that.").

– Tr. 2320:16-24 (Bennet) ("DOC is short for decommissioning operations contract," a fixed price turnkey contract with a large architect engineer firm that would complete the entire decommissioning process, as well as complete the fuel transfer process from wet storage to dry storage.).

b. In an Initial Decision issued in August 1998, a FERC Administrative Law Judge ("ALJ") concluded that Connecticut Yankee's decommissioning cost estimate submitted with its 1996 FERC filing contained numerous "deficiencies" that rendered it "too unreliable for ratemaking purposes," D471 at 80. Among those deficiencies were the criticisms by DPUC and other intervenors of certain spent fuel storage assumptions used in the 1996 FERC Submission, *see* D471 at 77-79, although the ALJ did not directly reject Connecticut Yankee's previously stated preference for extended wet storage of spent fuel and HLW, *see* D471 at 77-79. *See also* Tr. 2463:8-2464:22 (Bennet).

c. The FERC ALJ concluded that Connecticut Yankee "has not justified the requested increase [in decommissioning costs] over the amounts previously estimated. … Accordingly, Connecticut Yankee's rates should continue to be based upon the preexisting decommissioning cost estimate, including a reasonable allowance for inflation, until a new, more reliable estimate has been prepared and tested." D471 at 80. The Initial Decision set forth suggestions for the new cost estimate, including that it should "assume that DOE will accept its legal responsibility for spent fuel storage delay costs," D471 at 81-82, but also acknowledged, "[o]f course, if future events offer additional guidance on aspects of the decommissioning cost estimate that are currently unknown, or if circumstances change for reasons not now anticipated, these factors should be taken into account, as appropriate, D471 at 81. *See* Tr. 2319:14-16 (Bennet) (noting that FERC ALJ directed Connecticut Yankee to prepare new decommissioning cost estimate).

d. As a result of the ALJ's rejection of Connecticut Yankee's decommissioning cost estimate accompanying its 1996 FERC submission, Connecticut Yankee faced significant known and estimated future cost increases for decommissioning and spent fuel storage, but was precluded from raising its collection rates to cover those increasing costs. Therefore, it was imperative that Connecticut Yankee develop a new cost estimate that was acceptable to FERC. It also was important to obtain the DPUC's support.

– Tr. 2333:6-22 (Bennet) (After the ALJ decision throwing out the prior cost estimate, Connecticut Yankee committed to the FERC to prepare a new cost estimate).

– Tr. 2466:1-7 (Bennet) (after the ALJ threw out Connecticut Yankee's decommissioning cost study, it prepared a new decommissioning cost estimate

and, through interaction with the interveners, agreed to a settlement based on that cost estimate).

– Tr. 2321:25-2322:6 (Bennet) (After the ALJ's decision, Connecticut Yankee set out to reconsider its assessment of spent fuel storage options, and in particular the relative merits of wet versus dry storage).

e. As Connecticut Yankee began preparing a new cost estimate for submission to FERC, it also determined to pursue a DOC, which was favored by the DPUC.

– Tr. 2321:10-14 (Bennet) (DOC was "a newly emerging seemingly growing business of large architect engineers getting involved with fixed-price decommissioning contracts at nuclear power plants."); Tr. 2321:17-22 (Bennet) (timing of ALJ decision and Maine Yankee DOC contract).

– Tr. 2323:1-13 (Bennet) (noting reasons DPUC favored a DOC); Tr. 2321:2-11 (Bennet) (additional reasons for interest in DOC by DPUC and Connecticut Yankee).

f. Upon completion of its analysis of its fuel storage options and of Maine Yankee's DOC contract, Connecticut Yankee prepared and issued a request for proposal ("RFP") for a DOC in December 1998. Connecticut Yankee's RFP requested that bidders address options relating to both long-term wet storage and long-term dry storage, in addition to a number of decommissioning-related options. Both bidders who submitted proposals included options for both long-term wet and long-term dry storage of spent fuel and HLW.

– Tr. 2322:16-22 (Bennet) ("As part of all the new analysis that we had completed looking at fuel storage and the decommissioning operations contract up at Maine Yankee, we prepared and issued an RFP in December of 1998 after about 45 days' worth of discussions with potential bidders as to things we might consider in crafting that RFP.").

– Tr. 2323:19-22 (Bennet) (two bidders, Stone & Webster and Bechtel, submitted proposals).

– Tr. 2324:19-25 (Bennet) (both bidders had responded with proposals for both long-term wet storage, long-term dry storage).

g. Following thorough evaluation of the proposals, including the options for long term spent fuel storage, Connecticut Yankee in April 1999 executed a DOC with Bechtel Corporation which included phased construction of an ISFSI and transfer of spent fuel to dry storage.

– Tr. 2325:10-2326:2 (Bennet) ("The decision to award dry storage as part of Bechtel's contract wasn't just based on their bid information. We had been studying dry storage for quite some time, going back to the studies that were commissioned at the time we came to – or I came to Connecticut Yankee in 1997. And as such, the consideration of the length of time that we might be facing storing fuel at the site, as well as the economics of being able to complete decommissioning in our fixed-price contract in a reasonable time frame, and award all of that under a single scope, as well as some additional information we got from the bidding process as to the potential long-term O&M cost savings we would have on wet versus dry storage, gave us enough information to award Bechtel that full scope, and, essentially began executing transfer of fuel – executing the path to dry storage.").

– Tr. 2326:3-7, 14-20 (Bennet) (cost of different storage methodologies was a factor Connecticut Yankee evaluated based upon its own analysis as well as information it received from the competitive bids in DOC procurement process; another factor was "the length of time we would be looking at fuel storage.").

– Tr. 2364:19-24 (Bennet) (economic advantage for dry storage in Bechtel proposal).

– Tr. 2326:25-2327:7 (Bennet) (enumerating risk factors Connecticut Yankee evaluated in DOC procurement process).

– Tr. 2327:23-2328:3 (Bennet) (evident in the differences in the particular bid options that operating a dry storage facility is less expensive than operating a wet storage facility); Tr. 2327:8-18 (Bennet) (after planned completion of Bechtel contract, Connecticut Yankee would be responsible for operating its ISFSI; relative costs of wet versus dry storage over the long run would be Connecticut Yankee's responsibility).

– Tr. 2323:23-2324:3 (Bennet) (Connecticut Yankee awarded DOC contract to Bechtel in April 1999).

– Tr. 2329:2-13 (Bennet) (Bechtel contract was fixed-price turnkey contract built on a structure of 21 milestones and underlying submilestones for which Bechtel would receive payment for completing that work).

h. Connecticut Yankee's determination that dry storage under the DOC contract was the most reasonable and appropriate course to pursue based on a number of factors, including (i) uncertainty regarding when in the future DOE would remove Connecticut Yankee's SNF; (ii) the economic advantage of dry storage over wet storage, which was confirmed during the DOC bidding process, *see* Tr. 2326:3-20; Tr. 2327:8-2328:3; Tr. 2364:6-24 (Bennet); and (iii) other factors that Connecticut Yankee had been studying for several years and that its management team was very familiar with from their experience at Yankee Atomic.

– Tr. 2325:4-2326:2 (Bennet) (describing factors); Tr. 2362:2-2363:6 (Bennet) ("[The] most significant factor is the fact that DOE would not be performing on the contract . . . . And the expected long duration of that nonperformance was the most critical factor in our mind."; other factors included "economics" and "transportability.").

– Tr. 2362:21-2363:4 (Bennet) ("Since the performance breached by DOE was going to be so long, so exceptional, the desire to have the fuel in a transportable [state]," so that if the opportunity arose, it could be moved either to the DOE site or to private fuel storage, was another factor in favor of dry storage.).

– Tr. 2365:18-25 (Bennet) (same factors informed judgment of both Connecticut Yankee and Yankee Atomic that dry storage would best address issues arising from storing fuel over the long term, except DOC did not work out at Yankee Atomic).

– Tr. 1574:3-6 (Bennet) ("packaging the fuel in dry storage was the, in our view the most – the best way to take care of the fuel given the long time frame of having to store it pending DOE coming to get it"); Tr. 1815:23-1816:3 (Bennet) ("Based on all of the studies, the first and general conclusion is that dry fuel storage is less expensive than wet. And that is a fairly clear conclusion that comes from essentially the passive state of dry storage versus the operation of a fuel pool."); Tr. 1816:5-8 (Bennet) (no properly conducted study would conclude that wet storage is cheaper than dry).

– P1457YA at 35 (July 1994 presentation by NRC Chair Selin) ("For those plants in premature or extended shutdown, the NRC finds several strong reasons why the interim, on-site storage of spent fuel should often be shifted from the existing fuel pool to a dry storage system. . . . Therefore, the NRC increasingly views dry storage as the preferred method of interim storage of

mature spent fuel for plants in permanent shutdown. . . ."); *see* Tr. 1351:14-23 (Stuart) (recalls the speech and audit very clearly; "it was a very significant speech because this was a senior person in government who was expressing a view about the future that would require a cask for spent fuel. So that was very dramatic for NAC. It was also quite dramatic for someone of Mr. Selin's stature to be expressing a preference because the NRC does not generally do that. . . .").

– D218 (at YDK007561) (October 4, 1993 letter from Lake Barrett, Acting Director of OCRWM, to Representative Norman Dicks) ("Once the Nuclear Regulatory Commission has certified Sacramento Municipal Utility District's transport-storage system, the Department would be willing to initiate the appropriate actions to include such a system as an acceptable waste form under the terms of the <u>Standard Contract</u>.") (emphasis in original); P1013 (May 3, 2000 letter from OCRWM Director Itkin to Governor King of Maine) (assuring Governor King that the Standard Contracts provide that DOE will accept and dispose of spent fuel that has been stored in accordance with NRC approved proceedings); P81 & Tr. 4197:3-10 (Zabransky) (agreeing that the position that the utilities in the high-level waste working group (of which Mr. Zabransky was chairman) presented to the DOE in P81 was that DOE should accept licensed multi-element fuel canisters as a standard fuel assembly classification).

i. The April 1999 Bechtel DOC contract formed the basis for Connecticut Yankee's preparation of a new decommissioning cost study, which in turn became the basis for an April 2000 settlement among Connecticut Yankee, the DPUC and other intervenors of the 1996 FERC rate case. As part of that settlement, Connecticut Yankee agreed to use its best efforts to secure funding or reimbursement from the DOE for onsite storage and disposal of its spent nuclear fuel and GTCC waste.

– Tr. 2333:6-15 (Bennet) ("[O]ur cost estimate would be built around the Bechtel contract; that is, our oversight of it [and] would also now be based on long-term fuel storage in a dry ISFSI.").

– Tr. 2334:1-2335:5 (Bennet) (explaining that the "January 1, 2000 to-go estimate," which was built around the Bechtel contract, was the basis for the April 2000 settlement of Connecticut Yankee's 1996 FERC case).

– D740 (signed Settlement of 1996 FERC rate case) at 3 ("In agreeing to the terms of this Offer of Settlement, the Settling Parties have taken into account the DOC process and costs, as well as CY's most recent estimate of DOC oversight and other decommissioning costs incurred by CY.").

– D740 at 6 ("Connecticut Yankee shall use its best efforts to secure funding or reimbursement for storage and disposal of spent nuclear fuel and high-level radioactive waste, including GTCC waste, from the DOE.").

100. In the course of implementing dry storage, and under the DOC contract, Connecticut Atomic determined to procure and use transportable storage containers of the same type used at Yankee Atomic. This determination was reasonable and appropriate.

– Tr. 2329:21-2330:7 (Bennet) ("The type of canisters were essentially the same type of canisters that Yankee Atomic procured. We elected in the [DOC] RFP, because of the similarities of Yankee Atomic's and Connecticut Yankee's fuel, to specify [] the NAC system. . . . And that would allow for potential synergies on down the road for commonality of transport casks and simplification of our oversight of Bechtel during the licensing, engineering and design of that equipment.").

– Tr. 2352:8-24 (Bennet) ("We had already made the decision at the award of the Bechtel contract that we would be using the same transportable cask design[] as Yankee Atomic. . . . [W]e had always wanted to follow the DOE plan that these casks be transport ready.").

– Tr. 1578:25-1579:17 (Bennet) (explaining reasons for selection of multipurpose containers: (1) "that was the path that was envisioned by DOE. In fact, they went through a process of going to procure multipurpose casks themselves," and (2) "[b]ut to us, and our stakeholders at Yankee Atomic, the most important issue was, since this fuel was to go to Yucca Mountain, that it, indeed, be transportable").

– Tr. 1603:25-1607:25 (Bennet) (discussing DOE's 1994 initiative to procure multipurpose canisters ("MPCs")); Tr. 1607:9-18 (Bennet) (after cancellation of DOE MPC procurement: "we made the immediate calculation that the MPC was the way that DOE intended to get fuel out to Yucca Mountain. So we specifically adopted the MPC specification as the main part of our request for proposal.").

– Tr. 1826:6-1827:13 (Bennet) (elaborating significance of transport readiness).

– Tr. 1355:21-1356:15 (Stuart) (in early 1990s, DOE Secretary Watkins believed multipurpose canisters were a "good idea").

– Tr. 1358:2-21 (Stuart) (listing advantages of multipurpose canisters).

– Tr. 1360:24-1361:6 (Stuart) ("I believe everyone in the industry at that point in time [early 1990s] felt that the handwriting was on the wall by DOE that MPC concept would be the acceptable way for the program to progress.").

– Tr. 1361:7-10 (Stuart) (the industry's reaction to what DOE was announcing "was to begin designing MPC type systems.").

101. In the course of implementing dry storage, Connecticut Yankee determined that the best and most cost-effective way to store its spent fuel assemblies that are classified as failed or damaged would be to either reconstitute the assemblies or place them in special containers and in either case to then store the reconstituted or canned assemblies in the same dry storage canisters and casks as intact assemblies. This determination was reasonable and appropriate.

– Tr. 1408:2-12; Tr. 1412:12-19; Tr. 1414:21-1416:18 (Stuart) (reasons for reconstituting or canning fuel assemblies with failed fuel rods).

– Tr. 2332:10-20 (Bennet) (Connecticut Yankee has reconstituted its failed fuel and/or packaged it in damaged fuel containers and placed it in canisters).

– P989 at CTR006 0044; Tr. 446:21-448:19 (Mills) (statement in P989 that "failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel" comports with "our understanding that the failed fuel would go on a same-schedule procedure as other unfailed spent fuel," Tr. 448:22-449:2).

102. In the course of deciding to implement dry storage, and under the DOC contract, Connecticut Yankee determined that the best and most appropriate way to store its GTCC waste, including such waste derived from reactor internals, would be to arrange for storage of such waste in the same dry storage canisters and casks as its spent fuel. This determination was reasonable and appropriate, particularly given Connecticut Yankee's understandings that GTCC waste would be disposed of in the DOE repository and that DOE was obligated by Statute and the Contract to remove GTCC waste with the spent fuel.

– Tr. 2330:13-2332:1 (Bennet) ("Very similar to Yankee Atomic in which the [GTCC] waste . . . would be segmented from the reactor internals, . . . and cut into pieces that would be placed into fuel-assembly-sized canisters and

ultimately placed in three storage canisters."); Tr. 2331:5-18 (Bennet) (treatment of GTCC waste specified in Connecticut Yankee's DOC RFP).

– Tr. 1568:10-14 (Bennet) ("our intent was that it be packaged in a way similar to fuel so that it could be . . . . handled and stored just like fuel"); Tr. 1623:10-22 (Bennet) (similar).

– Tr. 2331:12-18 (Bennet) ("the placement of GTCC inside of the fuel-assembly-like containers would, not only allow us to handle the GTCC and load it much like the fuel, [but] it also would allow for its transportation and disposal by the DOE in an efficient manner. Each canister could be handled and was physically the same"); Tr. 2331:19-2332:1 (Bennet) (understanding DOE would take GTCC waste for disposal was part of reason for canisterization).

– *See* testimony and exhibits cited below in support of PFF ¶¶ 134, 137, 140.a.

103. If the DOE had performed under its Contract with Connecticut Yankee, Connecticut Yankee would not have implemented dry storage for its spent fuel and GTCC waste.

– *See* testimony and exhibits cited above in PFF ¶¶ 92-102.

– Tr. 2328:16-23 (Bennet) ("We wouldn't have built the ISFSI if the government was performing. . . . [T]he construction of an ISFSI is not something that's what I call fun to do. And, clearly you wouldn't do it if fuel was being removed from the site. There wouldn't be a need to. . . ."); *see* Tr. 1634:16-1635:5 (Bennet) ("[I]n the instance of DOE performing, we would not have built the ISFSI.").

104. Connecticut Yankee's implementation of dry storage in the context of the DOC contract involved licensing and arranging for fabrication of dry storage containers. Tr. 2328:24-2330:7 (Bennet). Construction of the ISFSI pad was delayed by litigation with the Town of Haddam over zoning and permitting issues, *see* Tr. 2345:5-2346:18 (Bennet), which was settled in January 2002, Tr. 2346:19-2347:3 (Bennet), allowing ISFSI construction to proceed.

105. Although Connecticut Yankee's damages claim is premised on completion of the Bechtel DOC (including dry storage implementation) on time and on budget, *see* Tr. 2384:1-18 (Bennet), Tr. 2528:13-19 (Jewell-Kelleher), in June/July 2003 Connecticut Yankee terminated that contract for default, Tr. 2354:5-13 (Bennet). Since then Connecticut Yankee has "assumed

the role of general contractor" and is managing the completion of the work using a number of subcontractors. Tr. 2354:14-2355:2 (Bennet).

a. Termination of the Bechtel contract will delay completion of dry storage implementation beyond the December 2003 completion date assumed in Connecticut Yankee's damages claim, Tr. 2384:12-18 (Bennet), "CY-DOE-2002-10-29-links.xls/" Connecticut Yankee Decom Key Dates, and increase the cost of dry storage implementation above that claimed here as damages. Tr. 2359:23-2360:14 (Bennet); Tr. 2527:17-2528:12 (Jewell-Kelleher).

b. At the time of trial, Connecticut Yankee had completed construction of the ISFSI pad, declared the ISFSI operational, loaded 10 containers with spent fuel and 2 with GTCC waste, and was working to complete the process of loading 40 fuel containers and 3 GTCC waste containers early in 2005. Tr. 2355:3-22 (Bennet).

106. Connecticut Yankee acted reasonably and appropriately in contracting with Bechtel and others for the design, licensing, fabrication and loading of its dry storage canisters and casks and the construction of its ISFSI, in overseeing and managing the Bechtel and other contractors selected to perform these tasks, in performing certain related tasks directly through employees, and in incurring the costs needed to accomplish these tasks.

– *See* testimony and exhibits cited in PFF ¶¶ 99-105 above.

– Tr. 2320:12-2321:19 (Bennet) (we talked with Maine Yankee frequently about the newly emerging seemingly growing business of large architect engineering firms (which had built these type of plants in the first place), getting involved with fixed-price decommissioning contracts at nuclear power plants. And Maine Yankee had already entered such a contract).

– Tr. 1633:18-1634:15 (Bennet) (lessons Connecticut Yankee learned from the Yankee Atomic and Maine Yankee dry storage experiences, and resulting improved loading efficiency at Connecticut Yankee).

– Tr. 1632:18-1633:4 (Bennet) ("And we had to do it without the benefit of a planned out program, as had been contemplated under the [NWPA] and the contract. And that caused a great deal of difficulty on our part. It was something which we had to, not only invent the industry, there wasn't a fuel transfer industry out there, we had to also directly develop with the vendors a lot of the processes and procedures you would use to load fuel.").

– Tr. 2349:18-21 (Bennet) (Haddam settlement agreement, *see* P1920 at 7, "required Connecticut Yankee to take all reasonable" efforts to procure the availability of a transport cask; again, to support their view that the waste ought to be packaged and as transport ready as possible); Tr. 2352:7-2353:1 (Bennet) ("it was also . . . that the availability of the transport casks as far as our stakeholders perceived, would provide for the earliest possibility of transport to some facility that was not in their state or their town, as they looked at it. And we valued that type of input and tend to integrate it into our planning as well."); *see* Tr. 1613:25-1615:19 (Bennet) (reasons why Yankee Atomic's NAC hardware contract included design and licensing of transportation cask); Tr. 1802:10-12 (Bennet) ("I assume DOE would procure or make use of our transport cask if we have one.").

– Tr. 1825:10-21 (Bennet) ("[T]he nature by which we manage the process of letting contracts, procuring the services, executing it is a very diligent one. It is not changed by the fact that we have to finance the money that DOE should have given us to do this. . . . So the process [by which we] manage and spend the money are just the same as if we were spending our own money. . . .").

107. The Bechtel termination has increased Connecticut Yankee's costs.

– Tr. 2527:17-2528:12 (Jewell-Kelleher) (compared to October 29, 2002 Connecticut Yankee budget, the costs and estimates for ISFSI construction and long term storage of SNF in the June 2004 Connecticut Yankee FERC rate case showed higher costs on a nominal basis, without contingency or escalation of approximately $12.5 million.).

– Tr. 2359:23-2360:14 (Bennet) ("Q. Thank you. Okay. Thanks. Can you describe just briefly and generally, Mr. Bennet, the effect of Bechtel's termination on the Connecticut Yankee decommissioning process? A. Because of their breach, default, we now have to complete the project ourselves. And under the contract, Bechtel had an obligation to complete it at a time certain. By September of 2004 was one of the major, what we call, time acceptance milestones in the contract. And as we see it now, the decommissioning project will be completed somewhere towards the end of 2006, as far as physical completion goes. Q. And has there been an impact on cost? A. Yes, there has. And we've had to make a FERC rate case application to address this. Q. That cost has moved in which direction? A. Up. Higher.").

## VI. FUEL STORAGE AT GE MORRIS

108. Since the late 1970s, Connecticut Yankee has stored 82 of its spent fuel assemblies (once used in its nuclear plant) at a Morris, Illinois facility operated by GE. Such storage, and associated costs incurred by Connecticut Yankee, have been reasonable and appropriate.

a. Prior to the cessation of spent fuel reprocessing in this country in 1976, Connecticut Yankee had sent the 82 assemblies to the Morris facility for reprocessing, Tr. 2300:18-25 (Bennet), but that facility never commenced reprocessing operations, Tr. 2300:25-2301:2 (Bennet).

b. First in settlement of resulting litigation, and then under a subsequent contractual arrangement, Connecticut Yankee and General Electric agreed that the 82 spent fuel assemblies would be stored at Morris, for a fee. Tr. 2301:23-2302:6 (Bennet).

c. There has been and continues to be intense opposition, from both citizens and pubic officials, to any attempt by Connecticut Yankee to bring the 82 spent fuel assemblies from Morris back in to Connecticut. Tr. 2346:6-25 (Bennet). Indeed, the January 29, 2002 Consent Order issued by the Federal District Court that resolved Connecticut Yankee's zoning/permit litigation with the Town of Haddam prohibits the return of the 82 assemblies. Tr. 2348:3-2349:7 (Bennet); P1920 at 5, ¶ 5. *See* Tr. 5712:19-5713:4 (Abbott) (in offering opinion that Connecticut Yankee should bring the 82 assemblies back from Morris to Haddam Neck, Abbott did not consider any factor other than estimated costs).

d. It is reasonable and appropriate for Connecticut Yankee to store the 82 assemblies at the Morris Facility. *See* ¶ 108.a.-c. above.

## VII. RERACKING

109. From 1995 to 1996, Connecticut Yankee expanded its on-site storage capacity for spent fuel by reracking its spent fuel pool for the second time.

– Tr. 2588:18-2620:18 (Mellor) (discussing reracking and associated documentation).

– P287CY (licensing submittal to NRC) at p. 1-2 ("Background," p. 5 at ¶ 1, detailing initial capacity of 336 assemblies, expansion of capacity to 1,168 assemblies after the first reracking in the 1970s, and request to permit second reracking to 1,480 assemblies).

– Mr. Mellor was employed at Connecticut Yankee for approximately six years from March 1997 to April 2003, including as Director of Operations and Decommissioning, Vice President of Operations and Decommissioning, and finally as President and Chief Executive Officer, Tr. 2584:5-2585:11 (Mellor), and had responsibilities including oversight of the spent fuel, and operations of the spent fuel pool, Tr. 2585:17-25 (Mellor).

110. Reracking is the removal and replacement of storage racks in the fuel pool with racks of higher density, creating more compact storage of fuel assemblies, which allows more fuel assemblies to be stored in the pool.

– Tr. 2590:6-9 (Mellor); *see also* Tr. 1552:22-1553:8; Tr. 2306:16-25 (Bennet); Tr. 2849:3-10 (Whittier).

111. When its reactor was operating, Connecticut Yankee always maintained sufficient excess capacity in its fuel pool to allow discharge into the fuel pool of all fuel assemblies in the reactor core (known as "full core reserve") through the end of its licensed period.

– Tr. 2591:5-2592:3 (Mellor); *see also* Tr. 2671:17-2672:2; Tr. 2676:14-17 (Heider) (explaining that Yankee Atomic also maintained full core reserve).

112. Maintaining full core reserve so that the fuel assemblies in the reactor core can be discharged into the fuel pool is a safety-enhancing and common practice in the commercial nuclear power industry. Full core reserve allows the reactor to be maintained and repaired when necessary.

– Tr. 2850:14-19 (Whittier); Tr. 2591:19-2592:17 (Mellor); Tr. 2672:3-2676:13 (Heider) (explaining that allowing a loss of full core reserve "would be viewed as a management failure"); Tr. 5430:23-5431:8 (Abbott).

113. Moreover, the NRC has stated that it prefers nuclear utilities to maintain full core reserve capability, and NRC in-service inspections conducted every 10 years require the discharge of all fuel assemblies in the core. But maintenance of full core reserve capability is not required.

– Tr. 2856:13-21 (Whittier).

– Tr. 2857:18-21 (Whittier).

114. In October 1992, Connecticut Yankee projected that, absent DOE performance under the Contract, its reactor would lose full core reserve in 2000, Tr. 2597:7-11 (Mellor); P1444CY (at CDB006672; CDB006691), when its reactor would have discharged sufficient spent fuel into the Connecticut Yankee fuel pool and the then-existing storage racks in the pool to eliminate full core reserve capacity, Tr. 2604:14-2608:13 (explaining the discharge of fuel assemblies for 1994-2000); *see also* P1445CY (at CDB006705-706).

115. In October 1992, Connecticut Yankee reasonably estimated that there was less than a 25% probability that the Department of Energy would commence the removal of spent nuclear fuel from utility sites in 1998 as required by the Contract.

– Tr. 2596:5-13 (Mellor).

– P1444CY (at CDB006684).

116. By December 1993, Connecticut Yankee reasonably concluded that DOE could not be expected to meet its obligation to commence the removal of spent nuclear fuel starting January 31, 1998 and that DOE would not accept a quantity of spent fuel from Connecticut Yankee sufficient to allow Connecticut Yankee to avoid losing full core reserve capacity in the fuel pool.

– Tr. 2599:4-7; Tr. 2600:16-24 (Mellor).

– Tr. 2307:16-22 (Bennett).

– P1445CY (at CDB005938, CDB00692).

– *See also* P287CY (licensing submittal to NRC, at p. 2, ¶ 1).

117. Connecticut Yankee concluded, as early as 1992, that the most reasonable, cost-effective method to avoid loss of full core reserve in the spent fuel pool was to rerack Connecticut Yankee's fuel pool.

– P1444CY (at CDB006681).

– P1445CY (at CDB005938; CDB006692; CDB006697).

– P1448CY (at CDB006660-661); P287CY (licensing submittal to NRC) at p. 2, ¶ 2.

118. During the 1990s, Connecticut Yankee proceeded to plan the reracking of its spent fuel pool in a "flexible" "wait and see approach" in order to minimize expenditures. In doing so, Connecticut Yankee hoped to defer major expenditures as long as reasonably possible in the event that DOE somehow actually started to accept Connecticut Yankee's spent nuclear fuel.

– Tr. 2600:25-2601:8 (Mellor).

– P1445CY (at CDB006692).

– P1448CY (at CDB006652).

119. At the time Connecticut Yankee was planning for a possible reracking in the 1990s and at the time it made the decision to rerack, Connecticut Yankee expected to continue operations until the end of its operating license in 2007.

– Tr. 2592:18-2593:3; Tr. 2611:13-17; Tr. 2619:8-25 (Mellor).

– P287CY (licensing submittal to NRC, at p. 2, ¶ 2).

– P1448CY at CDB 006668 (Appendix 2, under "Loss of FCR" column, noting "EOL" on "End of License Life.").

120. Connecticut Yankee submitted its licensing submittal, entitled "Proposed Revisions to Technical Specifications, Spent Fuel Capacity Expansion," to the U.S. Nuclear Regulatory Commission on March 31, 1995 to gain approval for the reracking of its spent fuel pool.

– Tr. 2609:8-2610:10; Tr. 2620:4-7 (Mellor).

– P287CY (licensing submittal to NRC).

121. The NRC approved Connecticut Yankee's plan to rerack its spent fuel pool.

– Tr. 2610:6-10 (Mellor).

122. The reracking of Connecticut Yankee's spent fuel pool, which was completed in the summer of 1996, expanded the pool's storage capacity from 1,168 assemblies to 1,480 assemblies.

– Tr. 2589:3-19 (Mellor).

– Tr. 2608:18-2609:7 (Mellor) (explaining why the spent fuel pool's actual capacity prior to reracking was 1,168 assemblies as opposed to its licensed capacity for 1,172 assemblies).

123. The reracking of Connecticut Yankee's fuel pool provided the capability to maintain a full core reserve to the end of Connecticut Yankee's operating license in 2007.

– Tr. 2611:13-17; Tr. 2619:8-25 (Mellor).

– P287CY (licensing submittal to NRC, at p. 2, ¶ 2).

124. Connecticut Yankee would not have reracked its spent fuel pool but for DOE's announced and anticipated failure to accept Connecticut Yankee's spent fuel and HLW as required by the Connecticut Yankee Contract.

– Tr. 2307:16-22 (Bennett).

– Tr. 2596:8-13; Tr. 2600:25-2601:8 (Mellor).

– P1444CY (at CDB006684).

– 287CY (licensing submittal to NRC, at p. 2, ¶ 1).

125. Connecticut Yankee incurred costs as a result of the reracking project of $8.3 million.

– Tr. 3256:11-3257:2 (Wise).

– Tr. 2307:1-15 (Bennet).

126. The reracking costs of $8.3 million would not have been incurred by Connecticut Yankee but for DOE's announced and anticipated failure to accept Connecticut Yankee's spent fuel and HLW as required by the Connecticut Yankee Contract.

– Tr. 2307:16-22 (Bennett).

– Tr. 2596:8-13; Tr. 2600:25-2601:8 (Mellor).

– P1444CY (at CDB006684).

– 287CY (licensing submittal to NRC, at p. 2, ¶ 1).

## VIII. GTCC WASTE

127. During decommissioning, Connecticut Yankee segmented activated metal from near the reactor core, sometimes called "reactor internals," which is classified as greater-than-Class C ("GTCC") waste.

– Tr. 3149:21-3150:22 (Meisner).

– Tr. 1565:10-1566:17 (Bennett).

– Tr. 5557:8-5558:1 (Abbott).

– *See also* P1910 at HQR165 0190 (activated metal is "from the decommissioning of commercial nuclear power plants"); (7/14/04) Dep. Desig. 6/13/02 Campbell, 47:24-48:16.

128. GTCC waste from the segmentation of Connecticut Yankee's reactor internals is highly radioactive material.

– P1785 (NRC letter to Senator Lieberman) (characterizing Connecticut Yankee's GTCC waste as "highly radioactive").

– Tr. 3150:5-18 (Meisner) ("these metals were themselves very highly radioactive").

– Tr. 5937:17-20 (Abbott) ("Q: GTCC waste from commercial reactors is highly radioactive? A: Yes."); Tr. 5557:21-23 (Abbott) (during generation, the reactor internals "become highly activated").

– *See also* P1911 at HQR-164-0053 (Draft March 21, 2002 memorandum for the Secretary) ("The largest portion of GTCC consists of highly radioactive metal from commercial nuclear power plants").

## A. <u>Connecticut Yankee's GTCC Waste Is Covered By the Contract.</u>

129. Congress intended that the NWPA, and the geologic repositories contemplated by the NWPA, would be the solution for disposal of highly radioactive utility waste other than spent fuel that did not otherwise have a disposal path.

a. In the NWPA, Congress found that "*radioactive waste* creates potential risks and requires safe and environmentally acceptable methods of disposal." 42 U.S.C. § 10131(a)(1) (2000) (emphasis added).

b. Congress found that a "national problem" had been created by the accumulation of spent fuel and the accumulation of radioactive waste from reprocessing and "other sources." 42 US.C. § 10131(a)(2) (2000).

c. Congress recognized that "Federal efforts during the past 30 years to devise a permanent *solution* to the problems of civilian radioactive waste disposal have not been adequate. 42 U.S.C. § 10131(a)(3) (2000) (emphasis added).

d. Congress defined "disposal" in the NWPA to include "emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or *other highly radioactive material*. . . ." 42 U.S.C. § 10101(9) (2000) (emphasis added).

e. In the NWPA, Congress defined "disposal package" as a container that holds "solidified high-level radioactive waste, spent nuclear fuel, *or other* radioactive materials. 42 U.S.C. § 10101(10) (2000) (emphasis added).

f. In the NWPA, Congress defined HLW broadly to include – in addition to spent fuel and the highly radioactive byproducts from reprocessing – "other highly radioactive material" that the NRC "determines by rule requires permanent isolation." 42 U.S.C. § 10101(12) (2000).

g. Disposal in a repository constitutes permanent isolation. (6/28/04) Dep. Desig. 4/25/02 Klein, 440:14-19 (Rule 30(b)(6) witness) (disposal in repository would constitute permanent isolation); (7/14/04) Dep. Desig. 6/14/02 Campbell, 444:20-445:3 (similar); *see also* P1157 (contractor-generated document) at IDF017 0305 (1995 analysis by the National Low-Level Waste Management Program of statutory and regulatory provisions pertinent to co-disposal of GTCC waste with HLW).

130. At the time of Contract formation, the parties understood that decommissioning would generate waste from the reactor internals that would have been exposed to intense radiation and achieved levels of radioactivity too great to permit their burial in the low-level waste disposal facilities that were the responsibility of the states. Tr. 450:17-451:2 (Mills).

131. At the time of Contract formation, the parties understood that DOE would remove from utility sites and dispose of in the repository all highly radioactive waste that needed to be disposed of in a repository.

– Tr. 454:11-23 (Mills) ("We knew that any waste with a radioactivity Greater Than Class C was the responsibility of the federal government. . . . We had thought at the time of the contracts that any of those wastes would go to the geologic repository"); Tr. 450:20-451:2 (Mills); *see also* Tr. 451:21-452:4; Tr. 451:3-20 (Mills) (the LLWPAA and NWPA "indicated the mechanism and the responsibility for the disposal of all radioactive waste from commercial power operation").

132. The Low Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA") codified and confirmed the federal government's responsibility for the disposal of all GTCC waste from all sources, including that arising from the nuclear utilities' decommissioning. 42 U.S.C. § 2021c(b)(1)(D) (2000); *see generally*, P1047 at iii (DOE's statutorily-required, 1987 Report to Congress and the President ("1987 GTCC Report to Congress") ("Under paragraph 3(b)(1) of the Act . . . the Department of Energy has responsibility for the disposal of . . . [GTCC waste].").

133. From the enactment of the LLRWPAA until the present, DOE has intended and planned to dispose of utilities' GTCC waste along with the utilities' spent fuel in the repository.

– P1972 at HQR-077-0671 (OCRWM Director Ben Rusche's comments to the 1987 GTCC Report to Congress: "It is our present intent that reactor hardware would be disposed of in the repository.").

– P1089 at 2 (senior NRC official Robert Bernero July 23, 1990 letter to OCRWM Director Bartlett) (NRC sees "little benefit" in developing a regulatory alternative path, and "[w]e believe that it is much more reasonable now to use the planning assumption that residual capacity at the HLW repository can accommodate much or perhaps all of the GTCC waste").

– Tr. 627:3-628:4 (Bartlett) (Bartlett and Bernero "concurred that it would be easy to dispose of [GTCC] waste" in the planned Yucca Mountain repository because "it exists in very small quantities.").

– P1139 at YDK012782 (DOE December 20, 1994 letter to Yankee Atomic) (DOE's analyses of its GTCC waste program strategy "strongly suggested that the Department should consider co-disposal of utility-generated [GTCC] waste in the geologic repository being developed by the Department for disposal of high-level radioactive waste and spent nuclear fuel").

– P1144 at 2 (DOE memorandum authorizing publication of the 1995 Federal Register Notice regarding DOE's preferred strategy for GTCC waste) ("it appears that a dedicated GTCC LLW disposal facility cannot be justified by the volume of the waste or the hazard it presents.").

– 60 Fed. Reg. 13424, 13425 (DOE's March 13, 1995, publication in the Federal Register of its "tentative selection of a strategy for GTCC LLW management and disposal," identifying "co-disposal of GTCC LLW with spent nuclear fuel and high-level waste in a geologic repository as the preferred co-disposal option."); Tr. 4421:25-4422:10 (Huizenga) (agreeing that this notice appears to reflect DOE's policy at the time).

– P1155 at YDK012703 (DOE June 1995 presentation slides produced from Yankee Atomic's files, stating "Pursue co-disposal of GTCC LLW in a geologic repository.").

– P1280 at i & 13 (1995 GTCC Waste Management Plan) ("co-disposal with high-level radioactive waste (HLW) and spent fuel in a repository is the most viable disposal option").

– P1298 at HQR141 0151 (1999 GTCC Waste Management Plan) ("The strategy also supports DOE's long term approach to dispose of GTCC LLW in a geologic repository"); *id.* at HQR-065-0462 ("DOE's long-term solution for the disposal of GTCC LLW is the same as that for spent nuclear fuel . . ."); *see also* Tr. 4410:6-4411:2 (Huizenga) (1999 Plan was an update of the 1995 Plan).

– P1654 (June 22, 1999 teleconference summary reflecting that within DOE "there is an understanding between GC, RW, and EM that GTCC waste will go to the repository"); (7/14/04) Dep. Desig. 1/29/03 Campbell, 606:18-610:23, 615:2-9 (confirming that DOE official Mr. Frei stated that there was an understanding that GTCC waste would go to the repository and directing that other options not be pursued); *see also* (6/28/04) Dep. Desig. 4/25/02 Klein, 499:3-20 (DOE's Rule 30(b)(6) witness) (admitting that at the policy level an understanding exists that GTCC will go to the repository, if authorized, and DOE expects that it will have such authority).

– P1658 at NRC004 0090 (DOE September 1, 1999 presentation to NRC) (identifying repository disposal as the long-term disposal option).

– P1909 at HQR165-0179 to HQR165-0180 (Memorandum for the Secretary from Patrice Bubar's files) ("it appears that the NRC and Congress anticipated that the GTCC wastes would ultimately be disposed of in the RW-managed repository – *i.e.*, no other licensed repository has been authorized by Congress for siting").

– P1911 at HQR164-0053 (March 21, 2002 DOE draft memorandum for the Secretary) (Utility GTCC waste "has a number of similarities to SNF and is best suited for disposal in the proposed repository").

– P1909 at HQR165-0181 (within DOE, OCRWM "has taken the position that, *other than* activated metal from commercial reactors, it cannot accept GTCC wastes within the repository") (emphasis added).

134. Knowledgeable participants in the nuclear utility industry have understood, at least from the enactment of the LLRWPAA to the present time, that disposal of utility GTCC waste was a DOE responsibility and that DOE would fulfill that responsibility by disposing of the utility GTCC waste at a repository.

– Tr. 454:11-21 (Mills) ("We knew that any waste with a radioactivity Greater Than Class C was the responsibility of the federal government. . . . We had thought at the time of the contracts that any of those wastes would go to the geologic repository").

– Tr. 4947:13-16 (Kadak) ("the responsibility for GTCC is clearly DOE's, but the definition, if you connect the dots, okay, it will lead one to conclude it has to go into a repository . . ."); Tr. 4951:12-15 (Kadak) ("And I made a recommendation that, why doesn't the NRC simply, in its regulations, declare it as high level waste because it will ultimately end up in the repository anyway?").

– Tr. 5927:7-9 (Abbott) ("There's a greater than .5 probability that the GTCC waste will go to Yucca Mountain"); Tr. 5929:11-16 (Abbott) (Q: "In fact, every one of the . . . decommissioning cost estimates that includes spent nuclear fuel storage costs that you prepared at ABZ, assume that DOE would be accepting failed fuel and GTCC, correct? A: That's correct.").

135. Consistent with the NWPA, the Contract defines the term "high-level radioactive waste" to include "other highly radioactive material that the [NRC], consistent with existing law, determines by rule requires permanent isolation." P1CY, Art. I.12.(b).

136. The NRC has determined by Rule that GTCC waste requires permanent isolation.

a. NRC's 1989 Rule unambiguously requires permanent isolation of GTCC waste "unless" there is an NRC-approved alternative, and there is no such alternative.

– P1069 at 22583 (1989 Rule) (GTCC waste "must be disposed of in a repository . . . .").

– P1613 at 1 (May 25, 1989 NRC memorandum authorizing publication of the Rule) (the rule "requires disposal of [GTCC] waste in the nation's high level radioactive waste repository"); *see also* P1069 at 22582 (1989 Rule comments) ("the Commission believes that the course of action it had proposed – *requiring* geologic repository disposal of GTCC waste, or approved alternative – should be adopted") (emphasis added).

– P1157 (contractor-generated document) at IDF017 0308 (1995 analysis by the National Low-Level Waste Management Program of statutory and regulatory provisions pertinent to co-disposal of GTCC waste with HLW) ("it should be noted that virtually *all* NRC regulations reserve latitude for the Commission to make exceptions. In general, provisions allowing exceptions do not obviate the mandatory nature of rules") (emphasis in original).

– P1280 at 13 (1995 GTCC Waste Plan) ("NRC, in 10 C.F.R. 61.55(a)(2)(iv) *requires* that GTCC LLW be disposed of in a repository unless the DOE makes a compelling case for another disposal option") (emphasis added); *see also* Tr. 4441:20-4442:6 (Huizenga).

– Tr. 1837:17-20 (Bennet) ("We consider GTCC waste to be high-level waste under the contract. . . . the NRC has declared it as requiring permanent isolation.").

– In *Connecticut Yankee Atomic Power Co.*, 84 FERC ¶ 63,009, 86 (1998), a FERC Administrative Law Judge found that: "DPUC and Staff argue persuasively that there is a reasonable likelihood that GTCC waste removal and disposal is covered in the standard DOE contract."

b. DOE has never proposed an alternative disposal path to NRC, and is not considering any such proposal.

– P1654 (June 22, 1999 teleconference summary) ("[o]ptions other than the repository are considered politically undesirable in light of overall DOE waste management objectives").

– (6/28/04) Dep. Desig. 4/25/02 Klein, 448:3-6 (DOE not considering proposing an alternative to NRC); *see id.* at 496:11-21 (it would be "difficult" to site another facility for GTCC waste).

– (7/14/04) Dep. Desig. 1/29/03 Campbell, 494:3-495:2 (not aware of any proposal to NRC for an alternate facility and doesn't know of any effort in DOE to develop intermediate disposal capacity).

– Tr. 4538:2-4540:25; Tr. 4560:23-4564:5 (Huizenga) (Mr. Huizenga was and is ("[a]nd I am currently") unaware of any other substantial, credible options for GTCC waste other than the repository).

– P1144 at HQR-077-1686 (February 14, 1995 Memorandum re Federal Register notice) ("it appears that a dedicated GTCC LLW disposal facility cannot be justified by the volume of the waste or the hazard it presents.").

– P1139 at 1 (Grumbly December 20, 1994 letter to Thayer).

137. The Contract obligates DOE to remove Connecticut Yankee's GTCC waste no later than DOE's removal and disposal of its spent fuel. *See* PFF ¶¶ 129-136.

– (6/28/04) Dep. Desig. 5/15/02 Barrett, 395:18-396:4 (Lake Barrett, who served as the Director or Deputy Director of OCRWM from 1993-2002) ("Q. Now, a different question: Is it your expectation that when the Department of Energy commences the acceptance of Yankee Atomic's spent fuel, it will accept at the same time contemporaneously Yankee Atomic's GTCC and remove it away from the site? [Objection omitted] A. When all extraneous legal matters are finally resolved my expectation is the greater-than-Class C waste will go at the same time, contemporaneously, at the same time."); *see also id.* at 400:9-17 & 397:9-10 ("at the end of the day, I believe that [GTCC waste] should go at the same time").

– Tr. 3152:4-16 (Meisner) ("as a matter of prudency and responsibility . . . . we would have expected the government to take the most responsible and economic approach to take this material off site. . . . it is a pretty universal view that the most cost-effective and efficient way to do that is to take advantage of the transportation systems that the government has set up for fuel. . . . And take the GTCC along with the fuel.").

– P1857 at NRC004 0294 (draft letter from DOE Secretary to Governor King, with NRC comments) ("It is my intention that nuclear utilities would not have to store GTCC waste beyond the time that they will have to store spent nuclear fuel").

– P1659 at NRC004 0167 (DOE to NRC's Advisory Committee on Nuclear Waste: utilities should not be "stuck with their greater than Class C waste *after* their spent fuel is gone. . . .") (emphasis added); *see* (6/28/04) Dep. Desig. 5/8/02 Milner, at 195-96 ("My personal opinion . . . I think it would be bad policy to leave GTCC sit at a reactor site long after all of the spent fuel has been removed from that reactor site.").

– Tr. 4514:19-4515:25 (Huizenga) (impeached with prior deposition testimony that his understanding, during his tenure working on GTCC waste, was

that DOE intended that utilities would not have to store GTCC waste beyond the time they would have to store SNF).

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 165:10-166:18 (it "would be an unreasonable or an untenable situation" for utilities to have to store GTCC waste after their SNF is removed); *see also id.* 6/14/02, 396:1-17 ("if the repository was available [in 1998], then, you know, based on the suitability of that repository to dispose of [GTCC] waste, yes, a path should have been in place.").

– Tr. 5926:18-5927:19 (Abbott) (there is a greater than fifty percent chance that DOE will take the utilities' GTCC waste to the repository); *accord* Tr. 5928:20-5930:22 (Abbott) (many professionals in the industry, including Abbott, believed that DOE was obligated to remove the spent fuel and GTCC waste beginning in 1998, and that it was a "reasonable assumption" to assume that the GTCC from decommissioning would be removed no later than the last fuel assembly).

– Tr. 5929:11-16 (Abbott) (Q: "In fact, every one of the . . . decommissioning cost estimates that includes spent nuclear fuel storage costs that you prepared at ABZ, assume that DOE would be accepting failed fuel and GTCC, correct? A: That's correct.").

**B. Regardless of Whether GTCC Waste Is Covered By the Contract, DOE Would Have Accepted GTCC from Connecticut Yankee If It Had Accepted SNF.**

138. Apart from the Contract, DOE has a statutory duty to accept and dispose of Connecticut Yankee's GTCC waste. 42 U.S.C. § 2021c(b)(1) (2000); *see* Tr. 4375:16-21 (Huizenga); PFF ¶ 132.

139. DOE's policy and plans have long been to accept GTCC waste for storage or disposal when the need arises.

– P1047 at iv-v (1987 Report to Congress) ("DOE plans to carry out its responsibility . . . by ensuring that such waste in need of disposal is directed to an appropriate facility . . . . Until the time that GTCC low-level waste can be disposed, DOE plans to accept such waste *as necessary* . . .") (emphasis added).

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 162:9-163:16 (Mr. Campbell's understanding is that in the 1987 Report, DOE committed to accept GTCC waste for storage when needed).

– Tr. 4376:2-4377:5 (Huizenga) (DOE is presently accepting sealed sources because there is a need to do so); Tr. 4445:17-4448:14 (Huizenga)

(ongoing case-by-case acceptance of sealed sources is consistent with DOE's policy in the 1987 Report).

140. DOE has not removed Connecticut Yankee's GTCC waste, and has no plans to do so, because (1) it intends and plans to manage and dispose of the nuclear utilities' GTCC waste together with their spent fuel, (2) there is no need or urgency to remove the GTCC waste from utilities' sites because their spent fuel will remain on utilities' sites for the foreseeable future, and there is no significant impact on utilities to store GTCC waste while the spent fuel remains on site, and (3) DOE is concerned that any actions to develop such plans would undermine its litigation position in these cases.

a. DOE plans to manage utility GTCC waste the same as spent fuel.

– *See* PFF ¶ 133.

– P1785 (NRC letter to Senator Lieberman) (Regarding Connecticut Yankee's SNF and GTCC Waste: "This remaining waste will remain on site, awaiting ultimate transfer to a permanent repository operated by the Department of Energy").

b. No need or urgency because the utilities must store their spent fuel for an extended period of time.

– P1280 at 3-4 (1995 GTCC Waste Plan) (DOE-sponsored evaluations "recognized that storage of GTCC LLW generated by nuclear utilities could be done at the generator site without significant impact . . . ") and 6 ("[e]ach waste stream can be handled independently meeting the specific needs for assistance by generators which have different timing. Nuclear utility wastes are assumed to remain on-site until the spent nuclear fuel is sent to disposal").

– P1910 at HQR-165-0191 (Bubar May 23, 2002 memo to Roberson) ("The nuclear utilities are having to continue to store their SNF until the repository opens, and therefore have the capability to store their activated metal waste in the same facilities (which is the current practice).").

– P1911 (March 21, 2002 DOE draft memorandum for the Secretary) at HQR-164-0054 ("The commercial utilities are required to store their SNF, and most utilities undergoing decommissioning are managing their activated metal GTCC the same way they are managing SNF").

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 166:20-167:8 ("the impact of the utility storing [GTCC waste] while they have to store their spent fuel is smaller than the impact of having to store the spent fuel. So given that situation, storing the activated metal while they store the spent fuel, is not an unreasonable situation in – from my point of view. Once the spent fuel is gone, though, then you've – I think that creates a problem."); *id.* at 168:4-5 ("once the fuel [has] left, the urgency would increase.").

c. Litigation has curtailed progress on GTCC waste planning.

– P1337 at 2 (Issue paper on GTCC waste and Maine Yankee) ("GC's position was that since we are in litigation with Maine Yankee over the issue of GTCC waste, that *DOE should do nothing*.") (emphasis added).

– P1614; P1616 (DOE and DOJ litigators in December 20, 2000 meeting with NRC and DOE regarding GTCC waste planning).

– (7/14/04) Dep. Desig. 1/29/03 Campbell, 544:1-545:16, 546:13-18, 549:5-552:15 (Robert Campbell's superior directed him to cancel a presentation to NRC's Advisory Committee on Nuclear Waste regarding DOE's plans for GTCC waste because of this litigation).

– Tr. 4511:6-20 (Huizenga).

– P1907 (Huizenga January 29, 2002 memo to Roberson) at HQR130-0005 ("There would likely be political sensitivities to accepting activated metal GTCC but not accepting SNF for storage. Currently, DOE is in litigation with nuclear utilities over SNF and utility related GTCC issues."); Tr. 4525:6-4529:12 (Huizenga) (discussing same).

– *See* P1910 at HQR-165-0193 (Bubar May 23, 2002 memo to Roberson) ("transfer options which include RW will require resolution of the current litigation"); Tr. 5046:15-5047:4 (Bubar) (Ms. Bubar's understanding is that transfer of GTCC waste responsibility to the spent fuel program will require resolution of the spent fuel litigation).

– P1908 at HQR-168-0007 (Yuracko June 17, 2002 e-mail to Bubar) ("Transfer of GTCC waste responsibility to RW could complicate current nuclear utility litigation issues").[2]

---

[2] The government has asserted that P1908 is a "contractor document." It is an e-mail, with an attached memorandum for the Secretary and related policy papers, that was sent from the contractor to Ms. Bubar (DOE). The document was produced from Ms. Bubar's files, sets forth the activities of DOE, and contains no indicia of untrustworthiness, and it is admissible for the truth of its contents pursuant to the Court's September 17, 2004 Order.

– P1910 at 2 (Bubar May 23, 2002 memo to Roberson) ("we would need to ensure that such a decision [to presently accept other than sealed source GTCC waste] does not affect/undermine the ongoing litigation with the utilities about commercial spent fuel").

– (6/28/04) Dep. Desig. 5/14/02 Barrett, at 140 (regarding RW's consideration of whether to accept GTCC for the repository, the litigation "has made it more difficult to reach closure on this matter.").

141. Technical issues concerning transportation, handling and disposal of GTCC waste are less challenging than for spent fuel; therefore, DOE readily could have removed Connecticut Yankee's GTCC waste at the same time as its spent fuel.

– Tr. 1421:24-1422:6 (Stuart) (providing opinion that DOE could have removed the GTCC waste from Yankee utilities in 1998 "quite readily").

– Tr. 1421:24-1424:25 (Stuart) ("The requirements for handling and transporting GTCC are much [lower] than for handling spent fuel.").

– (7/14/04) Dep. Desig. 6/14/02 Campbell, 416:10-23.

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 153:15-154:25 (logistically and technically, if packaged like fuel, GTCC can be taken without problems to the repository); *id.* at 150:12-152:24; 156:18-157:7 (reporting that Mr. Zabransky advised that GTCC can be placed in the repository); *see also id.* at 205:18-206:16.

– P1346 at 3 (Issue paper re EIS) (disposal of utility GTCC in repository "would pose no technical difficulty").

– Tr. 4535:16-4538:2 (Huizenga) (discussing P1346).

142. Even if GTCC waste is not covered by the Contract, if DOE had removed the SNF from Connecticut Yankee's site, DOE would have met its obligation under the LLRWPAA and also removed Connecticut Yankee's GTCC waste at the same time.

– *See* PFF ¶¶ 129, 131-136.

## IX. GOOD FAITH AND FAIR DEALING

143. The Contract provides for Connecticut Yankee to list the amount of spent fuel it "wishes to deliver" on delivery commitment schedules ("DCSs") that Connecticut Yankee would submit to DOE. P1CY, Art. V.B.1.

144. In 1992, DOE instructed and required Connecticut Yankee to complete its DCSs in conformity with the stated pace and schedule for spent fuel acceptance set forth in DOE's then-current Annual Capacity Report/Annual Priority Ranking (the "1991 ACR").

> – D28.001 at HQR-001-2146 (DCS instructions) ("The allocations in the 1991 [ACR] should be the basis for the DCS submittals"); *id.* at GPE0010065 ("only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval"); *id.* at GPE0010069 ("the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)").

145. The acceptance rate projected in the 1991 ACR was unreasonably low and inconsistent with the intent of the NWPA and the parties to the Contract.

> – *See* PFF ¶¶ 63-80 above.

146. DOE instructed and required utilities to conform their DCSs to the unreasonably low acceptance rate in the 1991 ACR because DOE knew that it would not accept SNF beginning not later than January 31, 1998, as required by the Contract, and DOE wanted to try to limit its liability to utilities.

> – Tr. 7618:22-7622:19 (Vance) (DOE used low rates in the 1991 ACR because it knew that it would not make the 1998 deadline and it wanted to limit liability).

147. No later than early 1997, DOE suspended consideration of both DCSs and the Final Delivery Schedules ("FDSs") provided for in the Standard Contracts, P1CY, Art. V.C., and no FDS was ever approved. D28.014 (January 9, 1997 FDS submittal); D28.015 (DOE March 11, 1997 letter, stating that DOE "is not able at this time to approve your FDS submittal");

D28.016 (DOE March 13, 1997 letter refusing to consider DCS submittal); D28.018 (similar); *see* D30.021 (non-conforming FDS submitted by Yankee Atomic for 1998); D30.022 (DOE refusal to consider Yankee Atomic's FDS); *see, e.g.,* P2040 (DOE January 29, 1998 letter refusing to consider Yankee Atomic's DCS submittal); Tr. 3995:12-3997:21 (Pollog) (DOE stopped processing DCS submittals in late 1996/early 1997; and DOE apparently believed that may limit liability); Tr. 4118:2-12 (Zabransky) (DOE stopped processing DCSs on advice of counsel).

148. DOE's actions, referred to in PFF ¶¶ 143-147 above, precluded utilities, including Connecticut Yankee, from obtaining or negotiating mutually agreeable DCSs or FDSs. P1CY, Art. V.B.2.

> – *See* D30.002 (September 25, 1992 Yankee Atomic submits non-conforming DCSs); D30.004 (December 1, 1992 DOE rejection); D30.005 (January 7, 1993 Yankee Atomic resubmits non-conforming DCSs); D30.006 (DOE April 8, 1993 letter rejecting Yankee Atomic's non-conforming DCSs); D30.007 at 2 (April 28, 1993 Yankee letter: DOE schedule "is unacceptable"); D30.008 at 3 (Yankee June 10, 1993 letter: DOE did not negotiate); D34 at 1 (same); D30.009 (DOE July 15, 1993 letter rejecting again non-conforming DCSs); D30.010 (Yankee July 26, 1993 DCS submittal under protest); D30.021 (Yankee Atomic's January 31, 1997 FDS including request that DOE take all of Yankee Atomic's SNF and GTCC waste in 1998); D30.022 (DOE's March 11, 1997 refusal to consider FDS submittal).

149. DOE's actions, referred to in PFF ¶¶ 143-147 above, were contrary to plaintiff's justified expectations and the implied Contract obligation of good faith and fair dealing.

## X. DAMAGES

150. At trial, Connecticut Yankee established that it is entitled to recover "minimum damages" of $198,293,973. This is the minimum damages amount based on evidence set forth at trial, as adjusted by changes agreed to by Connecticut Yankee.

a. Total minimum damages of $198,293,973 is derived as follows:

b. $210,281,215 in total minimum damages submitted in March 2003 and initially at trial using a risk-free discount rate.[3] P2043A.17, .19; Tr. 3252:13-3255:5 (Wise);

c. Minus $11,987,242 for adjustments agreed to at trial. P2043.13, .16; Tr. 7474:22-7475:20; Tr. 7476:14-7479:25 (Wise).

> – Tr. 3210:22-3211:3 (Wise) (minimum damages claim assumes that in breach world DOE comes in 2010 and removes all fuel in single campaign), Tr. 3211:6-14 (Wise), P2043A.5.

151. As of year-end 2002, approximately $82.9 million of Connecticut Yankee's minimum damages had already been incurred as "past damages," as adjusted for changes agreed to by Connecticut Yankee, and by the time of trial even more damages had been incurred.

a. Past damages of $82.9 million to year-end 2002 are derived as follows:

b. $89.7 million in past damages as submitted in March 2003 and initially at trial. P2043A.17, .19; Tr. 3247:25-3248:13; Tr. 3253:23-3255:11 (Wise);

c. Minus approximately $6.8 million of adjustments agreed to at trial attributable to past (*i.e.*, pre-2003) damages: *see* PFF ¶ 174.b. Spent Fuel Transfer to DOE – $5,233,725; ¶ 174.c. Final Status Survey Engineers/M&S Adjustment due to Staffing – $394,778/$70,245; and ¶ 174.d. Crane Upgrade – $1,114,554. P2043.13; Tr. 7474:22-7475:20; Tr. 7476:14-7477:13 (Wise).

> – Tr. 3248:8-13 (Wise) ("[w]e submitted the report in 2003 so at that point, 2003 was the future and 2002 was the past. The future costs are based on the estimates provided by the company. The past costs are based on costs that were actually realized or, in the case of Yankee Atomic, projected to be experienced in 2002."); Tr. 3254:3-15 (Wise) (Connecticut Yankee's past costs handled in the same manner as Yankee Atomic's costs).

---

[3] All figures in PFF ¶¶ 150-174 reflect a risk-free discount rate, unless otherwise indicated. *See* PFF ¶ 171 (explaining appropriateness of risk-free rate).

152. As of year-end 2002, approximately $115.4 million of Connecticut Yankee's minimum damages were future damages, as adjusted for changes agreed to by Connecticut Yankee and based on pick up of Connecticut Yankee's SNF by DOE in 2010, and by the time of trial a significantly smaller amount of Connecticut Yankee's damages were future damages. Connecticut Yankee's future damages now consist almost entirely of annual ISFSI operating costs and end-of-life ISFSI unloading and decommissioning costs.

a. Future damages of $115.4 million is derived as follows:

b. $120.6 million in future damages as submitted in March 2003 and initially at trial, *see* P2043A.19 (the sum of damages for the years 2003 to 2012); Tr. 3253:7-3254:7 (Wise);

c. Minus approximately $5.2 million of adjustments agreed to at trial attributable to future (*i.e.*, post-2002) damages: *see* PFF ¶ 174.a. Pre-9/11 Security/Enhanced Security – $1,267,666/$2,961,098; ¶ 174.c. Final Status Survey Engineers/M&S Adjustment due to Staffing – $197,389/$35,123; ¶ 174.e. 2005 Computer Upgrade – $51,006; ¶ 174.f. Officer Contract Benefits Phase 02/Phase 06 – $19,218/$10,207; ¶ 174.g. Electrical Utilities – $559,790; and ¶ 174.h. Record Document Services – $72,444. P2043.13; Tr. 7474:22-7475:20; Tr. 7476:14-7477:13 (Wise).

– Tr. 3248:8-13 (Wise) ("we submitted the report in 2003 so at that point, 2003 was the future and 2002 was the past. The future costs are based on the estimates provided by the company. The past costs are based on costs that were actually realized or, in the case of Yankee Atomic, projected to be experienced in 2002."); Tr. 3254:3-15 (Wise) (Connecticut Yankee's past costs handled in the same manner as Yankee Atomic's costs).

153. Connecticut Yankee's damages fall into three categories: ISFSI construction damages, ISFSI operations damages and wet pool-related damages.

– Tr. 3253:7-3254:2 (Wise) (P2043A.17 "is a table that lists the damages in the past and in the future, broken down by each of the three" damages categories).

154. Connecticut Yankee's ISFSI construction damages are the costs for the design, licensing and fabrication of Connecticut Yankee's dry storage system, construction of its ISFSI pad and for the transfer of its SNF from the spent fuel pool to the ISFSI. This damage category totals approximately $72.16 million, after adjustment for changes agreed to by Connecticut Yankee at trial.

a. ISFSI construction damages of $72.16 million is derived as follows:

b. $78.46 million in ISFSI construction damages as submitted in March 2003 and initially at trial, *see* P2043A.19; Tr. 3253:7-3256:10 (Wise);

c. Minus approximately $6.3 million of adjustments agreed to at trial attributable to ISFSI construction damages: *see* PFF ¶ 174.b. Spent Fuel Transfer to DOE – $5,233,725; and ¶ 174.d. Crane Upgrade $1,114,554. P2043.13; Tr. 7474:22-7475:20; Tr. 7476:14-7477:13 (Wise).

– Tr. 3305:22-3306:2 (Wise) ("ISFSI construction cost . . . are the costs that are associated with designing and licensing and constructing the ISFSI up through the point when the ISFSI is completely loaded with fuel."); Tr. 3307:16-22 (same); *see also* Tr. 3246:8-13; Tr. 3253:23-3254:1; Tr. 3255:6-11 (Wise) (ISFSI construction costs).

– Tr. 3352:12-3353:9 (Wise) (ISFSI operations costs and ISFSI construction costs "as a matter of proper damage analysis, they should be included as damages. . . . It's unique to the breach world and is properly included as a damage element.").

155. All of Connecticut Yankee's ISFSI construction damages are from its DOC (Decommissioning Operations Contract) contract with Bechtel Corporation for all activities associated with moving Connecticut Yankee's SNF out of its spent fuel pool and into its ISFSI, including licensing work for the canisters, construction of the ISFSI, the road, the pad and the

overall facility, and the actual loading operations, as set forth in milestone 21 to the Bechtel contract, which P1726CY assumes was completed in a timely manner for the agreed fixed price (including agreed change orders).

– Tr. 2528:13-19 (Jewell-Kelleher) (October 29, 2002 budget [P1726CY] assumes that Bechtel completed the job, as set forth in milestone 21, which is the ISFSI canister and loading).

– Tr. 2384:12-18 (Bennet) (October 29, 2002 cost estimate assumes Connecticut Yankee's ISFSI would be completed by the date set forth in the DOC contract, which is December of 2003).

– Tr. 2639:12-2640:1 (Heider) (Bechtel responsibilities under contract with Connecticut Yankee); Tr. 2640:2-2640:6 (Heider) (Bechtel work activities are captured in milestone 21 of the Bechtel contract; *see* P1726CY, file: CY-DOE-2002-10-29-LINKS ("CY 4.9 Legal Bechtel Schedule By Milestone Number"); Tr. 2384:1-2385:3 (Bennet).

a. ISFSI construction damages incurred by Connecticut Yankee, one of the first in the nuclear industry to construct an ISFSI, were reasonable.

– Tr. 5917:4-17 (Abbott) (agreeing that there is a learning curve associated with moving fuel from the pool into the canisters and casks and transporting them to dry fuel storage, and also a learning curve in moving fuel from the pool into transportation containers; as you climb this learning curve, you would expect that the level of difficulties encountered would be reduced and loading time would decrease).

156. Connecticut Yankee's ISFSI operations damages are the costs to operate Connecticut Yankee's ISFSI and the company after the ISFSI is fully loaded and until the DOE picks up its SNF (assumed to be 2010 in the "minimum damages" scenario). This damages category totals approximately $93.58 million, after adjustments agreed to by Connecticut Yankee at trial.

a. ISFSI operations damages of $93.58 million is derived as follows:

– $98.5 million in ISFSI operations damages as submitted in March 2003 and initially at trial, *see* Tr. 3253:7-3256:10 (Wise); P2043A.19;

– Minus approximately $4.92 million of adjustments agreed to at trial attributable to ISFSI operations damages: *see* PFF ¶ 174.a. Pre-9/11 Security/Enhanced Security – $1,267,666/$2,961,098; ¶ 174.e. 2005 Computer Upgrade – $51,006; ¶ 174.f. Officer Contract Benefits Phase 06 – $10,207; ¶ 174.g. Electrical Utilities – $559,790; and ¶ 174.h. Record Document Services – $72,444. P2043.13; Tr. 7474:22-7475:20; Tr. 7476:14-7477:13 (Wise).

– Tr. 3306:22-3307:6 (Wise) ("[T]he ISFSI operations costs includes all of those costs that are associated with maintaining the companies. And that includes, also, the general and administrative costs that, up to the point of the completion of decommissioning, do not constitute damages. But beyond that point in time, are damages, because they are only being incurred because of the necessity to maintain the corporation while the ISFSI is on site and being maintained.").

– Tr. 3306:6-14 (Wise) (once the ISFSI is loaded, "the company shifts into long-term operations with the ISFSI there, where they're still in business, because the ISFSI is there and the fuel is on site. And that operation continues through the point when the DOE comes to remove the fuel in the future, and the company has to conduct decommissioning of the ISFSI and undertake the other activities that are necessary to run down the corporation.").

– Tr. 3352:12-3353:9 (Wise) (ISFSI operations costs and ISFSI construction costs "as a matter of proper damage analysis, they should be included as damages. . . . It's unique to the breach world and is properly included as a damage element.").

b. Connecticut Yankee's claimed costs and staffing estimate (of 5 on-site and 3.5 corporate FTEs, net of security) for ISFSI operations are reasonable.

– Tr. 2197:1-6; Tr. 2180:25-2181:12; Tr. 2188:18-2189:25; Tr. 2197:22-2200:5 (Heider) (explaining the functions of the personnel necessary to support dry storage).

– P1726CY, file CY-DOE-2002-10-29.xls (staffing detail sheet) (showing dry storage staffing costs for 2006 forward of $13.803 million).

157. Connecticut Yankee's wet pool-related damages are the costs of operating its fuel pool after August 2001, the date the evidence establishes that the pool would have been empty in

the non-breach world, through December 2003, when Connecticut Yankee estimated it would have completed the transfer of its SNF to its ISFSI. This damage category totals approximately $32.58 million, after adjustments agreed to at trial by Connecticut Yankee.

a. $32.58 million in wet pool-related damages is derived as follows:

– $33.3 million in wet pool-related damages as submitted in March 2003 and initially at trial, *see* P2043A.19; Tr. 3253:7-3254:20 (Wise).

– Minus approximately $.72 million of adjustments agreed to at trial attributable to wet pool-related damages: *see* PFF ¶ 174.c. Final Status Survey Engineers/M&S Adjustment due to Staffing – $592,167/$105,368; and ¶ 174.f. Officer Contract Benefits Phase 02 – $19,218. P2043.13; Tr. 7474:22-7475:20; Tr. 7476:14-7477:13 (Wise).

– Tr. 3305:11-16 (Wise) ("wet pool operations . . . consist[ ] of costs that are incrementally incurred by the companies because they have the pool on the facility at a point in time after which you would have been empty by the DOE removal campaign in our nonbreach world.").

– P2043A.9 (minimum damages claim assumes that in nonbreach world, Connecticut Yankee's fuel would be gone by August 2001); Tr. 3211:4-3212:11 (Wise).

b. All of Connecticut Yankee's costs claimed for wet pool-related damages have already been incurred.

– P2043A.19 (showing wet pool-related costs through 2003).

– Tr. 2651:9-12; Tr. 2653:20-24 (Heider) (Connecticut Yankee's October 29, 2002 cost estimate assumes that fuel transfer is completed by the end of 2003 and that spent fuel pool operations cease at the end of year 2003).

c. Connecticut Yankee's annual wet pool-related damages of approximately $10.7 million are reasonable.

– Tr. 2652:10-25 (Heider) (actual staffing levels in 2002 and 2003 were in line with the estimated levels in the October 29, 2002 Connecticut Yankee cost estimate).

– P169 (contractor-generated document) (August 1991 "Cost Estimates of Operating On Site Spent Fuel Pools After Final Reactor Shutdown"), prepared for U.S. Department of Energy by Pacific Northwest Laboratories ("PNL Cost Study"), Table at 2.4 (showing range of pre-9/11 annual wet pool storage costs [net of security] in 1989 dollars of $2,270,000 to $6,000,000 and, at 2.5, "[t]he expensive outliers are all older facilities with relatively small pools [like Connecticut Yankee].").

– Tr. 6014:21-6018:21 (Abbott) (Connecticut Yankee's wet pool storage costs are in-line with wet pool storage costs reported by other facilities in response to a survey done by Abbott pre-9/11, which reported a range of wet pool storage costs from $2.5 million to $12 million).

– Tr. 6042:10-6049:25 (Abbott) (discussing TLG workpapers for 1999 Decommissioning Cost Estimates for Zion Nuclear Power Station Units 1 and 2 (February 1999) showing $7,564,677 annual cost to run Zion spent fuel pool in 1993 dollars (which, when adjusted to 2003 dollars and post-9/11 security needs, added according to formula used by government expert Mr. Abbott (*see* Tr. 6035:13-6036:2)), equals approximately $12 million in annual wet pool costs).

158. In calculating damages resulting from the government's breach, accurate and reliable calculations and estimates of breach and non-breach world costs come from Connecticut Yankee.

– *See* testimony and exhibits noted below in support of PFF ¶¶ 160-163.

– Tr. 3204:25-3205:9 (Wise) ("And in this case, I have the benefit of working with people who are actually operating a nuclear utility through the decommissioning process who routinely put together cost estimates for purposes of running the business or for purposes of going before rate-setting boards.").

– Tr. 3364:22-3365:4 (Wise) ("And through the process of educating ourselves and the companies as to what the issues are going to be and how we might address them, the use of the company budgets as a primary source of information for our analysis was a result of that process. The deliberative process led us to the conclusion that using the company budgets would be a very good way to do this analysis.").

159. Connecticut Yankee's damages claim is derived largely from costs set forth in its October 29, 2002 cost estimate. P1726CY; Tr. 3194:3-3198:16 (Wise) ("[W]e felt that the best

approach here to capture everything that might be out there was to rely on the budgets prepared by the companies. And that was – that was going to be a very sound way to do the analysis.").

a. P1726CY contains six electronic files, which also have been provided in hard copy: 1) "CY-DOE-2002-10-29;" 2) "CY-ACT-NOM;" 3) "CY-DOE-2002-10-29-LINKS;" 4) "CY-DOE-2003-1-17_Section 1;" 5) "CY-DOE-2003-1-17_Section 2;" and 6) "CY-DOE-2003-1-17_Section 3."

b. The "CY-DOE-2002-10-29" file is the October 29, 2002 edition or "snapshot" of Connecticut Yankee's long term cost estimate. The October 29, 2002 long-term cost estimate contains all of Connecticut Yankee's actual and estimated costs from 1999 through 2023, presented at both the summary level and in detail by category in the areas of Staffing, Benefits, Insurance, Miscellaneous, Regulatory and M&S (Materials & Supplies). Tr. 1643:12-1644:21; Tr. 1652:19-1653:16; Tr. 1664:4 (Bennet); Tr. 1880:7-1888:7 (Jewell-Kelleher); Tr. 2518:22-2520:9 (Jewell-Kelleher) (Connecticut Yankee October 29, 2002 cost estimate prepared in the same manner as Yankee Atomic).

c. The "CY-ACT-NOM" file contains all of Connecticut Yankee's past costs incurred from 1999 through 2001 and reflects actual cost data taken directly from the books and records of the company, such as from invoices, payroll distribution, and time sheet entries. Tr. 1880:11-1882:7 (Jewell-Kelleher) (describing the ACT-NOM file); Tr. 1645:4-22 (Bennet); Tr. 2519:19-2520:5 (Jewell-Kelleher) (Connecticut Yankee ACT-NOM file prepared in the same manner as Yankee Atomic).

d. "CY-DOE-2002-10-29-LINKS" file contains backup information and support for virtually every estimated line item in the October 29, 2002 long-term cost estimate. Tr. 1883:17-1887:16; Tr. 1887:24-1888:3; Tr. 2049:15-2052:16 (Jewell-

Kelleher) (explaining Yankee Atomic's "Link files"); Tr. 1644:22-1645:3; Tr. 1664:14-21 (Bennet) (same); Tr. 2519:19-2520:9 (Jewell-Kelleher) (Connecticut Yankee Link files prepared in the same manner as Yankee Atomic).

e. "CY-DOE-2003-1-17_Section 1" sets forth Connecticut Yankee's summary of its estimated "Out Year Cost Damages" for long-term spent fuel storage (2006 through 2010). *See also* PFF ¶ 167 below.

f. "CY-DOE-2003-1-17_Section 2" sets forth Connecticut Yankee's summary of "Total ISFSI Costs," incurred by Connecticut Yankee in constructing its ISFSI construction. *See also* PFF ¶ 167 below.

g. "CY-DOE-2003-1-17_Section 3" sets forth Connecticut Yankee's summary of "Total Wet Fuel Storage (Fuel off – 8/1/01)." *See also* PFF ¶ 167 below.

160. P1726CY is reliable.

a. The process Connecticut Yankee used in preparing P1726CY is reliable. *See* PFF ¶ 161.a.-j. below.

b. Capable company personnel prepared the October 29, 2002 long-term cost estimate. *See* PFF ¶ 162.a.-e. below.

c. Connecticut Yankee's long-term cost estimates, like the October 29, 2002 long-term cost estimate, have been found to be reliable by FERC and others. *See* PFF ¶ 163.a.-c. below.

161. The process Connecticut Yankee used in preparing P1726CY is reliable.

a. P1726CY was prepared using the same process that Connecticut Yankee uses to prepare both its annual updates to its long-term cost estimate (which is

incorporated into its financial statements) and the cost estimates Connecticut Yankee submits periodically to FERC.

– Tr. 1642:25-1643:5 (Bennet) ("We have our, what we call our long-term cost estimate. That cost estimate is the – is the particular item that projects our costs out through the conclusion of fuel storage and typically forms the basis of our FERC funding plan.").

– Tr. 1662:25-1663:2 (Bennet) ("[T]his [P1726CY] is a very thorough cost model that we think is very detailed and captures costs over a fairly long period of time. . . .").

– Tr. 1653:13-16 (Bennet) ("It [P1726CY] was prepared in the same way that we prepare our annual update to the cost estimate or the FERC cost estimate. It uses the same structure and process."); Tr. 1650:1-1651:7 (Bennet) (same); Tr. 1653:3-10 (Bennet) (same); Tr. 1861:20-1862:1 (Jewell-Kelleher) ("From the long-term forecasting process, we take snapshots at different points in time as requested by our executive management. They could be for FERC rate cases as well as sponsor information and other types of needs. And actually, I'll give you an example, is the snapshot that we took in this particular case."); Tr. 2046 (Jewell-Kelleher) (same).

– Tr. 2518:22-2520:9 (Jewell-Kelleher) (The Connecticut Yankee October 29, 2002 Budget was prepared in the same manner and format as the Yankee Atomic October 29, 2002 Budget); Tr. 2507:13-2508:1 (Jewell-Kelleher) (same); Tr. 2373:16-2374:3 (Bennet) (same).

– Tr. 2441:23-25 (Bennet) (Connecticut Yankee's cost estimates are updated annually and become part of Connecticut Yankee's financial statements).

– Tr. 2534:11-2537:20 (Jewell-Kelleher) (Connecticut Yankee's sponsor companies use Connecticut Yankee and Yankee Atomic's audited closure costs, based on their long-term cost estimates, in their 10Qs and 10Ks).

b. Connecticut Yankee's budgeting process relies on the project accounting system that has been in place since January of 1999, when Connecticut Yankee reassumed management control of its operations after several years of management by Northeast Utilities. Tr. 2502:9-2503:12 (Jewell-Kelleher).

c. Connecticut Yankee's project accounting system allocates costs to various phases, projects, costs centers and natural accounts. The "phase," which is the primary

piece of the account code string, delineates whether a cost is related to wet fuel storage (Phase "02"), decommissioning (Phase "04"), dry fuel storage (Phase "06"), or administrative and general ("A&G") (Phase "20"). Every cost of the company requires a phase code to be entered into the accounting system and is tracked accordingly.

> – Tr. 2502:9-24 (Jewell-Kelleher) (Connecticut Yankee uses the same accounting system and similar process of tracking costs by phases: "02" for wet storage, "04" for decommissioning, "06" for ISFSI or dry spent fuel storage and "20" for administrative and general costs).

> – Tr. 3206:2-4 (Wise) (Connecticut Yankee budget lines grouped into four phases); Tr. 3213:19-3214:5 (Wise) (explaining Connecticut Yankee's budget phases).

d. Connecticut Yankee has also implemented a series of internal controls of its timesheet, payroll and purchase order and requisition review processes to ensure that projects are correctly coded to the appropriate project phase. Tr. 1856:12-1858:15 (Jewell-Kelleher) (describing internal controls at Yankee Atomic); Tr. 2506:10-23 (Jewell-Kelleher) (Connecticut Yankee has similar internal controls and oversight of its project accounting system as those in place at Yankee Atomic).

e. The project accounting system is fully integrated into Connecticut Yankee's formal budgeting process, which includes the preparation on an annual basis during the third and fourth quarter of every year of 1) a long-term cost estimate and 2) a one or two year operating budget. Tr. 1642:18-1644:10; Tr. 1646:15-24; Tr. 1648:15-25 (Bennet); Tr. 2366:6-2367:18; Tr. 2379:18-2380:8 (Bennet) (Connecticut Yankee uses the same integrated cost estimate model as Yankee Atomic). Connecticut Yankee also updates its long-term cost estimates in between annual operating cycles when requested by executive management, *e.g.*, for use in FERC filings or to satisfy a shareholder request

for updated cost information. Tr. 1647:23-1648:18 (Bennet); Tr. 2369:23-2370:4 (Bennet); Tr. 2507:13-2508:1 (Jewell-Kelleher).

f. Connecticut Yankee uses its long-term cost estimates and annual operating budgets to hold managers accountable for their performance. Tr. 1643:6-11 (Bennet) (explaining that the annual operating budgets, prepared from the long-term cost estimates, are used to monitor performance); Tr. 2366:6-2367:18; Tr. 2379:18-2380:8 (Bennet) (Connecticut Yankee uses the same integrated cost estimate model as Yankee Atomic). Connecticut Yankee performs tracking on a monthly basis, using monthly variance reports that track actual costs incurred against the annual operating budgets. Tr. 1868:2-16 (Jewell-Kelleher) (managers are required to explain any expenditures that vary from the budget estimates); Tr. 2514:12-2515:23 (Jewell-Kelleher) (the annual operating budget is used to compare against actuals and variances are handled in the same manner at Connecticut Yankee as they are for Yankee Atomic).

g. Connecticut Yankee's long-term costs estimates are built from the bottom up, with managers responsible for the various cost centers preparing estimates for their respective departments, using the most recent actual cost information along with other financial reporting tools to help them prepare their estimates.

– Tr. 2508:2-14; Tr. 2508:23-2509:5 (Jewell-Kelleher) (Connecticut Yankee's long-term cost estimates are prepared in the same manner as the Yankee Atomic cost estimates; certain individuals are assigned areas of responsibility to prepare the estimates, actual historical costs are used to inform estimates)

– Tr. 2371:12-14 (Bennet) ("It's [Connecticut Yankee's cost estimate] prepared from the bottoms up, involving the inputs of a number of individuals and information sets.").

h. The cost estimates are then reviewed by senior management and executive management in what are referred to as "challenge sessions." During the challenge

sessions, cost center managers are required to defend their estimates against a rigorous review and challenge on a line-item by line-item basis by executive management.

– Tr. 2508:2-22 (Jewell-Kelleher) (Connecticut Yankee's cost estimates go through a similar rigorous process of management challenges sessions and executive challenge sessions as Yankee Atomic's cost estimates).

– Tr. 1865:1-1866:20; Tr. 1861:3-8; Tr. 2045:5-21 (Jewell-Kelleher).

– Tr. 2045:16-18 (Jewell-Kelleher) ("[T]here's several layers of review. And I also mentioned the executive challenge sessions that occur as well."); Tr. 1866:3-6, 11-15 (Jewell-Kelleher) ("I set the challenge sessions up and coordinate them with the executive management team and the respective person that is basically on stage and ready to defend their estimates to the executives.").

– Tr. 2139:25-2140:11 (Mr. Heider) ("just to elaborate a little further, we've been quaintly calling these challenge sessions. What they really were was the individuals that were developing the [cost] estimates brought them into a management meeting where we went cell by cell through the spreadsheets. . . . And required changes to be made to be consistent . . . and then they were finalized for the cost estimate.").

i. After management reviews and extensive challenge sessions where the forecast line items are reviewed in detail, Connecticut Yankee's long-term cost estimates and operating budgets are approved by the executives and presented to the Board of Directors.

– Tr. 2371:5-21 (Bennet) (after review and approval by the executive level, the Board of Directors reviews the cost estimate); Tr. 2513:14-25 (Jewell-Kelleher) (same).

j. In addition to internal review by the executive management and board oversight, Connecticut Yankee employs both internal and external auditors to confirm the reliability of its long-term estimate process.

– Tr. 2509:23-2510:15 (Jewell-Kelleher) (Connecticut Yankee has similar internal and external audit oversight of the budget process to Yankee Atomic).

– Tr. 2512:6-11 (Jewell-Kelleher) (Connecticut Yankee auditors drew similar conclusions to Yankee Atomic's auditors).

– Tr. 7290:25-7291:5 (Jewell-Kelleher) ("In the official report [by Yankee Atomic's external auditors regarding their 2002 audit], it states here, the more significant judgments and accounting items relate to future closure costs and ISFSI related costs. We determined that management's procedures for forming these estimates were acceptable and appropriate in these areas."); P2037 (Report).

– Tr. 1867:2-1868:1 (Jewell-Kelleher) (Yankee Atomic's internal and external auditors concluded that Yankee Atomic's forecasting process was very comprehensive and had substantial support and backup).

162. The experience and expertise of senior executives at Connecticut Yankee and other personnel who prepare long-term cost estimates like P1726CY every year ensure the reliability of P1726CY.

– Tr. 2495:1-2496:13 (Bennet) (Yankee Atomic in the ordinary course of business prepares long-term cost estimates annually, closing out the process in December of that year); Tr. 2379:22-2380:4 (Bennet) (cost estimating and budgeting process at Connecticut Yankee is same process as at Yankee Atomic); Tr. 2369:23-2370:3 (Bennet) (long-term cost estimates at Connecticut Yankee are prepared annually or as necessary to support requests from board members or FERC filings or other requests).

– Tr. 2507:3-12; Tr. 2514:1-11 (Jewell-Kelleher) (Connecticut Yankee prepares long-term cost estimates on an annual basis).

– Tr. 2045:5-2046:13 (Jewell-Kelleher) (Yankee Atomic has employees who have developed expertise and credibility in preparing long-term cost estimates, which undergo several layers of review and ample scrutiny to ensure that the forecasts are reasonable).

– Tr. 2128:17-2129:7; Tr. 2131:8-2133:20 (Heider) (describing Yankee Atomic's experience in preparing detailed long-term cost estimates since 1994).

a. Tom Bennet, Connecticut Yankee's Vice President and CFO, had oversight responsibilities for P1726CY, just as he does for all of Connecticut Yankee's cost estimates.

– Tr. 2370:5-19 (Bennet).

b. Ms. Jewell-Kelleher, Connecticut Yankee's Controller and Treasurer, oversaw preparation of P1726CY, as she does for all Connecticut Yankee cost estimates.

– Tr. 2509:6-22 (Jewell-Kelleher) (her role in the preparation of Connecticut Yankee's cost estimates is to oversee the entire process and to prepare the line items in the budget related to the corporate and administrative functions, such as for example, account services, internal and external audit, benefits, corporate and administrative staffing, corporate related M&S and Miscellaneous costs, and payroll).

– Tr. 2509:6-22 (Jewell-Kelleher) her role in preparing the October 29, 2002 Budget was the same as for any other long term cost estimate).

– Tr. 2558:11-2559:25 (Jewell-Kelleher) (cost estimates prepared for Connecticut Yankee are reliable because they are prepared by persons with knowledge in those specific cost areas and they go through a rigorous review process that has been set up by the company as part of its normal course of operations).

– Tr. 2506:24-2507:2 (Jewell-Kelleher) (she has personally been involved in the budgeting and forecasting function for Connecticut Yankee since 1999).

– Tr. 2373:21-2374:3 (Bennet) (for Connecticut Yankee, process of preparing cost estimates is the same as that for Yankee Atomic).

c. Kenneth Heider, Connecticut Yankee's Vice President – Operations, was heavily involved in preparation of the staffing and security cost estimates in P1726CY.

– Tr. 2641:3-2643:1 (Heider) (he was involved in the preparation of the Connecticut Yankee October 29, 2002 Budget, in particularly he focused on staffing, security, M&S and regulatory fees).

– Tr. 2649:5-13 (Heider) (he reviewed the Staffing Detail sheet in P1726A file: CY-DOE-2002-10-29.xls, which provides Connecticut Yankee's detailed staffing estimate for the years 2002 through 2023, recommended changes, and ensured that those changes were implemented).

– Tr. 2128:17-2129:7; Tr. 2156:6-2157:6; Tr. 2170:22-2171:15, Tr. 2641:3-2643:1 (Heider) (describing his own extensive experience preparing long-term cost estimates).

d. In estimating future costs for its long-term cost estimates like P1726CY, Connecticut Yankee seeks input from all of its managers.

– Tr. 2508:2-14; Tr. 2508:23-2509:5 (Jewell-Kelleher) (Connecticut Yankee long-term cost estimates are prepared in the same manner as the Yankee Atomic cost estimates; certain individuals are assigned areas of responsibility to

prepare the estimates, actual historical costs are used to inform estimates, and they go through a similar rigorous process of management and executive "challenge sessions."

– Tr. 2371:12-14 (Bennet) ("It's [Connecticut Yankee's cost estimate] prepared from the bottoms up, involving the inputs of a number of individuals and information sets.").

e. Mr. Abbott, the government's witness, agrees that nuclear utility plant staff has the expertise and plant knowledge to prepare reliable cost estimates

– Tr. 5583:16-5584:8 (Abbott) (noting that he is co-author of P1551YA, entitled "Assuring an Accurate and Dependable Decommissioning Cost Estimate" and agreeing with his statement in the conclusion of P1551CY that "The plant operating staff has the expertise and plant knowledge to provide not only the data needed to perform the estimate, but provide the expertise required for detailed reviews.").

163. FERC acceptance ensures the reliability of Connecticut Yankee's long-term cost estimates.

a. Long-term cost estimates submitted to FERC by Connecticut Yankee are scrutinized by FERC intervenors who predominantly advocate on behalf of the interest of the consumer ratepayers. FERC proceedings can be "very adversarial and intense" and often involve exhaustive discovery requests, as well as in person meetings where the long-term cost estimates are reviewed on a line-item by line-item basis. Tr. 1871:2-1872:23 (Jewell-Kelleher).

b. The government's witness, Mr. Abbott, agrees that when utilities submit cost estimates to FERC in a rate-making proceeding, those cost estimates have to be reasonable, that the standard at FERC for judging cost estimates is that they have to be reasonable, and that if a utility in a FERC rate proceeding claimed a cost that was not reasonably going to be incurred in the future, it would likely be thrown out. Tr. 5570:20-5571:22 (Abbott).

c. Connecticut Yankee's FERC estimate filed in June of 2004 is higher than the October 29, 2002 estimate by $12.5 million on a nominal basis in the areas of ISFSI and long-term storage costs, which is attributable to Connecticut Yankee's self performance. Tr. 2527:8-2528:19 (Jewell-Kelleher).

164. Connecticut Yankee's damages expert, Dr. Wise, in conjunction with Connecticut Yankee executives, reviewed the company's October 29, 2002 cost estimate or "budget" (P1726CY) and both confirmed and calculated the company costs that were incremental to the DOE breach (*i.e.*, were components of damages caused by the breach).

– Tr. 3206:6-3206:14 (Wise) ("[W]e go over line by line with the company each budget. And we do it for two reasons. One is to figure out what lines could possibly constitute a damage element. And another reason we do it is to identify what lines may have some sort of an offset in a nonbreach world that we would need to track and include in our analysis."); Tr. 3355:22-23 (Wise) ("The initial information that we need to do the damage analysis comes from the company budgets.").

– Tr. 3212:12-3220:22; P2043A.6-.8 (Wise) (explaining and illustrating example of how damages model was created from Connecticut Yankee budget).

– Tr. 3353:15-3356:23; Tr. 3369:7-3371:2; D745 (Wise) (explaining changes to Connecticut Yankee budget (set forth in budget change sheets for Connecticut Yankee, D747) that Dr. Wise incorporated into his damages model).

– Tr. 3263:15-3267:2 (Wise) (describing certain of his adjustments to the damages claim).

165. Connecticut Yankee's four phases aided Dr. Wise in determining which costs were incremental to the breach.

a. Connecticut Yankee's phase 02 (wet storage costs) and phase 06 (dry storage costs) in its October 29, 2002 cost estimate correlate with Connecticut Yankee's three damages categories of ISFSI construction, ISFSI operation and wet pool-related damages. Phase 06, for dry storage, correlates with ISFSI construction prior to

completion of Connecticut Yankee's ISFSI and correlates with ISFSI operations thereafter.

– Tr. 3206:2-5 (Wise) (four phases in Connecticut Yankee's budget, "[S]ome phases would constitute damage items and some phases would not.")

– Tr. 3214:1-18 (Wise) ("[Phase] 2 would be a cost associated with the pool. [Phase] 4 is a cost associated with decommissioning and dismantlement. [Phase] 6 is a cost associated with the ISFSI. And [phase] 20 is a cost associated with general and administrative expenses. And when you look at the numbers here [in phase 20], you can see that there are numbers in 2002 and 2003 and 2004 and 2005 in the general and administrative expense category. And then that there are then numbers in the sixth category [phase 6], which is an ISFSI category. The numbers move from the one category to the other in that year because, after 2005, in a nonbreach world, the company would be gone. And therefore, any costs of this nature that exist in 2006 and afterwards would be costs that are being incurred because of the breach. And therefore they're in that damage category.").

– Tr. 3246:10-13 (Wise) ("Well, the three groupings we have for damages are those associated with pool operation, those associated with ISFSI construction, and those associated with ISFSI operation.").

b. Costs in two phases – 04 (decommissioning) and 20 (administrative and general) – were not incremental to the breach because they would occur in both worlds.

– Tr. 3219:13-21 (Wise) ("The 4 phase is decommissioning. And as we talked about before, we assumed the decommissioning was going to occur in both worlds. And the 20 phase is general and administrative expenses that would be occurring in the breach and nonbreach world. Therefore we realize those should not be included in a damage calculation and we take them out of the budget that we're going to use to calculate damages.").

166. The reliability of Connecticut Yankee's budget (1726CY) and three-section analysis is further established by the rigorous audit process in this litigation.

a. The audit process in this litigation was rigorous and comprehensive.

– Tr. 2528:20-2533:9; Tr. 2574:2-4 (Jewell-Kelleher) (she supervised the government's audits of Connecticut Yankee in both 2001 and 2003, which were similar to those at Yankee Atomic and involved nearly 500 separate audit requests, including requests for all invoices greater than $5,000, which Connecticut Yankee provided; the government auditors also interviewed Ms. Jewell-Kelleher at least a half a dozen times and interviewed members of her

staff, as well as a representative of AON, Connecticut Yankee's insurance consultant).

– Tr. 2010:6-21; Tr. 2529:1-2533:9 (Jewell-Kelleher) (during both the 2001 and 2003 audits Yankee Atomic provided the government auditors with the link files associated with each cost item; in addition, the government conducted extensive interviews of both Yankee Atomic and Connecticut Yankee personnel, including Ms. Jewell-Kelleher (a half a dozen times) and even a representative of AON, the company's insurance consultant).

b. As a result of the audit process in this litigation, Connecticut Yankee agreed with some of the government's objections to Connecticut Yankee's damages claim. (*See* PFF ¶ 174).

167. Connecticut Yankee also prepared a "3-section analysis" which grouped breach world costs into the three damages categories: ISFSI operations costs (Section 1), ISFSI construction costs (Section 2), and wet pool storage costs (Section 3).

– P1726CY; CY-DOE-2003-1-17_Section 1, 2, 3; Tr. 3243:15-24 (Wise) (identifying Tab 4 as Connecticut Yankee's 3-section analysis: "When we received the budgets from Yankee Atomic and Connecticut Yankee and from Maine Yankee, each of the companies have done what they called a sectional analysis, where it really was their first pass at estimating the source of damages that would be associated with either ISFSI operation, ISFSI construction or wet pool operation.").

– Tr. 3244:5-20 (Wise) ("The section 1 costs are associated with long-term spent fuel storage. They basically capture costs associated with the operation of the ISFSI through the time when DOE comes to remove the fuel."; "Section 2 represents the costs associated with building the ISFSI itself."; "Section 3 are the costs associated with wet fuel storage.").

– *See* PFF ¶ 159.e.-g. above.

168. The three-section analysis prepared by Connecticut Yankee provided another check for Dr. Wise in preparing Connecticut Yankee's damages claim.

– Tr. 3279:25-3280:3 (Wise) ("And the sectional analyses were useful in that we could compare what we were getting to what the company was getting to see if there was some issue raised that we should pursue with the company."); Tr. 3245:2-11 (Wise) (same).

169. Connecticut Yankee's minimum damages calculated by Dr. Wise appropriately includes pre-1999 costs that were not included in Connecticut Yankee's October 29, 2002 cost estimate.

– Tr. 2307:1-15 (Bennet) (Connecticut Yankee incurred pre-1999 costs of about $8.3 million related primarily to the re-racking of its spent fuel pool).

– Tr. 3221:21-23; Tr. 3256:11-3257:2 (Wise) (pre-1999 costs for Connecticut Yankee included the cost of reracking and also some costs for studies).

– Tr. 3222:2-3223:7 (Wise) (Dr. Wise reviewed with company Connecticut Yankee's pre-1999 cost information tabulated in expert report submitted with Connecticut Yankee's 1999 damages submission).

170. The contingency amounts included in Connecticut Yankee's damages calculation are appropriate.

a. Because unforeseen events are likely to occur and because the purpose of contingency is to allow for unforeseen but likely events in estimating future costs, it is appropriate to include contingency in calculating future damages.

– Tr. 1665:9-1666:1 (Bennet) (in its long-term cost estimates, Yankee Atomic accounts for expected but unforeseeable future events by applying contingency on a line-by-line basis); Tr. 2374:21-23 (Bennet) (in its cost estimating process, Connecticut Yankee handles and tracks contingency the same way and for the same purpose as Yankee Atomic).

– Tr. 3223:8-3231:19 (Wise) (explaining the difference between acceptable and unacceptable contingency and his determination that Yankee Atomic uses acceptable contingency in their long-term cost estimates).

b. The long-term cost estimates that Connecticut Yankee regularly prepares, including P1726CY, include contingency.

– Tr. 1665:17-20 (Bennet) ("Well, contingency, is used in our cost model on a line-by-line basis, in which we apply a particular contingency factor to a particular type of cost or line item of cost in the estimate."); Tr. 1666:18-20 (Bennet) ("Contingency is tracked to the extent that we have a specific issue that arises that is characterized as a contingent event.").

– Tr. 2374:21-23 (Bennet) (in its cost estimating process, Connecticut Yankee handles and tracks contingency the same way and for the same purpose as Yankee Atomic).

c. Connecticut Yankee applied contingency in an economically sound manner.

– Tr. 3223:20-3224:8 (Wise) ("I have done a lot of work for engineers in the past where on occasion engineers would include a contingency that I didn't feel really was a legitimate contingency. What I mean by that is I didn't think it was a contingency designed to capture what you would actually spend ultimately. It was more of a contingency to give you some sort of a comfort level that you would have more than enough money to finish the job if bad things happen that you didn't expect. . . . And so [in the Yankee cases contingency] . . . was a considerable item in terms of dollar value. And I wanted to make sure that we weren't putting something into our damages analysis that didn't belong there.").

– Tr. 3226:1-4 (Wise) ("I created a memo on this topic [contingency] to make sure that we were all on the same page in terms of what constituted an appropriate contingency and what did not."); Tr. 3227:8-12 (identifying D318, D318A as memo on contingency that Dr. Wise prepared).

d. Connecticut Yankee applied contingency correctly in its October 29, 2002 cost estimate, P1726CY.

– Tr. 7000:24-7001:3 (Bennet) ("Our [Yankee Atomic's and Connecticut Yankee's] decommissioning cost estimate with the contingency in it is our best estimate of what we're likely to spend to complete the work" for each respective cost item "[a]nd the entirety of the estimate.").

– Tr. 1868:2-1870:16; Tr. 2515:8-23 (Jewell-Kelleher) (Connecticut Yankee tracks contingency and past experience reflects actual usage of the contingency included in its cost estimates).

171. Connecticut Yankee has established that it is appropriate to adjust its future damages to present value using a risk-free discount rate.

a. As a matter of economics, to the extent costs included in damages are expected to increase in the future at a rate greater than general inflation, one should use a lower discount rate for these future costs.

– P2043A.13 (Wise) (describing what is meant by "discount rate").

– Tr. 3236:23-3237:12 (Wise) ("There is a nuance in this particular case, which is that I have used a much lower rate of inflation than the companies would be using for an escalation factor. And assuming a higher rate of inflation is mathematically equivalent, if you do the math right, to assuming a lower rate of discount. So that if you believed that in fact the company's escalation rates were more appropriate than my inflation rates, you might view the risk-adjusted rate as too high, and you might view the risk-free rate as a more appropriate rate for discounting the future cashflows . . . . in my damage analysis.").

– Tr. 3234:4-6 (Wise) ("What I mean by risk-free rate is a rate that is reasonably certain to be obtained. And that is generally viewed as a rate on government securities.").

b. To calculate Connecticut Yankee's claim for future damages, Dr. Wise used an escalation/inflation rate based on consensus forecasts for general inflation in the economy, not for the higher inflation rates expected by Connecticut Yankee and reflected in its long-term cost estimates like P1726.

– Tr. 3231:20-3233:3 (Wise).

c. Because the evidence shows that the types of costs included in Connecticut Yankee's future damages will increase in the future at a substantially higher rate than the general inflation rate used by Dr. Wise, a low, and indeed risk-free, discount rate is more appropriate.

– Tr. 5873:3-9 (Abbott); P1964 (accompanying the record), "Review of Decommissioning Cost Estimates for New England Nuclear Power Plants" (June 1997) prepared by Mr. Abbott and ABZ "for the Office of the Massachusetts Attorney General" at 2 (acknowledging that he concluded in this study that decommissioning cost estimates performed at different times for the same plant, over time, have increased at a rate well above the rate of inflation).

– Tr. 3235:10-15 (Wise) (general equities are more variable than costs, which one wouldn't expect to move that greatly in relationship to the overall market).

172. In adjusting future damages to present value, it is appropriate to use an after-tax discount rate.

– Tr. 7442:19-7448:15; Tr. 7454:21-7465:17 (Wise) (detailed explanation as to why after-tax discounting is appropriate in this case); P2043.1, .2 ("Pre-Tax vs. After-Tax Discounting").

a. Any award will be taxed initially by the government.

– Tr. 3234:7-14; Tr. 7443:24-7444:4; Tr. 7447:1-8 (Wise).

b. Potential recapture at a later date does not support pre-tax discounting.

– Tr. 7447:9-7448:15; Tr. 7454:21-7465:17 (Wise) (detailed discussion with demonstratives as to why potential recapture at a later date does not support pre-tax discounting); P2043.3 ("One Period Case with Recapture"); P2043.4 ("Portion of Damages Judgment Required to Pay Future Costs").

173. Connecticut Yankee's annual costs of ISFSI-only operations will be approximately $10.2 million in 2003 dollars from 2011 and forward.

– Tr. 3267:3-3271:6 (Wise); P2043A.24 (P2043A.24 shows average additional annual cost of $10.2 million for storing Connecticut Yankee's spent fuel in the event that DOE comes after 2010).

174. The damages set forth in Connecticut Yankee's 2003 pretrial submissions were adjusted by changes agreed to at trial. The agreed changes to Connecticut Yankee's damages claim amount to $11,987,242, including contingency, as set forth in P2043.13 and explained below.

a. Connecticut Yankee adjusted its damages claim downward in the amount of $4,228,764 for the reduction of Connecticut Yankee's security guard force to four guards after DOE has removed all the SNF from Connecticut Yankee's ISFSI.

– P2043.13, Item No. 1 – "Pre-9/11 Security," $1,267,666," and Item No. 2 – "Enhanced Security," $2,961,098, totaling $4,228,764.

– Tr. 2667:8-23 (Heider) (appropriate to reduce Connecticut Yankee's security guard force to four guards after all the fuel is removed from Connecticut Yankee's ISFSI by the DOE).

– Tr. 3272:16-3273:4; Tr. 3276:3-3277:8 (Wise) (noting adjustment); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $4,228,764 is adjusted from Future damages and ISFSI Operations. *See* Tr. 3248:8-13 (Wise) (costs for 2003 and beyond are future); Tr. 3244:5-20 (Wise) (explaining that ISFSI Operations costs capture the costs of operation of the ISFSI through the time when DOE comes to remove the fuel).

b. Connecticut Yankee adjusted its damages claim downward in the amount of $5,233,725 to account for its pool-to-DOE fuel transfer costs in the non-breach world.

– P2043.13, Item No. 5 – "Spent Fuel Transfer to DOE," $5,233,725.

– Heider Demonstrative 11 ("Connecticut Yankee Pool to DOE Bottoms up Estimate");Tr. 2203:5-2205:7; Tr. 2206:3-2208:2; Tr. 2229:7-23; Tr. 2258:20-2262:15; Tr. 2205:8-2206:2; Tr. 2210:11-2211:12; Tr. 2258:20-2261:15; 2684:21-2685:9; Tr. 2712:12-2716 (Heider) (explaining adjustment for pool-to-DOE transfer in the non-breach world).

– Tr. 3272:16-3273:12; Tr. 3276:3-3277:8 (Wise) (noting adjustment); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $5,233,725 is adjusted from Past damages and ISFSI Construction. *See* Tr. 3248:8-13 (Wise) (costs for 2003 and beyond are future, prior are past); *see also* PFF 88, *supra,* Pool-to-DOE transfer in the nonbreach world would have been complete by August 2001. Tr. 3211:4-3212:11 (Wise).

c. Connecticut Yankee adjusted its damages claim downward in the amount of $697,535 for the removal of two licensing engineer positions in years 2002 and 2003 related to Connecticut Yankee's final status survey that are appropriately attributable to decommissioning and for materials and services ("M&S") costs associated with these positions.

– P2043.13, Item No. 10 – "Final Status Survey Engineers," $592,167 and No. 12 – "M&S Adjustment due to Staffing Change," $105,368, totaling $697,535.

– Tr. 2653:1-19 (Heider) (explaining that two positions in year 2002 and one position in year 2003 associated with Licensing Engineers are appropriately attributable to decommissioning as opposed to wet fuel storage).

– Tr. 3272:16-3273:4; Tr. 3276:3-3277:8 (Wise) (noting agreed change); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $394,778/$70,245 for salary of two positions in year 2002 and related M&S costs is adjusted from Past damages and $197,389/$35,123 salary of one position in year 2003 and related M&S costs is adjusted from Future Damages. *See* Tr. 3248:8-13 (Wise) (costs for 2003 and beyond are future, prior are past); see *also* P1726CY, CY-DOE-10-29-02.xls, Staffing Detail, positions for Licensing Engineer (Day & White) originally coded to Wet Fuel Storage in 2002 and 2003 – *see* cells I84, K84, and I-83; Tr. 2653:7-19 (Heider).

– $592,167 and $105,368, totaling $697,535 is adjusted from Wet Pool related damages. *See* Tr. 2653:1-19 (Heider) (positions originally coded to wet fuel storage).

d. Connecticut Yankee adjusted its damages claim downward in the amount of $1,114,554 for removal of costs for the crane upgrade.

– P2043.13, Item No. 3 – "Crane Upgrade," $1,114,554.

– Tr. 3272:16-3273:12; Tr. 3276:3-3277:8 (Wise) (noting change); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $1,114,554 is adjusted from Past damages and ISFSI Construction. *See* Tr. 3248:8-13 (Wise) (costs for 2003 and beyond are future, prior are past); see *also* P1726CY, YA-DOE-10-29-02-Links, "CY 2002 D&D Milestones Paid Payment Bechtel Schedule Data.doc" at page 7, Single Failure Proof engineering spec complete 12/30/99 – $278,638.5; SFPY crane upgrade comp. Single failure proof – 3/4/02 – $835,915.50.

e. Connecticut Yankee adjusted its damages claim downward in the amount of $51,006 for computer replacement costs in 2005 to reflect the cost of replacing two computers per year.

– P2043.13, Item No. 9 – "2005 Computer Upgrade," $51,006.

– Tr. 2533:10-2534:10 (Jewell-Kelleher) (explaining computer upgrade adjustment); Tr. 3272:16-3273:4; Tr. 3276:3-3277:8 (Wise) (noting change); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $51,006 is adjusted from Future Costs and ISFSI Operations. *See* Tr. 3248:8-13 (Wise) (costs for 2003 and beyond are future, prior are past); Tr. 3244:5-20 (Wise) (explaining that ISFSI Operations costs, capture the costs of operation of the ISFSI through the time when DOE comes to remove the fuel).

f. Connecticut Yankee adjusted its damages claim downward by $29,425 removing from damages officer contract benefits costs that related to certain vehicle costs that would have existed in the nonbreach world.

– P2043.12, Item No. 7 – "Officer Contract Benefits – Phase 02," $19,218; Item No. 8– "Officer Contract Benefits – Phase 06," $10,207, totaling $29,425.

– Tr. 3272:16-3273:4; Tr. 3276:3-3277:8 (Wise) (noting change); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $19,218 "Officer Contract Benefits – Phase 02" costs are adjusted from Wet Storage and Future damages.[4] Tr. 3214:1-5 (Wise) (Phase 02 is associated with wet pool storage); *see* Tr. 3248:8-13 (Wise) (costs for 2003 and beyond are future, prior are past); *see also* P1726CY, CY-DOE-10-29-02.xls, Benefits Detail, Line 2.18, "Officer Contract/Benefits."

– $10,207 in "Officer Contract Benefits – Phase 06" costs are adjusted from Future damages and ISFSI Operations.[5] *See* cites for P1726CY in preceding bullet point.

g. Connecticut Yankee adjusted its damages claim downward in the amount of $559,790 to account for the use of a lower kilowatt load in Connecticut Yankee's ISFSI electrical usage estimate.

– P2043.13, Item No. 4 – "Electrical Utilities – ISFSI," $559,790.

– Tr. 2666:3-2667:7 (Heider) (explaining why 54 kilowatt is reasonable and reliable); Tr. 3272:16-3273:12 (Wise).

– Tr. 3276:3-3277:8 (Wise) (noting agreed change); Tr. 7476:14-7477:2 (Wise) (presenting value of adjustments).

---

[4] A portion of the Officer Contract Benefits – Phase 02 adjustment could be attributable to past costs, but in the interests of simplifying these adjustments the entire adjustment is being attributed to future damages.

[5] A small portion of the Officer Contracts – Phase 06 adjustment could be attributable to past costs, but in the interests of simplifying these adjustments the entire adjustment is being attributed to future damages.

– $559,790 "Electrical Utilities - ISFSI" costs are adjusted from Future costs and ISFSI Operations.[6] *See* P1726CY, CY-DOE-10-29-02.xls, Materials and Supplies Detail, line 617.09 "Utilities – Electric."

h. Connecticut Yankee adjusted its damages claim downward in the amount of $72,444 by removing record document services costs for storing documents associated with this litigation.

– P2043.13, Item No. 6 – "Record Document Services," $72,444.

– Tr. 3272:16-3273:4; Tr. 3276:3-3277:8 (Wise) (noting change); Tr. 7476:14-7477:2 (Wise) (presenting adjustment values).

– $72,444 "Record Document Services" costs are adjusted from Future costs and ISFSI Operations. *See* P1726CY, CY-DOE-10-29-02-links.xls, "CY 2002 Forecast 4.2 Record Doc Services."

## XI. TAKINGS

175. The federal government has had responsibility for the disposal of SNF from domestic commercial utilities since before the enactment of NWPA.

– 10 C.F.R., Pt. 50, App. F. (2004) ("Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government.").

– Tr. 276:3-7 (Mills) ("[F]rom the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program."); 276:18-24 (Mills) ("And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they [the government] would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that.").

– Tr. 1680:20-1681:4 (Bennet) ("Well, it's always been our understanding that the federal government would be responsible for disposal of spent fuel. As I described early on, they actually owned the spent fuel. And until commercial power reactors were allowed to own it, that was the primary

---

[6] A small portion of the Electrical Utilities – ISFSI adjustment could be attributable to past costs, but in the interests of simplifying these adjustments the entire adjustment is being attributed to future damages.

understanding. But with the high-level waste policy put in place, that put in place the mechanism by which they do that, that's the – that set up a reliance we had on their responsibility for spent fuel.").

176. The government has plenary authority to accept and store SNF. 42 U.S.C. §§ 2075, 2096, 2201(m) (2000); Brief for the Dep't of Energy at 25, *Idaho v. Dep't of Energy*, No. 91-70094 (9th Cir. filed Mar. 11, 1991); 42 U.S.C. § 2021c(b) (LLRWPAA).

177. DOE has decided to store SNF at utility sites until a repository is available.

– P1216 at 1 (July 6, 2001 letter from DOE Secretary Abraham to Governor King of Maine) (DOE is continuing to pursue repository but SNF may continue to safely be stored at utility sites in the meantime).

178. The government is using Connecticut Yankee's property for a public purpose – the storage of SNF.

– Tr. 2386:10-11 (Bennet) ("[I]t's that ISFSI and their fuel on our 15 acres of property that constitutes the taking.").

179. The government's use of Connecticut Yankee's property will continue until at least 2010, and more likely than not will continue for years beyond that time.

– P951 at 27,008 (Waste Acceptance Issues, DOE "Notice of Inquiry," 59 Fed. Reg. 27,007) (May 25, 1994) (In May 1994, DOE stated in a Federal Register notice that it would not be able to begin disposing of spent fuel in 1998 because a repository would not be operational until, at the earliest, 2010).

– Tr. 1536:21-1537:2 (Bennet) (When he joined Yankee Atomic in 1995, he did not believe that the Department of Energy would commence performing these contracts in 2010; "I personally always understood it would be somewhat later than that, if not a great deal later than that. And I also had my own view that they very well may never perform.").

– Tr. 5606:21-5607:6 (Abbott) (acknowledging that he had testified at his deposition that, if he were advising a client who was planning in a decommissioning cost estimate to estimate the time of the spent fuel pickup at 2010, he would say make it 2015, and it's likely pick-up may never happen).

– Tr. 5609:10-13 (Abbott) ("Today, if we did a decommissioning cost estimate, I would probably say it would be 2015 for the purposes of putting the estimate together.").

– Tr. 3483:13-3484:7 (Kouts) (unaware of any proposal for government storage that would allow government acceptance of spent fuel prior to 2010).

180. The property the government is using for a public purpose consists of the approximately 15 acres on which Connecticut Yankee's ISFSI is situated.

– Tr. 2385:11-15 (Bennet) ("The property we're speaking of there [at Connecticut Yankee] is the 15 or so acres of real estate on our plant site on which the ISFSI is placed.").

181. The property that the government has taken has a fair market value of $30,000 per acre, totalling $450,000 for 15 acres.

– Tr. 2387:1-2389:7 (Bennet) (appraisal showing land value of $30,000 per acre at Bates No. 28462-28463); P1729CY (10/1/00 "Valuation Analysis, Connecticut Yankee Atomic Power Plant, Haddam Neck Plant by S&W Consultants, Sylvester & Co., LLC).

– Tr. 2388:8-17 (Bennet) (relied on appraisal, which was done when Connecticut Yankee was in process of considering value of land to sell to developer for new power plant, as well as looking at the possible value should Connecticut Yankee complete decommissioning and elect to donate or sell it).

– Tr. 2388:22-2389:7 (Bennet) ($30,000 per acre times 15 acres on which ISFSI sits equals $450,000 worth of land that Connecticut Yankee claims government has taken).

Dated: November 17, 2004

Respectfully submitted,

_s/ Jerry Stouck_________________

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
CONNECTICUT YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH