**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | No. 98-154 C (Senior Judge Merow) |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | Filed electronically February 18, 2005 |

**CONNECTICUT YANKEE'S REPLY ON ITS**
**POST TRIAL PROPOSED FINDINGS OF FACT**

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
CONNECTICUT YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: February 18, 2005

## Table of Contents

**Page**

I. General Findings and DOE Contract .......... 1

II. ISFSI Development .......... 12

III. Fuel Storage at GE Morris .......... 14

IV. Reracking .......... 15

V. GTCC Waste .......... 17

VI. Good Faith and Fair Dealing .......... 18

VII. Damages .......... 18

VIII. The Government's Proposed Alternative Damages Findings Set Forth in Its "Additional Response To Connecticut Yankee's Proposed Damages Findings" Fail to Account for the Agreed Changes to Connecticut Yankee's Damages or Are Wrong .......... 31

A. The Government's "Summary" of the Abbott/Johnson Criticisms is Unreliable and Unhelpful .......... 36

B. The Government's Proposed Alternative Findings That Certain of Connecticut Yankee's Damages Were Not Caused By the Breach Are Wrong. .......... 37

C. The Government's Assertions That Connecticut Yankee's Claim Must Be Reduced to Eliminate Contingency is Wrong. .......... 44

D. The Government's Assertions That Connecticut Yankee's Damages Must Be Reduced to Eliminate Unreasonable Costs Either Fail to Account for Changes Agreed to at Trial or Are Wrong. .......... 45

E. The Government's Proposed Alternative Findings That Connecticut Yankee's Damage Should Be Reduced to Eliminate Unsupported Costs Are Wrong Because Connecticut Yankee Provided the Government With Support .......... 60

F. The Government's Position re Discounting Connecticut Yankee's Future Damages to Present Value is Incorrect .......... 62

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | : | No. 98-154 C<br>(Senior Judge Merow)<br><br>Filed electronically February 18, 2005 |

**CONNECTICUT YANKEE'S REPLY ON ITS**
**<u>POST TRIAL PROPOSED FINDINGS OF FACT</u>**

Connecticut Yankee submits this reply to the government's response to Connecticut Yankee's post-trial Proposed Findings of Fact. As was the case in responding to the government's proposed findings, Connecticut Yankee can efficiently address any of the government's responses to Connecticut Yankee's Proposed Findings ("GRCYPF") in categories, while providing some additional replies to individual government responses. In many instances, the GRCYPF simply cite the government's own proposed findings of fact, to which Connecticut Yankee has already responded. Connecticut Yankee will not repeat those responses here, but instead respectfully refers the Court to Connecticut Yankee's prior filing.

## I. General Findings and DOE Contract

To a remarkable degree, the government's responses to Connecticut Yankee's proposed findings regarding general issues and the DOE contract deliberately ignore or speak past the evidence cited by Connecticut Yankee. Instead, the government stubbornly bases its responses on the government's views of the Contract, most of which have already been rejected by the Court. *See* Order of June 26, 2003, substantially adopting *Commonwealth Edison Co. v. United*

*States*, 56 Fed. Cl. 652, 663 (2003). For example, the government cites *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), at least two dozen times, for the proposition that testimony is not admissible on the issue of reasonable government performance. S*ee* GRCYPF 42-46, 50-65, 67, 81-83. The government's heavy reliance on *Berry* is misplaced, however, as it is neither a Federal Circuit decision nor even a contract case. It addresses the admissibility of expert testimony on the ultimate issue of fact in a 42 U.S.C. § 1983 case. Instead, in *David Nassif Assoc. v. United States*, 557 F.2d 249, 259 (Ct. Cl. 1977), the Federal Circuit's predecessor made clear in a contract case that consideration of testimony and other evidence is appropriate to determine what reasonable contract performance would have been where a term is missing from the parties' contract. This Court's ruling noted above (based on *Commonwealth Edison*) made clear that the DOE contract does not set out the terms of DOE's performance.

Likewise, the government's reliance on *First Heights Bank, FSB v. United States*, 51 Fed. Cl. 659 (2001), *see* GRCYPF 61, for the proposition that testimony is irrelevant to the Court's interpretation of the obligations created by the DOE contract is also misplaced. *First Heights* merely recites the traditional rule that extrinsic evidence will not be received to aid the interpretation of "the terms of a contract that is clear on its face." 51 Fed. Cl. at 659 (internal citation omitted). As explained above, however, this Court already has ruled that the DOE contract is not clear on its face.

The government similarly asks the Court to ignore much of the evidence cited by Connecticut Yankee regarding what reasonable DOE performance would have been on the ground that such performance is not contractually binding. *See, e.g.,* GRCYPF 62-63 (arguing that Mission Plan and related documents are not binding), 74 (arguing that testimony regarding the need for acceptance capacity to handle unanticipated contingencies is irrelevant, because

such capacity is not contractually required), 77 (arguing that evidence of DOE's plans to accept 3000 MTU of spent fuel per year is irrelevant because there is no obligation in the contract to accept spent fuel at that rate). Connecticut Yankee, of course, has not alleged that such documents were intended to automatically impose binding obligations. But such evidence is highly probative of what reasonable DOE performance would have been – evidence that the Court may use in the absence of an acceptance rate term in the parties' contract to fashion an appropriate acceptance rate provision.

4. The government's argument that the reasonably constant rate at which Connecticut Yankee will accrue damages beyond 2010 was not litigated at trial is belied by evidence cited with CYPF 173. Although Connecticut Yankee is not requesting in this litigation a judgment to include such damages given the remote possibility that the government might perform by 2010, a finding regarding the accrual of such damages would help promote a more efficient resolution of the claim that Connecticut Yankee will likely eventually have to bring for such damages.

41. The government's argument that Dr. Wise did little independent analysis of plaintiffs' damages claims does not fairly reflect the totality of his testimony or what Dr. Wise, in fact, did in this case. Dr. Wise explained well his close interaction with plaintiffs and his role in assessing plaintiffs' damages. Tr. 3352:12-3356:21. *See also* reply to GRCYPF 164.

62. The government's assertion that no evidence supports the portion of the finding that DOE would compensate utilities for the failure to timely accept spent fuel is belied by P633, which states clearly DOE's contingency plans in the event a repository is delayed. *See* P633 at PNL-173-1284-85 (if the repository is expected to be delayed by less than two years DOE will either add buffer storage at the repository or take title to the spent fuel and move it into dry

storage at the utility and pay a rental fee to the utility to store the casks at the reactor; if the repository is expected to be delayed by more than two years, then DOE would construct a MRS).

63. The government's claim that it specifically rejected utilities' requests for more detail in the Standard Contracts is not supported by the cited government proposed findings. Those findings either merely claim that DOE did not adopt the suggestions of certain utilities or reflect Mr. Morgan's *post hoc* explanations for DOE's actions. The government has not cited any evidence to dispute the finding in CYPF 63.b. that DOE did not contemporaneously disavow the utilities' expressed understanding of the Standard Contracts.

The government's assertion that Connecticut Yankee misstated the parties' understanding of the program's goals as set forth in early program documents is flatly wrong. The government's claim that DOE did not intend to eliminate the need for all utilities to construct additional at reactor storage is belied by P678 at 11 (Mr. Morgan's December 1983 "Program Overview" for OCRWM), which stated clearly that "[d]uring the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that *no* utility would have to add *any* further storage facilities either on site or at another location." (emphasis added). P636 (a December 1983 draft of the Mission Plan) at 2-1, cited by the government, is in accord with Connecticut Yankee's proposed finding ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that *no* utility will have to provide additional storage capacity after January 31, 1998." (emphasis added). The Draft Mission Plan went on to explain that while an individual utility might face a need for expanded storage due to the timing of its shipment allocation, it was expected that in such instances, utilities would exchange with other utilities with earlier allocations and that "such brokering arrangements should prevent the need for *any* utility to

expand on-site storage and minimize transshipments.") (emphasis added). *See* P636 at 2-2 and 2-4.

66. Although the government argues that efficiency is not a contract requirement for the pace and schedule of SNF acceptance, the government concedes that efficiency is indeed "a program goal or objective," as the Yankees have alleged in its proposed findings. The government's argument that Dr. Bartlett's testimony that OCRWM was concerned with moving "must-move" fuel when he was director should be discounted because Dr. Bartlett approved the 1991 ACR, P60, which did not provide for must-move acceptance, misses the mark. As the government has emphasized, that ACR was submitted to Dr. Bartlett for approval with a memorandum, *see* D23, asserting that the acceptance rates in that ACR would prevent utilities from having to add onsite storage (*i.e.*, the acceptance rates would address must-move fuel). Although, as the government acknowledges, the 1991 ACR acceptance rates would actually not have addressed all must-move fuel, the approval memorandum shows that such performance was a concern for OCRWM in general and Dr. Bartlett in particular. In other words, Mr. Milner (the official who signed D23) must have thought that at least claiming that the rates in the ACR would adequately address at reactor storage needs was appropriate in order to serve Dr. Bartlett's approval of the ACR.

67. Once again, although the government argues that cost-effective performance was not a contract requirement, the government acknowledges that "the full cost recovery nature of the Standard Contract translates into a program goal or objective of operating the program in a cost-effective manner." The government's argument that Mr. Graves did not consider total system costs is wrong. In addition to his consideration of utilities' costs, as noted in CYPF 80, Mr. Graves relied, in part, on government studies, including P175, showing that an acceptance

rate of 3,000 MTU per year would have to minimize program costs. Tr. 782:10-783:3. He also considered the impact of exchanges on the ability for DOE to use efficient acceptance campaigns and found that the use of exchanges would have been much more consistent with campaigned acceptance than OFF acceptance. Tr. 836:1-839:24 and Graves Demonstrative 90.

69. The government's disputation of a generally self-evident fact (that is also supported by undisputed trial testimony), that a utility's at-reactor SNF storage costs rise if it is forced to add to its at-reactor storage capacity or if it is forced to extend at-reactor storage of SNF after it permanently shuts down, reflects a general lack of credibility in the government's positions. The government's claim that the costs of operating a particular type of storage facility does not generally depend on the amount of SNF and it is beside the point; plaintiff's proposed findings address situations where costs rise because either a new facility must be constructed or operated or an entire existing facility has to be operated because of the presence of SNF.

70. The government's claim that growth in must-move fuel could not be projected to rise at a 3,000 MTU per year rate is refuted by the evidence the government itself cites in response to CYPF 72. It is unhelpful for the government to raise technical objections to the evidence in supporting proposed findings while elsewhere essentially conceding the essence of the finding. The government's claim that D23, the approval memorandum for the 1991 ACR, represents an "analysis" that the acceptance rates in that ACR would accommodate at-reactor SNF storage needs is wrong. The statement in the document is an unsupported assertion, and the government presented no analysis to substantiate this assertion. The government's claim also is contrary to Mr. Pollog's testimony. Tr. 4039:22-4047:1. Moreover, Mr. Graves demonstrated that the 900 MTU acceptance rate would not have addressed at-reactor storage needs. Tr. 786:23-788:7; 918:7-919:11; 7503:3-7506:9.

71. The government's argument that Dr. Bartlett stated that an annual acceptance rate of 900 MTU would have been reasonable uses Dr. Bartlett's statement out of context. Although it was reasonable for Dr. Bartlett to approve the 1991 ACR with a use of 900 MTU acceptance, that fact does not mean that such performance would have been reasonable in the context of the parties' 1983 agreement. By 1991, DOE had already made clear that it would not have a repository ready until 2010 and limitations on acceptance at another facility imposed by the 1987 NWPA amendments constrained other acceptance. *See* P101 (1989 Report to Congress on Reassessment of Program) and P60 (1991 ACR). Given that situation, acceptance of 900 MTU per year was reasonable in the sense that it was about the best DOE could do under the circumstances. Tr. 706:22-707:5 (as Dr. Bartlett testified, such a rate was not desirable, but reasonable).

72. The government's disputation that annual aggregate commercial discharges could be projected to be about 2,000 MTU is silly, given that the evidence cited by the government is consistent with such discharges being at a rate between 2,000 and 3,000 MTU. If anything, the evidence cited by the government would indicate that acceptance at a rate higher than 3,000 MTU per year would have been reasonable.

73. The government's urged distinction between acceptance from utilities and an efficient throughput for the DOE system is also silly. If DOE fails to accept spent fuel from utilities at a rate of at least 3,000 MTU per year then it could not run its system at an efficient 3,000 MTU per year rate because it would lack sufficient spent fuel to put through its system. Dr. Bartlett's testimony is in accord with this reality. Dr. Bartlett explained that the reasonable rates of acceptance from utilities and emplacement in a repository are the same 3000 MTU per year, in part, because of how the two tasks relate to each other. Tr. 609:20-611:11.

75. Importantly, the government's response concedes that the evidence establishes "that campaigns are 'efficient'." The government's claim that plaintiff has not shown the relevance of campaigns in light of the oldest-fuel-first concept is wrong. Mr. Graves demonstrated that exchanges would have led to efficient campaigns. *See* CYPF 85.a.

77. The government correctly notes that there is a typographical error in plaintiff's proposed findings; of course, the finding intended to note that DOE has been planning to accept 3,000 MTU per year from utilities. As noted in the reply to CYPF 73 above, the government's claim of significance between acceptance from utilities and emplacement in a repository, is without merit. The government's claim of a distinction between use of a 3,000 MTU per year rate to determine program costs and use of that rate in determining an adequate fee is similarly silly. The purpose of the fee under the cost recovery program, of course, is to adequately fund the program.

78. The government's disputation of this proposed finding that DOE could technically have accepted spent fuel from utilities at a 3,000 MTU per year rate is evasive and disingenuous. It is obvious that the government cannot dispute that DOE could have accepted 3,000 MTU per year from utilities. The government's failure to find a place to put the spent fuel reflects the breach, not a technical impediment to robust acceptance. As reflected by the evidence cited by plaintiff (noting locations in Australia and Owl Creek), and indeed the ISFSIs plaintiff and the other Yankees are building at their sites, it is not technically difficult to identify a location at which to store spent fuel.

79. The government's suggestion that acceptance of 900 MTU per year would have been reasonable absent the breach is without merit for the reasons noted in the replies on CYPF 70 and 71 above. Importantly, the government has not proposed a finding that a 900 MTU per

year acceptance rate would have been reasonable absent the breach. The government's claim that it would have accepted spent fuel at the rates in the 1991 ACR is wrong as shown in Connecticut Yankee's response to GPF 93.

80. The government's claim that the record contradicts Dr. Bartlett's opinion that a ramp up to 3,000 MTU per year acceptance in three years is wrong. The government's assertion that DOE was planning to accept spent fuel at a 900 MTU per year is not supported. The 1991 ACR does not support this claim as noted in response to GPF 93. The government's argument that a centralized interim storage facility is not the same as an MRS is beside the point (and the government cites no evidence for its assertion that Dr. Bartlett said that the facilities were the same). As explained by Dr. Bartlett in testimony cited by plaintiff, a centralized interim storage facility is the sort of facility that DOE could have used to accept spent fuel from utilities at a reasonable rate starting in 1998. The government's claim that plaintiff cannot establish what DOE actually would have done if it had started acceptance in 1998, misses the mark. Plaintiff's evidence (and the relevant issue) goes to what DOE should have done to meet its obligation to accept spent fuel at a reasonable rate. In addition, the government's reliance on P978 to challenge the ramp up rate set out in the proposed finding is misplaced. P978 (a June 1983 report on financing the DOE program) assumes that DOE will accept 1800 MTU of spent fuel in the first five years of program operations (a total 9000 MTU). This is about the same as the ramp up used by Mr. Graves, in which the first five years of acceptance (1200, 1200, 2000, 2000, 2700) totals 9100 MTU.

81. The government's claim that the parties' contract requires OFF acceptance except for three exceptions notably ignores Art. VI.B.1(b).1. Similarly the government's argument that it can only be held liable for acceptance of spent fuel on an OFF basis ignores this Court's June

28, 2004 Order explaining that the Court must determine how the exchanges provision would have been used absent the government's breach.

84. For the most part, the government's disputation of plaintiff's proposed finding that utilities would have exchanged acceptance allocations consistent with their economic interests is based on the government's misinterpretation of Mr. Graves' analysis, debunked in plaintiffs' response to the government's proposed findings, that this finding depends on the development of a "perfect" market. Indeed, the government now admits that "some" exchanges may have occurred absent the breach.

a. The government's suggestion that Mr. Collier's testimony, showing that utilities do tend to find efficient ways to trade rights to further economic self interests should be ignored because his examples only pertained specifically to the front-side of the fuel cycle, is without merit. The government offers no support for the proposition that utilities would have acted contrary to their economic self interests regarding the back end of the fuel cycle absent the breach.

b. Connecticut Yankee cites the evidence of prior success between the industry and DOE on dealing with fuel enrichment services as a good indication of the kind of success that the parties would have enjoyed arranging for exchanges under the spent fuel contracts. The government's accusation that plaintiff is trying to mislead the Court here is unhelpful and belies the fact that the government lacks any basis with which to appropriately dispute plaintiff's evidence. The government's claim that plaintiff's statement that a robust and effective market developed is unsupported simply ignores Mr. Collier's testimony.

85. The government's assertion that its proposed findings show that DOE would have used a variety of criteria to analyze proposed exchanges is wrong. GPF 139 merely asserts that certain criteria "may" have been used.

a. The government asserts that Mr. Graves' model only shows allocations for some of the spent fuel acceptance through 2002 (assuming reasonable government performance). The government's claim that this assertion is supported by GPF 171 is wrong. That proposed finding simply asserts that under Mr. Graves' model, some of the spent fuel acceptance goes to utilities with must-move fuel.

b. The government's disputation of Connecticut Yankee's statement that exchanges would have led to DOE's acceptance of "cooler" fuel wrongly focuses on operating utilities. The point of the finding is that the exchange provision would have enabled shutdown reactors that have quantities of "cooler" fuel to ship all of their fuel to DOE.

86. It is significant that while the government technically disputes this proposed finding that there are no significant technical or transportation impediments to exchanges, the government does not even to attempt to address the particulars of Mr. Stuart's testimony cited by plaintiff on this issue.

87. The government is wrong to assert that it was not obligated by the parties' contract to accept SNF upon a reasonable or efficient schedule. Given the absence of more specificity in the contract, the Court must supply the terms of reasonable performance.

91. The government's claim that the record indicates that DOE would not have granted priority to plaintiff, if necessary, to prevent the company from waiting a substantial period to complete its decommissioning is unsupported. Similarly, the government's claim that there is no evidence of how DOE would have provided priority is belied by the Final Rule cited

by the government. The government's claim that Mr. Milner testified that DOE did not have an objective of granting priority to shutdown reactors tellingly does not meet plaintiff's evidence. The evidence cited by Connecticut Yankee is Mr. Milner's testimony that DOE has had an objective of allowing shutdown reactors to timely decommission. Preferably, that objective would have been met through an efficient swap mechanism. As stated in the proposed finding, the granting of priority to shutdown reactors would only have been used "if necessary."

## II. ISFSI Development

94. The government's primary reason for disputing this proposed finding that program delays caused Connecticut Yankee to reasonably believe that DOE would not start acceptance by January 1998 or proceed on a reasonable schedule and that there was significant uncertainty regarding the date when DOE would begin acceptance is that the proposed findings do not cite testimony from Yankee witnesses. The government ignores, however, the documents cited that reflect exchanges of correspondence between DOE and Connecticut Yankee that fully support the proposed finding. Ultimately, the government has no means with which to dispute the cited evidence. As noted in the response to GPF 93, the 1991 ACR is not to the contrary, as the ACR made clear, and DOE knew, that the acceptance scheme set out in that document was inconsistent with existing law.

95. Although the government complains that the evidence supporting this proposed finding that Connecticut Yankee has not had available options other than on-site storage of its SNF is limited, the government neither disputes that evidence nor offers any contrary evidence on the issue.

96. The government's disputation of this proposed finding that Connecticut Yankee evaluated options and began to take steps before and after it shut down to arrange for substitute performance in light of DOE's anticipated breach is without merit. The government cannot

dispute that Connecticut Yankee took the steps that it did. Instead, the government appears to argue that those steps were not taken in anticipation of DOE's breach, noting the government's proposed findings on that issue and noting some Connecticut Yankee documents that anticipated extended storage of spent fuel. Connecticut Yankee has already responded to the GPF. Also, the various Connecticut Yankee documents the government cites reflect the company's best guesses as to when DOE would perform; they do not represent the company's opinion of the performance to which it is entitled under the parties' contract.

97. Contrary to the government's arguments, the various Connecticut Yankee documents the government cites reflect the company's best guesses as to when DOE would perform; they do not represent the company's opinion of the performance to which it is entitled under the parties' contract. Moreover, the government does even attempt to refute all of the evidence cited by Connecticut Yankee.

98. Here, and elsewhere, *see, e.g.*, GRCYPF 98, 100, the government complains that Mr. Bennet's testimony is without foundation. Given that the Court has already received this evidence, these arguments are not available to the government. Moreover, the arguments are without merit. Here, for example, Mr. Bennet's testimony explained the basis for Connecticut Yankee's realization that DOE would not perform until at least 2010, or perhaps much later, which is the substance of the proposed finding.

99. The government's disputation of the proposed finding that Connecticut Yankee determined that dry storage would be the best and most cost-effective way to store its spent fuel is without merit. The government does not dispute the evidence cited by Connecticut Yankee. Instead, the government argues that Connecticut Yankee made this determination after negotiations with regulators, particularly the Connecticut Department of Public Utilities

("CDPUC"). But the government does not and cannot explain why it believes that reaching the go dry determination after negotiations with the CDPUC means that the determination was not based on cost effectiveness. Indeed, the evidence cited by Connecticut Yankee indicates that the CDPUC's concerns were related to using the most cost-effective storage method.

101. Connecticut Yankee has already refuted the government's arguments that failed fuel is subject to delayed acceptance in its responses to the government's proposed findings of fact. But even if that were true, it would not support the government's argument that Connecticut Yankee's decision to store its failed fuel dry is, thus, not reasonable and appropriate. Indeed, the longer the duration of the storage, the more appropriate the use of dry storage. *See* GRYAPF 102 and GPF 298 (conceding that economics generally favors dry storage over the long term).

103. The government's claim that Mr. Bennet's testimony that Connecticut Yankee would not have built the ISFSI but for DOE's breach is premised on the fuel-out date in Mr. Graves' model is not supported by the cited testimony. There, Mr. Bennet acknowledged that Connecticut Yankee's damage claims are based, in part, on exchanges. But nothing about that statement indicates that it was intended to modify his earlier testimony regarding the motivation for building Connecticut Yankee's ISFSI.

## III. Fuel Storage at GE Morris

108c. The government' disputation of the proposed finding that it is reasonable and appropriate for Connecticut Yankee to store 82 spent fuel assemblies at the Morris facility is without merit. The government cites no evidence for its claim that the assemblies could be transported and stored at Connecticut Yankee's ISFSI at a significantly lower cost. Moreover, the government does not dispute proposed finding 108.b. noting the continuing intense opposition to Connecticut Yankee returning the assemblies to its Haddam Neck site. Nor does

the government dispute that Connecticut Yankee's resolution of a zoning challenge to the ISFSI prohibits the return of the 82 assemblies to Haddam.

## IV. Reracking

115. The government's response to CYPF 115 is erroneous for two reasons. First, the government continues to erroneously state, "Connecticut Yankee was scheduled to run out of storage space, less full core reserve, in 1996. As a result, reracking was needed prior to any DOE performance obligations." As explained in Yankee Atomic's response to DPFOF ¶ 328, the government improperly relies on a July 24, 1992 Yankee Atomic document, D156, *see* Abbott's slide 45 (citing D156), for the 1996 date. This Yankee Atomic document studied possible spent fuel exchanges among New England reactors. *See* D156. Mr. Abbott, the government's technical witness, acknowledged that it was not possible to determine how "Yankee Atomic got the information . . . or derived the [1996] date" and that Yankee Atomic "could have been wrong." Tr. 5620:10-5621:4 (Abbott). Moreover, beginning in October 1992, a series of Connecticut Yankee's own documents projected that, without DOE performance under the Contract, its reactor would lose full core reserve in 2000. P1444CY (at CDB006672; CDB006691), P1445CY (at CDB005938, CDB006705-706), P1448CY (at CDB006668).

Second, the government erroneously applies a hindsight analysis to suggest, "Had Connecticut Yankee simply waited until 1998 to perform the rerack . . . no rerack ever would have been performed based upon the 1996 decision to shut down." As explained in Connecticut Yankee's Initial Post-Trial Legal Brief at 4, this Court properly ruled that decisions related to alternative performance required by the defendant's breach must be "grounded in a determination as to reasonable commercial judgment on the part of plaintiff" at the time the decision was made. *See* Order of Aug. 29, 2003 at 3 (citing *Northern Helex Co. v. United States*, 207 Ct. Cl. 863, 883, 524 F.2d 707, 718 (1975).

At the time the decision to rerack was made, Connecticut Yankee was one of several plants operated by Northeast Utilities. The objective of Northeast Utilities "spent fuel storage strategy [was] directed at providing Full-Core-Discharge (FCD) capability *for each unit operated by NU System Companies*, for the duration of each of their respective operating licenses." P1444CY (at CDB006671) (emphasis added). Northeast Utilities had no plans to shut down Connecticut Yankee at the time the decision to rerack was made and it expected Connecticut Yankee to continue operating until the end of its license in 2007. Tr. 2592:18-2593:3, 2611:13-17, 2619:8-25 (Mellor). While the failure of DOE to meet its obligation to commence the removal of spent fuel starting January 31, 1998 was the main factor in deciding when to schedule the reracking of the spent fuel pool, Tr. 2599:3-13, 2600:16-24 (Mellor); Tr. 2307:16-22 (Bennett), Northeast Utilities also had to consider the financial impact of the timing and its ability to support that effort. As Northeast Utilities October 2, 1992 "Spent Fuel Storage Strategy" makes clear, "A substantial drain on human resources is expected to prevail if CY-reracking is performed at the same time that [REDACTED] is being reracked . . . . There is a limited cadre of NU personnel who have the experience to assure that reracking activities will be performed for the costs shown in Table 3." P1444CY (at CDB006681). Table 3 projected costs for a 1996 reracking to be approximately $8 million, but that delaying the reracking to 1998 would "increase [costs] by $2.8 million." P1444CY (at CDB006683); *see also* P1445CY (at CDB006693) (reracking "projected to take place between 1994 and 1996. The cost of this work was projected to be $8M."). By July 31, 1995, Northeast Utilities finalized the expansion of storage capacity among its operating plants: Connecticut Yankee would undergo a "partial reracking scheduled to be performed in 1996," another plant would utilize an "on-site transfer [REDACTION] and/or consolidation," and another plant would rerack "in 1998 or later."

P1448CY (at CDB006652). Thus, Connecticut Yankee properly and reasonably reracked in 1996 based on the prevailing commercial considerations at the time the decision to rerack was made.

118. The government's claim that Connecticut Yankee reracked too soon is addressed in the reply to CYPF 115 above.

**V. GTCC Waste**

128. Notwithstanding the hesitation by the government's counsel at closing argument to admit that the government would concede anything regarding GTCC waste, the government's response certainly does not dispute that GTCC waste is highly radioactive.

129. Although the government purports to dispute the finding that disposal in a repository constitutes permanent isolation, the government does not address (and cannot avoid) the admission of this issue by its Rule 30(b)(6) witness.

132. Notwithstanding the government's claim of lack of evidence on this point, there is ample support for the fact that the government has long been responsible for the disposal of high-level radioactive waste. *See, e.g.*, CYPF 42.

136. Helpfully, the government concedes "that the NRC has determined that GTCC waste requires permanent isolation 'unless proposals for disposal of such waste in a disposal site licensed pursuant to this part are approved by the Commission'." CYPF42 (*citation omitted*). And the government also concedes that it has not even proposed such an alternative. The government's claim that "[a]s part of the rule" NRC emphasized that it intended to preserve DOE's flexibility is wrong. The statement appears in the explanation of the rule, not the rule itself. *See* P1069 at 22579. And while the NRC clearly intended to preserve DOE's flexibility to pursue alternatives, that fact is not inconsistent with presently requiring (as it has since 1998 when DOE's performance was due) permanent isolation in order to "ensure that GTCC wastes

are disposed of in a manner that would protect the public health and safety . . . ." P1069 at 22578.

137. As is the case with spent fuel, the parties' contract is silent regarding the timing of DOE's obligation to remove GTCC waste. The cited evidence is support for the provision of a reasonable term, that such waste had to be removed no later than the last of a utilities' spent fuel. The government's failure (and inability) to dispute any of the cited evidence or to offer any contrary evidence on this issue is telling.

## VI. Good Faith and Fair Dealing

144. The government's claim that the proposed finding, that DOE instructed and required Connecticut Yankee to complete its DCSs in conformity with the pace and schedule for spent fuel acceptance in the 1991 ACR, is contrary to the evidence is unsupported. Ultimately, the government's "response" further confirms the proposed finding. Moreover, Mr. Zabransky gave substantially similar testimony. Tr. 4166:7-4167:15.

146. The government's response to this proposed finding that DOE required utilities to conform their DCS to the acceptance rates in the 1991 ACR because it wanted to try to limit its liability to utilities is limited to a series of too late or rejected evidentiary arguments concerning the Court's decision to accept Mr. Vance's testimony and a plea to discredit his testimony because his employer represents other nuclear utilities. The notion that testimony from witnesses should be rejected as incredible if an interested party employs them is unhelpful, as it would effectively eliminate consideration of most evidence from witnesses with knowledge.

## VII. Damages

In its responses to Connecticut Yankee's proposed findings 150-174, the government asserts repetitive boilerplate objections to Connecticut Yankee's damages based on 1) purported deficiencies in Mr. Graves' economic sequence model; 2) lack of causation; 3) assumptions

Connecticut Yankee made in planning documents purportedly based on "timely DOE performance," but actually reflecting planning in the face of DOE's breach;[1] 4) the government's position that the DOE contract does not cover GTCC waste or require timely acceptance of failed fuel; 5) alleged deficiencies in the discount rate used by Connecticut Yankee in computing its damages; and 6) the government's adjustments to Connecticut Yankee's damages (set forth in the government's alternative damages findings ("GAF"). Those objections have all been refuted in Connecticut Yankee's previous post-trial submissions and/or are addressed elsewhere in this reply. Connecticut Yankee's reply points below address only objections other than this boilerplate that the government has asserted in response to Connecticut Yankee's indicated proposed findings.

150. The government's response consists entirely of the boilerplate objections noted above.

151. The contention that the inclusion of Connecticut Yankee's 2002 costs in past damages is a "mischaracterization of the evidence adduced at trial" is flatly wrong, as the government's citation of the Wise testimony illustrates: "The past costs are based on costs that were actually realized or, *in the case of Yankee Atomic, projected to be experienced in 2002*." Tr. 3248:11-13 (Wise) (emphasis added). Moreover, Dr. Wise testified in full that, for Connecticut Yankee, just as for Yankee Atomic, past costs are 2002 and prior. Future costs are

---

[1] The government's reliance on the reference in D471 (August 31, 1998 initial decision by FERC administrative law judge ("ALJ") in Connecticut Yankee's 1996 FERC rate case) to assumptions made in the decommissioning cost estimate accompanying Connecticut Yankee's 1996 FERC filing is anomalous, because the ALJ concluded in his initial decision that "the deficiencies described above render the proffered [decommissioning cost] estimate too unreliable for ratemaking purposes." D471 at GPE0021178. S*ee also* Tr. 2319:11-16 (Bennet) ([The ALJ] made the determination that the cost estimate that had been provided in that [Connecticut Yankee] 1996 filing . . . was unreliable for rate-making purposes. And I believe his order directed that a new cost estimate be prepared to support decommissioning cost.").

2003 and future. "It's totally analogous to the Yankee Atomic [damages analysis] we looked at." Tr. 3254:3-7 (Wise). The government also confuses costs with damages. Dr. Wise testified that "we submitted the [expert] report in 2003 so at that point, 2003 was the future and 2002 was the past." Tr. 3248:8-9 (Wise). *See also* Plaintiffs' Demonstrative 2043A.14 (showing Connecticut Yankee's past damages in 2002 and prior years and future damages from 2003 forward). Since that time, Connecticut Yankee has continued to incur additional costs due to DOE's breach, so at present an even greater percentage of Connecticut Yankee's damages are comprised of past costs. Tr. 3202:11-12 (Wise) (by 2003, a very large percentage of the costs were past costs).

152. The assertion that Connecticut Yankee's future minimum damages are speculative and should await future adjudication is without merit, as set forth in Connecticut Yankee's response to DPF 314.

154. The government's response consists entirely of the boilerplate objections noted above. *See also* Connecticut Yankee's responses GAF 1-76 below.

155. The government's assertion that not all of Connecticut Yankee's ISFSI construction costs were incurred under the Bechtel contract ignores the fact that Phase 06 costs for activities other than those delineated in CYPF 155 are also included in Connecticut Yankee's ISFSI construction costs, such as Morris storage costs, true costs of procuring Connecticut Yankee's transport cask and Connecticut Yankee's oversight staffing. *See* P1726CY.

156a. The contention in 156a., that the record does not support a finding that Connecticut Yankee was one of the first in the nuclear industry to construct an ISFSI, is a frivolous quibble.

156b. The government notes that this response regarding Connecticut Yankee's ISFSI Operations damages is addressed in various GAF, to which Connecticut Yankee responds below.

The government's assertion in response to 156b., that Connecticut Yankee's ISFSI staffing should be reduced to 2 full-time technical staff positions and one half-time corporate executive, is not supported by the evidence the government cites. Rather, P1462YA (cited by the government) supports Connecticut Yankee's current ISFSI staffing numbers of 5 on-site and 3.5 corporate FTEs. *See* YDK007538 (showing ISFSI staffing for 2002 and beyond at 5.1 FTEs – 2 on-site [Yankee Atomic] staff and 3.1 full time equivalent YNSD [Yankee Nuclear Services Division] staff – plus corporate staff of 3.5 FTEs); *see also* YDK007520 ("Overall staffing for the two options [wet and dry storage] differ, but total YNSD staffing is the same for both options . . . for the entire life cycle."); *compare* P1462YA, YDK007538 re dry storage staffing *with* YDK007537 re wet storage staffing). Staffing in D688 and D689 is for Connecticut Yankee's and Yankee Atomic's alternative GTCC only on-site storage alternatives in the nonbreach world, and is not relevant to the breach world staffing of Connecticut Yankee's ISFSI, which stores both SNF and GTCC waste. *See also* Connecticut Yankee's response to GAF 44 below.

157. 157a.-b. See reply to GRCYPF 151 above. The government's response in 157c., regarding Connecticut Yankee's wet pool-related costs, duplicates GAF 52, to which Connecticut Yankee responds below. *See also* Connecticut Yankee's responses to GAF 22-58 below. The government's objection that the bracketed material in the quote from P169, the PNL Study, "Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown," (contractor-generated document) at 2.5 was incorrectly included is wrong. Mr. Abbott agreed that Connecticut Yankee's pool is small after having been read the statement from P169 that "the expensive outliers are all older facilities with relatively small pools." Tr. 6031:8-11; 6032:9-11 (Abbott). The government's assertion that P169 was not admitted into evidence also is wrong. The PNL Study was prepared "for the U.S. Department of Energy under Contract DE-AC06-

76RLO 1830," P169 at 1; *see also id.* at 2 ("This report was prepared as an account of work sponsored by an agency of the United States Government."). The government produced in discovery a copy of the PNL Study from DOE's files at Headquarters (Bates No. HQR 25-0873-905). The PNL Study also is available to "DOE and DOE contractors from the Office of Scientific and Technical Information" and "to the public from the National Technical Information Service." P169 at 2. Pursuant to the Court's September 17, 2004 Order governing contractor-generated documents, P169 has been admitted.

The assertion in 157.c. that Connecticut Yankee's citation to Mr. Abbott's survey of other facilities' wet pool storage costs cannot support a finding that Connecticut Yankee's wet pool-related costs are reasonable, because the survey results are "utility specific," is belied by Mr. Abbott's own reliance on the wet pool costs at General Electric's Morris, Illinois facility as a good method of identifying and determining the cost of operating a wet storage pool. Tr. 5652:11-17 (Abbott). The further contention in 157.c. that Zion information "is not contained with an admitted exhibit" is disingenuous (and irrelevant), because the testimony regarding the Zion decommissioning cost study is in the record. Moreover, the implication in 157.c. that the cost of $7.5 million at Zion to "maintain dormancy" refers to something other than the annual cost to run the Zion spent fuel pool is wrong. Mr. Abbott identified the "4B Dormancy" period in the Zion report as the period having "fairly isolated wet pool costs." Tr. 6036:6-6037:25 (Abbott). And the conclusion in CYPF 157.c. regarding the annual cost of running Zion's wet fuel pool is not "base[d] upon the response to a hypothetical" but on knowledge of the author of the Zion decommissioning cost estimate. *See* Tr. 6043:3-18 ("in our report C04-1326-002 [TLG's decommissioning cost study for the Zion Nuclear Power Station], the wet storage costs shown in tables 4.1 and 4.2 for period 4B must be added together to obtain the total wet storage

costs for the Zion units. There is only one pool, and the wet storage costs were shared between both Zion pools.").

159. The government's contention in response to CYPF 159d., that the LINKS files in P1726CY, Connecticut Yankee's October 29, 2002 cost estimate, do not fall within the business records exception has been rejected by the Court's ruling to the contrary. *See* Tr. 3436:5-6 (Court ruling: "It's [P1726CY] admitted in evidence for business record purposes.").

160. The government's contention that P1726CY alone cannot establish the amounts of Yankee Atomic's damages is wrong for two reasons. First, it has been rejected by the Court's ruling to the contrary. *See* Tr. 3436:5-6 (Court ruling: "It's [P1726CY] admitted in evidence for business record purposes."). *See also* Connecticut Yankee's responses to GAF 1-78. Second, P1726CY is not the only evidence supporting the amount of Connecticut Yankee's damages.

161. The description of Connecticut Yankee's tracking of actual costs against its estimates (Tr. 7043:25-7045:14 (Bennet)) bolsters the reliability of the estimates and the cost process through which they are developed, contrary to the government's assertion that the process is unreliable. The increase in Connecticut Yankee's damages claim from 1999 to 2003 reflects the greater reliability of actual costs and the fact of consistently rising costs in the nuclear industry, but for the same reasons does not make the 2003 costs other than "reasonably certain." The government's assertion that P1726CY is not reliable (or was "prepared for this litigation") has been rejected by the Court's ruling to the contrary. *See* Tr. 3436:5-6 (Court ruling: "It's [P1726CY] admitted in evidence for business record purposes.").

161a. Contrary to this assertion, abundant evidence shows that Connecticut Yankee employees provide the same types of estimates and include the same documentary support for cost estimates submitted with FERC rate case filings as for P1726YA. *See, e.g.,* Tr. 6996:17-

6997:15 (Bennet) (Yankee Atomic and Connecticut Yankee estimated future D&O insurance premiums or other insurance premiums in Plaintiffs' Exhibit 1726 by obtaining input from insurance consultant Aon, "the same way" it estimates future premiums in FERC cases); Tr. 2495:1-2496:16 (Bennet) (10/29/02 cost estimate prepared in the same way that annual update to the cost estimate or the FERC cost estimate is prepared); Tr. 2519:3-10 (Jewell-Kelleher) (P1726CY is same kind of long-term forecast that Connecticut Yankee prepares annually or on a snapshot basis).

161d. This response regarding the government's "adjustments" to Connecticut Yankee's cost estimates duplicate the various GAF to which Connecticut Yankee responds below.

161j. Contrary to this response, the conclusion by Connecticut Yankee's external auditors in P2037 that "the more significant judgments and accounting items relate to future closure costs and ISFSI related costs" and that "management's procedures for forming these estimates were acceptable and appropriate in these areas" (P2037 at 2) supports the reliability of the estimating process in Connecticut Yankee's long-term cost estimates, which is the same process used to prepare P1726CY.

162e. Mr. Abbott's article does support a finding that Connecticut Yankee's personnel have the knowledge and expertise to prepare reliable cost estimates, a finding that is also amply supported by other record evidence.

163. The government's objection to this proposed finding on relevance grounds, asserting that "the purposes of a FERC hearing are different from the requirements in a damages proceeding," and citing of Mr. Johnson's testimony (Tr. 6325:25-6326:2) that "it's incumbent upon the proper measurement of an asserted claim for damages for it to reflect the best estimate, only the best estimate," 1) ignores the fact that the FERC estimate is relevant to the

reasonableness of the damages claim, as the government's expert acknowledges, Tr. 5570:20-5571:22 (Abbott), and 2) ignores Mr. Bennet's testimony that "[o]ur decommissioning cost estimate with the contingency in it is our best estimate of what we're likely to spend to complete the work [for each respective cost item] [a]nd the entirety of the estimate." Tr. 7000:24-7001:3 (Bennet). The government's complaint that no mechanism exists for the government to obtain reimbursement for estimates that exceed Connecticut Yankee's actual future damages if such damages are awarded in this case, is both legally and factually irrelevant. Courts regularly award future damages, and, as shown by the government's citations to D150 and D90 (Yankee Atomic's decommissioning cost studies in 1992 and 1994, respectively), the Yankees' costs are increasing over time, so there will be no occasion for a "reimbursement" of the type the government suggests.

163b. This response regarding contingency issues duplicates GAF 28-31, to which Connecticut Yankee responds below. The government's attempt to disavow Mr. Abbott's testimony that "reasonableness" is the standard for assessing costs at FERC does not make that fact untrue.

164. This response, asserting that Dr. Wise did little independent analysis of Connecticut Yankee's claim and purportedly relied on Connecticut Yankee's budgets based upon the terms of his hire, misstates Dr. Wise's testimony. Dr. Wise testified that the decision to have an independent accountant from PriceWaterhouseCoopers (Mr. Barry), review Connecticut Yankee's *pre-1999* costs to determine which were caused by DOE's breach was not his decision, but the terms of his hire. Tr. 3363:25-3364:10 (Wise). By contrast, Dr. Wise testified that it was his independent decision to rely on Connecticut Yankee's cost estimates in preparing its damages claim: "This goes back to the very early days of the project where we were trying to determine

the best way to go about doing our damage analysis. And through the process of educating ourselves and the companies as to what the issues are going to be and how we might address them, the use of the company budgets as a primary source of information for our analysis was a result of that process. The deliberative process led us to the conclusion that using the company budgets would be a very good way to do this analysis." Tr. 3364:11-3365:4 (Wise). *See also* Tr. 3195:8-18 (Wise) (same). Far from reciting the company line, as the government suggests, Dr. Wise testified that he and his staff 1) constructed an economic damages model by going through the Yankees' budgets "to see what line items would constitute damages and what line items would not constitute damages," and "interact[ing] with the company to make sure we all understand the budgets and that we're identifying the proper lines," Tr. 3196:24-3197:2, 3197:11-13, *see also* Tr. 3196:19-3206:25, 3208:1-3220:11 (Wise) & Wise Demonstratives 2043A.2-.8 (detailed explanation of use of company budget to construct damages model); and 2) put their own imprimatur on the damages by "review[ing] the information from the company and challenge[ing] it where it looked like there may be inconsistencies among the companies, or numbers might look anomalously high in particular line items." Tr. 3360:25-3361:4 (Wise); *see also* Tr. 3353:15-3355:12, 3356:15-21, 3369:12-23 (Wise) (identifying line-item changes in company budgets).

With respect to his analysis of Connecticut Yankee's cost estimates, Dr. Wise testified that: "[I]t's a very thorough process where we went over every line in their budgets to make sure that there wasn't some sort of issue that we had to address to get a correct estimate of damages." Tr. 3369:24-3370:2 (Wise). *See also* Tr. 7284:25-7285:24 (Jewell-Kelleher) ("we worked endlessly with the Brattle Group staff, line item by line item, looking in particularly and being challenged on what lines [of the 10/29/02 cost estimate] . . . would occur . . . in the nonbreach

world, and what the appropriate offsets would be for each and every line item in the cost estimate, so as to determine what the true incremental costs are to the damages in this case. . . . I was very involved in that myself."). Regarding adjustments to Connecticut Yankee's cost estimates, the companies determined the *amount* of the adjustments because "[they] have the information necessary to determine what appropriate changes in staffing would be, what appropriate changes in other items would be." Tr. 7497:2-5 (Wise). Dr. Wise, however, "was involved in the process of preparing the changes. There were changes where conversations with the companies would identify an issue where it was useful for us to go into the links. And people working under my direction would do that so that we could address those issues properly." Tr. 3360:11-16 (Wise). *See also* Tr. 3370:17-23 (Wise) (same). And, as noted in the first sentence of this paragraph, Dr. Wise was involved in determining the nonbreach world offsets.

The remaining assertions in this response are duplicated in the GAF, to which Connecticut Yankee responds below.

165. This response largely reiterates the assertions in response GRCYPF 164. The cost allocation issues addressed in this response are duplicated in the various GAF, to which Connecticut Yankee responds below.

166. This response regarding the government's "adjustments" to Connecticut Yankee's damages duplicates the GAF, to which Connecticut Yankee will respond below.

168. This response largely reiterates the assertions in GRCYPF 164 and 165. The last two sentences of this response, asserting that Dr. Wise did not rely upon Connecticut Yankee's three-section analysis but on the four phases of Connecticut Yankee's cost estimate, supports the conclusion that Dr. Wise performed his own independent damages analysis. As Dr. Wise explained, "The sectional analysis is the companies' first pass at what *damages* should be by

category. But we didn't start our analysis from there. We started it from the *actual budgets* and *the individual line items*." Tr. 3279:20-24 (Wise) (emphasis added). The government's response does not, in any event, detract from the proposed finding that the 3-section analysis provides a "check" on Dr. Wise's work.

169. With respect to Connecticut Yankee's pre-1999 costs discussed in this response, Dr. Wise reviewed no source documents supporting pre-1999 damages because he reviewed with Connecticut Yankee his use of the numbers from the Barry reports. Tr. 3221:14-3223:7 (Wise) (received pre-1999 cost information from Barry report and reviewed Barry numbers with companies prior to inclusion in damages); *see also* Tr. 3338:16-17 (Wise) ("I'm relying on [Mr. Barry's] work as reviewed by the companies.").

170. Sub-responses 155a. and c. duplicate the assertions in GAF 28-31, to which Connecticut Yankee responds below.

171. Contrary to the implication in 171a., Dr. Wise did not testify that a risk free discount rate is only appropriate when the future cost is expected to be a sum certain. He also testified that "if you believed that in fact the company's escalation rates were more appropriate than my inflation rates, you might view the risk-adjusted rate as too high, and you might view the risk-free rate as a more appropriate rate for discounting the future cashflows." Tr. 3237:5-10 (Wise). *See* Wise Demonstrative 2043A.13 (after-tax risk-free rate "may be appropriate if escalation of these costs is expected to exceed general inflation"). In addition, the government evasively cites only half of Dr. Wise's testimony regarding how to correct a present value calculation to accommodate a higher escalation rate. Dr. Wise testified: "There would be two ways to handle it. One way would just be to put in the higher inflation rate. The other way would be to leave my inflation rate alone but achieve the equivalent result by *lowering the*

*discount rate*. Tr. 3237:17-21 (Wise) (emphasis added). Finally, contrary to the assertion in this response, there is evidence in the record to support a finding that the companies' higher escalation rate was the appropriate rate to use. *See* Tr. 3232:10-17 (Wise) ("3.8 percent is actually a very common escalation factor in the budgets that we got. This created an issue for me because 3.8 percent, while it may be reasonable for the sorts of costs that these companies incur and may be consistent with their experience and may even be approved by FERC, is a number that's in excess of what people are predicting for general inflation."); Tr. 3002:14-16 (Smith) ("I used the escalation rate of 3.8 percent because that was the approved escalation rate from our FERC settlement from 1998."); Tr. 1667:19-22, 1668:18-23 (Bennet) (noting FERC's approval of GDP deflater as escalation factor for many items in FERC decommissioning cost estimates, and a higher escalation rate for worker salaries). Ample other evidence also shows that costs of handling high-level nuclear materials are increasing at a rate well above the general inflation rate. *See* response to 156c. The remaining assertions in this response regarding the appropriate discount rate for Connecticut Yankee's damages to present value duplicate GAF 69-76, to which Connecticut Yankee responds below.

171c. The government's assertion that "there is no evidence to support the proposition that 'the types of costs included in Connecticut Yankee's future damages will increase in the future at a substantially higher rate than the general inflation rate used by Dr. Wise'" is anomalous in view of the government's complaints regarding the increase in Connecticut Yankee's damages claim from 1999 to 2003. The citation to P1964 (which, as Connecticut Yankee noted, is "accompanying the record") is appropriate, because rising decommissioning cost estimates reflect the movement of actual costs. Indeed, Mr. Abbott counseled in P1964 that "[m]any decommissioning estimates try (usually implicitly) to argue that . . . rates of increase

will not continue by ignoring the history or making philosophical arguments as to why this history can not continue. This is an example of 'hopeful' engineering. That is, when faced with an unpleasant or undesirable conclusion based on current or historical facts, the implication for future events is simply hoped away." P1964 at 12.

172. The premise on pages 238-241 of this response, that the Yankees could invest any award received in tax-free securities, is wrong. The government's response to CYPF 157 is remarkable for these reasons: (1) it mounts a factual attack on Connecticut Yankee's use of an after-tax discount rate with complicated "evidence" the government never produced at trial; (2) it explicitly agrees with Dr. Wise's analytic methodology; and (3) the government's central factual premise – that Connecticut Yankee "could," and implicitly would, invest the damages proceeds from this case *exclusively* in tax-free bonds – is contradicted by evidence that was presented at trial. What Connecticut Yankee did prove was that FERC's prudent investor rule requires that "the investment management be separate and not controlled by the day-to-day utility management." Tr. 1677:17-24 (Bennet). "[T]here is a general set of requirements . . . that . . . investment managers, under the oversight of the trustee, . . . manage that [decommissioning trust] money." Tr. 1677:25-1678:3 (Bennet). The FERC prudent investor rule also "requires a very thoughtful allocation and diverse investment of the funds . . . Hence, the fact that we hire investment managers. And the trustee is the one that oversees the level of investments and the adherence to the prudent investor rule." Tr. 1678:12-23 (Bennet). As Mr. Bennet also explained, consistent with the prudent-investor rule, the fund is a diversified fund. Tr. 7109:16-24 (Bennet). Given those facts, it is inconceivable that Connecticut Yankee would invest the damages it receives from this case entirely in tax-free bonds.

Dr. Wise's opinion that an after-tax discount rate should be used, and the factual evidence supporting use of an after-tax discount rate summarized in CYPF 172, in no way depend on the illustration depicted in P2043.4 (which was offered in rebuttal to refute Mr. Johnson). Thus, the government's factual attack is both too late and too little - Dr. Wise's opinion is persuasive, credible and fully supported by the factual evidence that was presented at trial. The government's hypothetical set forth on pages 236-39 and in Figure 2: Pre-Tax Discount Rate Demonstrative (which was not presented at trial, and thus is not in the record) should be disregarded.

In addition, the assertion, at the bottom of page 238, that Connecticut Yankee may either pay no tax or a significantly lower tax than what Dr. Wise assumed upon any award they receive, is contradicted by the evidence. Ms. Jewell-Kelleher testified that, in the future, she expects both Yankee Atomic and Connecticut Yankee to be paying federal and state income taxes in the future, noting that "when looking at the revenue streams and the expenses incurred, both companies will find themselves in a taxable income situation in future years." Tr. 7282:9-20.

## VIII. The Government's Proposed Alternative Damages Findings Set Forth in Its "Additional Response To Connecticut Yankee's Proposed Damages Findings" Fail to Account for the Agreed Changes to Connecticut Yankee's Damages or Are Wrong

The government's "additional response to Connecticut Yankee's proposed damages findings" sets forth for the third time the same criticisms of Connecticut Yankee's damages claim that Mr. Abbott and Mr. Johnson first made in their pretrial reports and then read (with little or no accompanying reasoning) nearly word-for-word at trial from hundreds of "flash-card" slides that comprised their "testimony." The government ignores the cross-examination of these witnesses, which demonstrated that Mr. Abbott has no credibility (or relevant experience) and that Mr. Johnson, who relied on Mr. Abbott for the majority of his criticisms, Tr. 6673:13-

6674:15 (Johnson), is largely (if not entirely) simply an advocate for the government’s litigation positions. *See, e.g.*, Tr. 6820:24-6821:25 (Johnson) (with respect to his deduction of Connecticut Yankee’s costs of janitorial services, “I'm not sure I can explain to you, as I sit here, why [they're being excluded].”). The government’s post-trial presentation on these issues also ignores Connecticut Yankee’s rebuttal case, which fully answered those government criticisms that retained any life after the cross-examinations.

By thus ignoring what happened at trial, refusing to make any adjustments following Connecticut Yankee’s very effective cross-examination and rebuttal case – and even refusing to acknowledge the “agreed changes” that Connecticut Yankee accepted at trial – the government’s post-trial “additional response” is entirely unhelpful to the Court (particularly in light of its reliance only on the incredibly thin, “bare bones with no meat” trial testimony of Messrs. Abbott and Johnson) and ultimately is merely a distraction. Indeed, the government displayed its own lack of confidence in the Abbott/Johnson criticisms by virtually ignoring them at the January 24 closing arguments, focusing instead on broader arguments the government hopes will lead to a “zero damages” result.

Despite the government’s unhelpful (and ineffectual) reiteration of the Abbott/Johnson criticisms, Connecticut Yankee sets forth below a succinct reply to each of the government’s numbered “additional responses” with citations to more complete treatment of the issue at trial during cross-examination or rebuttal (or in some cases voir dire).

Initially, however, it is important to reiterate the overarching reasons why Mr. Abbott and Mr. Johnson lack credibility and why their testimony is unreliable.

**Abbott**. Neither Mr. Abbott nor anyone else at his consulting firm who worked on this case has an engineering degree or license (except for Mr. Brewer, who has an engineering degree but no engineering license). Tr. 5337:9-5338:7 (Abbott).

The last time Mr. Abbott had any responsibility for any operations at a nuclear plant was twenty-five years ago in 1979 at FitzPatrick nuclear power plant, and his operator's license expired when he left FitzPatrick. Tr. 5322:24-5323:9. Even at FitzPatrick, only ten to fifteen percent of Mr. Abbott's time was devoted to dealing with spent fuel matters. Tr. 5324:19-5325:3. Mr. Abbott has never had any responsibility for operating an ISFSI, nor has he participated in transferring spent fuel from wet to dry storage at a commercial reactor, in loading spent fuel storage casks or in transporting spent fuel assemblies. Tr. 5325:7-21, 5326:5-8; *see* Tr. 5329:8-5333:10 (no one at ABZ, Mr. Abbott's company, has ever been involved in transporting spent nuclear fuel).

Mr. Abbott also has never been employed in a position where his duties included anything involved with decommissioning a nuclear power plant or with spent fuel storage or management at a decommissioning plant. Tr. 5326:9-23, 5327:6-13. He has never participated in preparing an application for an ISFSI license, or in the licensing of a storage container for spent fuel. Tr. 5327:19-25. Prior to his engagement by the Department of Justice ("DOJ") in this case, Mr. Abbott had not reviewed even one certificate of compliance, the licensing document for a spent fuel transportation and/or storage cask. Tr. 5329:1-7. Mr. Abbott also has no experience with the design of transportation containers, Tr. 5333:18-20, and he has never been involved personally in a Part 72 license application for an ISFSI. Tr. 5353:23-5354:2.

During the time Mr. Abbot worked at the NRC in 1979 to 1981, he did not work at all on the development of the Nuclear Waste Policy Act (and is not even sure that he was aware at that

time that a statute like the NWPA or the program it established was under consideration), nor did he deal with any decommissioning or dry storage issues because they were not in the regulatory pipeline at that time. Tr. 5347:21-5348:25. He also cannot offer any opinions that are based upon specific knowledge about the current design of the Yucca Mountain repository, and, prior to this case, he had not even seen DOE's spent fuel contract with utilities. Tr. 5333:25-5334:6. Mr. Abbott also does not know whether or not the current design of the planned repository at Yucca Mountain contemplates the accommodation of nonstandard fuel or failed fuel as defined in the DOE spent fuel contracts. Tr. 5334:7-11. Nor, with three exceptions (a meltdown situation at TMI, a review of one failed fuel assembly at Maine Yankee, and inspection of failed fuel at FitzPatrick) has Mr. Abbott ever analyzed any failed fuel issues prior to his engagement by DOJ in this case. Tr. 5334:12-23. Mr. Abbott did not explain his seemingly inconsistent testimony that when he was at Fitzpatrick 25 years ago, there was no failed fuel in the pool. *See* Tr. 5352:11-14.

At the time of his first deposition in this case in 2002, Mr. Abbott was not qualified to receive safeguards information regarding nuclear-related security issues and therefore he did not have access to significant information about additional post-9/11 security requirements at nuclear plants and ISFSIs, nor was he permitted at that time to look at the security plans for the Yankee plants. Tr. 5334:24-5335:17. Nevertheless, he believed he was qualified at that time to offer expert opinions on security matters at nuclear plants and ISFSIs. Tr. 5335:18-22. In fact, Mr. Abbott still believes that one can be an expert on nuclear plant security matters without being privy to safeguards information. Tr. 5335:23-5336:2 (Abbott).

Even though Mr. Abbott has no training in accounting, and accounting is not his area of expertise, he believes that he is as qualified to estimate the cost of spent fuel management at

Connecticut Yankee as the management and plant staff, Tr. 5338:15-5339:7 – even assuming management and plant staff at Connecticut Yankee have more knowledge and expertise in their particular facility than he and others at ABZ. Tr. 5342:17-5345:3. The rate casework Mr. Abbot has performed was for four nuclear plants that had not yet gone into operation, so the plants involved had no spent fuel issues or related cost issues. Tr. 5357:1-8.

At the time of trial, about half of all of ABZ's work was on spent fuel cases with DOJ as the client, and Mr. Abbott made significant changes to his 2004 expert reports, such as adding significantly more detail to a specific scenario addressed in that report, because DOJ requested it. Tr. 5352:20-24, 5353:10-15. And DOJ conceived all five of the damages scenarios presented in his expert report. Tr. 5353:19-22. Finally, Mr. Abbott has never been a member of any industry group that is involved in helping DOE with the Yucca Mountain repository. Tr. 5362:25-5366:7, *compare* Tr. 3091:12-3093:15 (Meisner) (delineating Mr. Meisner's participation and leadership role in various industry groups addressing spent fuel issues relevant to decommissioning plants and to the Yucca Mountain repository).

**Johnson.** Mr. Johnson was largely an advocate for the government's litigation positions. *See, e.g.,* Tr. 6651:2-6 (acknowledging that he relied on Mr. Abbott with respect to many of his opinions); Tr. 6651:7-6652:6, Tr. 6662:4-6663:3 (Johnson) (acknowledging that Johnson demonstratives note with an "x" many (but not all) of the instances in which he had considered or relied upon Abbott's opinion). Mr. Johnson conceded that approximately sixty-nine percent of his proposed adjustments to Connecticut Yankee's damages claim is attributable to input from Mr. Abbott, and approximately thirty-one percent to his own opinions, Tr. 6668:8-6669:10 (Johnson); *see also* Plaintiffs' Johnson Demonstrative 1, and as set forth above (and demonstrated at trial), Mr. Abbott was not a credible witness.

Apart from his reliance on Mr. Abbott, Mr. Johnson knew little about the costs about which he was opining. For example, Mr. Johnson did not know what the Nuclear Waste Policy Act of 1982 is, and his opinions are not based upon interpretations of the contract. Tr. 6642:8-15. Mr. Johnson has never worked for a utility company (nor have his companies, Veris Consulting and Johnson, Lambert & Company), Tr. 6640:6-14, and he has no experience in the management of companies that own and operate ISFSIs. Tr. 6640:15-17. Veris and Johnson Lambert have never done work for a utility rate-making body, and have had no dealings with the Nuclear Regulatory Commission. Tr. 6640:25-6641:13. Other than limited contacts related with this case, Mr. Johnson and his companies have had no dealings with the Department of Energy. Tr. 6641:14-6642:7. Mr. Johnson also does not consider himself to be an expert 1) in economics, Tr. 6646:4-6; 2) in assessing tax effects on spent nuclear fuel and decommissioning trust funds, Tr. 6680:23-6681:1, or 3) on corporate taxes levied by the State of Connecticut. Tr. 6685:4-21. Mr. Johnson estimated that, at the time of trial the total fees for Veris on this case probably were in excess of $2 million. Tr. 6647:23-6648:21.

**A. The Government's "Summary" of the Abbott/Johnson Criticisms is Unreliable and Unhelpful.**

1- 8. Paragraphs 1 through 8 of the government's additional response summarize the deductions Mr. Johnson would make to Connecticut Yankee's damages in various categories conceived by Mr. Johnson. None of these deductions is warranted, for reasons discussed below in response to the government's additional alternative findings ("GAF") that address each proposed deduction in more detail. Even the government's conclusory summary in paragraphs 1 through 8 is unhelpful, however, and cannot be correlated to Connecticut Yankee's damages claim, because the government states all dollar amounts in constant mid-2002 dollars rather than appropriately discounting amounts in future years to present value, and because the

government's figures also fail to take account of adjustments agreed to by Connecticut Yankee at trial.

**B. The Government's Proposed Alternative Findings That Certain of Connecticut Yankee's Damages Were Not Caused By the Breach Are Wrong.**

9. This alternative proposed finding asserts that costs to license Connecticut Yankee's dry storage containers for transportation, costs shared with Yankee Atomic to acquire a transportation cask, and costs for the three casks that store Connecticut Yankee's GTCC waste, are not recoverable as damages "because they are not related to [the] need to store SNF as a result of DOE's breach" and "because DOE is not responsible for the acceptance and disposal of GTCC waste." But the legal issue, at least with respect to mitigation, is whether these costs were reasonably incurred by Connecticut Yankee, *see* legal brief(s), and the factual answer is yes, *see* CYPF 99h., 155a., particularly given DOE's own expressed preference for transportable storage containers, *see* Tr. 1603:25-1605:16 (Bennet) (describing DOE's 1994 initiative to procure multipurpose canisters); CYPF 100, and Connecticut Yankee's reasonable belief that GTCC would go to the DOE repository. *See also* CYPF 129-138. Indeed, the Contract requires DOE to provide transportation hardware, and Connecticut Yankee's costs for transportation cask licensing and supply are not merely a reasonable, but an eminently sensible, substitute for that DOE contract obligation. *See* Yankee Atomic's response to GPF 302. Moreover, under a settlement agreement with the City of Haddam, Tr. 2347:9-14 (Bennet) and P1920, Connecticut Yankee is required to make all reasonable efforts to procure the availability of a transport cask "to support the[] City's view that the waste ought to be packaged and as transport ready as possible so that it not become a mini Yucca Mountain, in their words." Tr. 2349:16-21 (Bennet). See also Tr. 1614:15-20 (Bennet) ("Connecticut Yankee is planning to procure a transport cask [because] under a settlement agreement, it has to do that.").

In any event, the government's $7,191,901 figure, purportedly for the NAC contract costs in the transportation and GTCC cask categories it criticizes, is incorrect and not substantiated by Mr. Abbott or Mr. Johnson in any credible way. *See* Johnson Connecticut Yankee slide 4, Abbott slide 19. In any event, Connecticut Yankee did make one "agreed change" to adjust its ISFSI construction costs to remove $1.1 million in costs associated with its crane upgrade incurred in 1999 and 2002. *See* CYPF 174d.

10. This proposed alternative finding, asserting that Connecticut Yankee has not demonstrated that staffing costs related to ISFSI construction in 1999 and 2000 were incurred as the result of DOE's breach because "[p]ayroll records were unavailable" is wrong and unsupported. Ms. Jewell-Kelleher testified that, during the government's audit of Connecticut Yankee's damages claim, the government's auditors asked for and received payroll distribution reports (with each individual's name, all of the dollars for that individual and the project numbers to which each individual coded his time) and time sheets, which were provided in their entirety in response to a request for the payroll distribution. Tr. 1899:16-1900:11; Tr. 2528:20-2532:4.

11-13. These proposed alternative findings, asserting that the offset for costs Connecticut Yankee would have incurred in the nonbreach world to transfer SNF from its wet pool to DOE transportation casks ("pool-to-DOE costs") should equate with the costs Connecticut Yankee incurred or expects to incur in transferring its SNF from its wet pool to its ISFSI, is unsupported and wrong. As established at trial, Tr. 2202:20-2209:7, 2712:13-2713:13 (Heider); Tr. 3148:12-25 (Meisner), and contrary to GAF 12, there are very substantial differences between the process [START HERE] of loading SNF from pool to DOE and the process of loading SNF from pool to ISFSI, and the former process would be far less costly (and more comparable to transferring SNF from ISFSI to DOE).

Mr. Abbott opined in his first report (and testified in his related deposition) that ISFSI-to-DOE costs were a reasonable proxy for the Yankees' pool-to DOE transfer costs in the nonbreach world. Tr. 5889:22-5890:3. *See also* Tr. 5892:22-5893:2 (Abbott) (at first deposition he testified "it was reasonable to assume that the level of effort needed to load the canisters . . . from the ISFSI to DOE, is similar to the level of effort needed to move the fuel in the fuel pool to the canisters"). Subsequently, Mr. Abbott changed his mind and opined in his second report, at his second deposition and at trial that the pool-to-DOE transfer costs in the nonbreach world should equate with the costs Connecticut Yankee included in its damages claim for the transfer of its SNF from its pool to its ISFSI, based upon its Bechtel/NAC contract, costs Mr. Abbott pegs at $5,473,516, Tr. 5425:8-5426:5 and increases to $6,545,191 with further staffing adjustments. Tr. 6425:12-6426:5.[2] Mr. Abbott admitted he performed no "bottoms up" analysis, Tr. 5889:17-21 (Abbott), as Connecticut Yankee did in preparing its agreed change regarding its spent fuel transfer from pool to DOE. *See* CYPF 174b. He merely took "money that was spent for fuel transfer [from pool to ISFSI], and that's what we used as the offset. It's as simple as that." Tr. 5896:14-16; *see also* Tr. 5905:23 (Abbott) ("We didn't check the number"); Tr. 5898:1-6 (Abbott) (although he "thinks we could" come up with a bottoms-up pool to DOE estimate without reference to the Yankees' numbers, " that wasn't our job in this case.") He also testified that he still had no opinion one way or the other about whether that $6.5 million is what Connecticut Yankee's pool-to-DOE transfer would actually cost in the non-breach world, Tr. 5906:3-22, nor could he give an approximation of the number of people it would take to

[2] Mr. Johnson then subtracted Connecticut Yankee's original $1,497,185 pool-to-DOE offset (set forth in its March 2003 damages claim), for a net total of $5,048,006. Tr. 6557:1-6 (Johnson).

accomplish the transfer. Tr. 5903:23-5908:14 (at Tr. 5907:6: "No, that wasn't part of our scope.").

After Mr. Abbott changed his mind, Connecticut Yankee took a closer look and developed a rigorous, "bottoms up" estimate's of its nonbreach world pool-to-DOE costs of $5,852,965, Tr. 2203:5-2205:7, Tr. 2661:13-2666:2 (Heider); Heider demonstrative 11.[3] This estimate takes account of the substantial cost differences between pool-to-DOE loading and pool to ISFSI loading. Tr. 3178:22-3179:6 (Meisner) ("[T]his bottoms up [pool-to-DOE] estimate is a fair bit less, for good reason, than what it cost us to move fuel from the pool to the ISFSI."). Tr. 3148:12-20 (Meisner) ("And since there would be no storage involved, the assumption was that they [DOE] would arrive with containers that could be easily opened on the other side [the DOE repository] to be put into long-term storage containers. So it wouldn't make any sense, not only to vacuum dry, but it wouldn't make any sense to weld lids on either, because that's a lot of work having to open those up on the other side."); Tr. 3182:23-3184:4 (Meisner) (pool-to-ISFSI transfer costs compared to cost of pool-to-DOE transfer is "almost all due to vacuum drying and the difference between bolting and welding").

14 & 22.[4] These proposed alternative findings, that certain security personnel (four security guards, two FFD/AAP/computer position and a fire trainer position) are unnecessary and therefore the related staffing, benefits and materials and services ("M&S") costs (for fire brigade

[3] Net of adjustments, Connecticut Yankee's estimate of pool-to-DOE costs is $5,233,725. CYPF 174b.

[4] Mr. Johnson's criticisms are arranged by the type of costs to which each criticism applies – dry storage and wet storage, and therefore each type of criticism ("non-incremental," "unreasonable," etc.) is asserted in two different GAF – one relating to dry storage and again, several paragraphs later, relating to wet storage. In responding to the government's criticism, Connecticut Yankee groups the GAF regarding dry and wet storage together to address the criticism once.

re-qualifications) should be deducted from damages in 2003-2007, are unsupported and wrong. First, Abbott slide 74 and Abbott testimony at Tr. 5476:2-14, Tr. 5534:10-15 addresses the removal of four security guards after DOE has picked up Connecticut Yankee's SNF in 2010, discussed in GAF 33, but not in GAF 14. Second, the sole basis for these proposed findings is Mr. Abbott's opinion that the personnel are unnecessary, Tr. 5534:16-5536:23, which is incorrect for reasons explained by Mr. Heider. *See* Tr. 7132:1-7142:7 (refuting government criticisms re ISFSI and wet pool-related-related security – FFD/AAP/computer, admin/trainer and security manager positions); Tr. 7175:21-7177:23 (refuting government criticisms re removal of four wet pool-related security guards). And because Connecticut Yankee has already reasonably incurred much of these personnel costs, it would be improper to deduct them from damages for that additional reason absent a convincing showing that the costs were unreasonable, which the government has not made.

15 & 23. These proposed alternative findings assert that the cost of benefits associated with the security personnel addressed above under GAF 14 & 22 should be deducted from damages for the same reasons that the direct costs of these personnel should be deducted. That assertion is generally unsupported and wrong for the reasons outlined above under GAF 14 & 22, *see* Tr. 7272:23-7273:10 (Jewell-Kelleher) (refuting government criticism re education reimbursements), Tr. 2052:17-2054:22 (Jewell-Kelleher) (refuting government criticism re officer contract benefits), Tr. 7276:4-23 (Jewell-Kelleher) (refuting government criticisms re COBRA and vacation accrual costs), although Connecticut Yankee did make one "agreed change" to these benefit costs because $29,425 of officer benefits was originally mis-charged to damages. *See* CYPF 174.f – re officer contracts/benefits).

16 & 25. These proposed alternative findings, asserting that M&S costs (for certain outside services, office supplies and direct materials) that Connecticut Yankee incurred or will incur between 2002 and 2007 are "non-incremental because they are necessary to plant decommissioning under both the breach and nonbreach scenarios, have no merit, as Mr. Heider testified. Tr. 2656:7-2659:20 (explaining categories of M&S charges and noting that M&S costs related to decommissioning would be charged through the Bechtel DOC contract). In addition, Mr. Heider refuted the government's assertion that the cost of fuel reconciliation services is not incremental the breach. Tr. 7166:8-7169:18 (fuel reconciliation project involved preparing a record (on CDs) for each of Connecticut Yankee's fuel assemblies stored in its dry cask storage containers so that the information could be transferred to DOE when it picks up the fuel).

17. This proposed alternative finding (and sub-finding 17a.) asserts that Connecticut Yankee cannot recover miscellaneous ISFSI operations costs for 2006-2012 because the actual completion date for Connecticut Yankee's decommissioning has been delayed to 2007, and therefore these costs are "non-incremental" during plant decommissioning. The government's assertions are unsupported and wrong. Connecticut Yankee's 10/29/02 cost estimate (P1726CY), which underlies its damages claim, assumes that decommissioning would be complete in 2004, with site release occurring in 2005. Tr. 7018:19-25 (Bennet). That assumption was reasonable at the time it was made, and the fact that decommissioning has been delayed in the breach world does not affect that assumption, as Mr. Bennet explained. Tr. 7019:8-7020:9. Ms. Jewell-Kelleher refuted the government's assertions in 17b. regarding vehicle costs in 2002-2012, Tr. 7273:23-7274:7; in 17c. regarding FERC rate case costs in 2012 , Tr. 7275:16-19 (Jewell-Kelleher); and in 17d. regarding actuarial costs in 2006. Tr. 7270:15-23 (Jewell-Kelleher).

18. This proposed alternative finding asserting that Connecticut Yankee's staffing costs of its CEO in 2006-2007 is non-incremental because plant decommissioning activities are expected to continue through 2007 is unsupported and wrong for the reasons set forth in response to GAF 17.

19. This proposed alternative finding, asserting that Connecticut Yankee's insurance costs in 2006-2007 are non-incremental because plant decommissioning activities are expected to continue through 2007, is unsupported and wrong for the reasons set forth in response to GAF 17.

20. This proposed alternative finding, asserting that $3.2 million should be added to Connecticut Yankee's damages claim because "Connecticut Yankee failed to account for the annual credits ("NEIL distributions") of $1.7 million that it purportedly would receive from its membership in NEIL and its payment of annual premiums in the 'non-breach scenario,'" is unsupported and wrong. First, for the reasons set forth in response to proposed alternative finding 17, the years 2006 and 2007 are not part of the "non-breach scenario." Second, as Mr. Bennet explained, NEIL credits should not be credited to Connecticut Yankee's damages claim because future payments (with respect to both entitlement and amount) are not certain, are related to premiums paid years before and are not related to the nuclear property insurance Connecticut Yankee is carrying during the long-term fuel storage period in its damages claim. Tr. 6982:19-6987:13.

21. This proposed alternative finding, asserting that the annual costs of Connecticut Yankee's regulatory fees in 2006-2007 are non-incremental because of the "revised date for the completion of decommissioning in 2007," is unsupported and wrong for the reasons set forth in response to GAF 17.

24 & 26. These proposed alternative findings, asserting that Connecticut Yankee's 2001 costs 1) for NRC annual fees and 2) for record documents services, both of which are allocated to wet pool-related damages, are non-incremental because they were incurred in 2001, is unsupported and wrong. The portions of those costs attributable to fuel storage following the August 2001 fuel out date in the nonbreach world are properly allocable to damages. *See also* response to GAF 42 regarding the costs of record document services.

27. This proposed alternative finding, asserting that Connecticut Yankee's re-racking costs are non-incremental are unsupported and wrong for the reasons set forth in Connecticut Yankee's reply to the government's response to CYPF 116.

**C. The Government's Assertions That Connecticut Yankee's Claim Must Be Reduced to Eliminate Contingency is Wrong.**

28. This proposed alternative finding is wrong because the contingency factor used by Connecticut Yankee did not "increase" its estimated future costs by use of contingency as the government asserts; rather, Connecticut Yankee used contingency to account for "known unknowns" and assure that its estimates of future items costs were accurate. Tr. 7000:24-7001:3 (Bennet) ("Our decommissioning cost estimate with the contingency in it is our best estimate of what we're likely to spend to complete the work" for each respective cost item "[a]nd the entirety of the estimate.").

29-31. These proposed alternative findings, asserting that it is improper to include a contingency factor in the context of a damages claim, are legally and factually wrong. In *In re Stone & Webster, Inc.* 279 B.R. 748, 801 (Bankr. D. Del. 2002), for example, the court approved the addition of a 5.7 percent contingency to Maine Yankee's total cost to complete decommissioning work, concluding that contingency "is a reasonable and appropriate part of Maine Yankee's damages award." *Id.* at 801. The court found that "[i]ncluding contingency as

a real cost of decommissioning is . . . an acknowledged practice within the industry" and that "practice in the industry has demonstrated that a certain percentage of contingency is required to account for unexpected costs . . . it is a 'known unknown.'" *Id.* The court found numerous factors supporting this finding: 1) witnesses testified that every budget for decommissioning should include a contingency; 2) SWEC's bids on Maine Yankee's project, before and after termination, included contingencies; 3) a DOE handbook [get] supported using contingencies in decommissioning cost estimates; and 4) SWEC 's earned value statement carried a contingency at the time of its termination. *Id. See also Brooklyn Waterfront Terminal Corp. v. Int'l Terminal Operating Co.*, 211 F. Supp. 702, 708 (S.D.N.Y. 1962) (accepting defendant's expert's inclusion of contingency in repair estimate for damaged pier, but reducing percentage of contingency in awarding damages); *In re M & M Towing Co.*, No. CIV.A. 94-3264, CIC.A. 95-1406, 1997 WL 96377, *5 (E.D. La. Mar. 4, 1997) (application of fifteen percent contingency to damages award for repairs not yet made found appropriate). Including a contingency for "known unknowns" is necessary to assure that estimates of future costs are accurate.

**D. The Government's Assertions That Connecticut Yankee's Damages Must Be Reduced to Eliminate Unreasonable Costs Either Fail to Account for Changes Agreed to at Trial or Are Wrong.**

32. This proposed alternative finding, asserting that the $2.5 million Connecticut Yankee paid to settle Bechtel's ISFSI construction delay claim, is unsupported and wrong. The government relies solely on the testimony of Mr. Blair, who did not discuss this delay claim in the text of his report, Tr. 5228:6-11 (Blair), but who at trial attributed the delay to Connecticut Yankee. As Mr. Bennet explained, however, that the delay "stemmed from the denial of the zoning application that we had made [with] the town of Haddam for purpose of constructing the ISFSI facility," Tr. 2345:12-24, and was breach-related – the Town of Haddam's "frustration with the lack of fuel being removed from the site was . . . probably more emotional than ours, but

it was still there. And as such, they had denied zoning, in our view, as a statement. They did not want to become the first town in the United States to zone for a dry fuel storage facility, when, in their view, fuel was meant to be stored in the permanent repository." Tr. 2346:4-14.

33. Connecticut Yankee agreed with the government's assertions in this proposed alternative finding regarding the reduction of Connecticut Yankee's security guard force to four guards after DOE has removed all the SNF from Connecticut Yankee's ISFSI. *See* CYPF 174a.

34. This proposed alternative finding, asserting that Connecticut Yankee's damages should be adjusted downward to eliminate future security equipment maintenance costs, is unsupported and wrong. The basis for this proposed finding is Mr. Abbott's opinion that the costs are significantly higher than Maine Yankee's costs and therefore must be reduced. Tr. 5536:24-5537:8 & Abbott Slide 110. Mr. Heider explained why Mr. Abbott was wrong. Tr. 7143:13-7544:19 (disagreeing with the government's proposed adjustment); Tr. 7145:5-13 (identifying Connecticut Yankee's security systems requiring maintenance).

35-36. These proposed alternative findings, asserting that certain of Connecticut Yankee's fitness-for-duty ("FFD") requirements and staffing are unreasonable and should be eliminated from damages, are wrong. The proposed adjustments are based solely on Mr. Abbott's opinion that the costs should be reduced proportionately to staffing reductions or eliminated. Tr. 5534:16-5535:13, Tr. 5554:4-8 & Abbott slide 75. Mr. Heider refuted Mr. Abbott's criticisms. Tr. 2158:9-19 (FFD program, implemented to assure that personnel are not encumbered by drugs, alcohol or other personal reasons that affect their ability to work safely on site or come into the contact with the fuel on site, was originally required by NRC; "as a business decision, we maintained that program on site.") *See also* response to GAF 14 & 22 above.

37. This proposed alternative finding, asserting that costs of Connecticut Yankee's security firearms requal training and first aid/CPR/AED requals are unreasonable and should be reduced, are unsupported and wrong, as Mr. Heider testified. Tr. 7145:14-7147:10.

38. There is no need for the government's asserted allocation of its proposed reductions to Connecticut Yankee's security costs among ISFSI construction, ISFSI operations and wet pool-related damages because the proposed reductions, as noted above in response to GAF 33-37, are wrong.

39 & 48. These proposed alternative findings assert that the cost of benefits associated with dry and wet storage staffing should be deducted from damages for the same reasons that the direct costs of these personnel should be deducted. That assertion is generally unsupported and wrong for the reasons outlined below under GAF 44 and 47.

GAF 39c. & 48c., asserting that cost adjustments should be made to Connecticut Yankee's educational reimbursement benefits because these costs were offered as a rentention tool and are not related to the breach, are wrong because of the post-2006 period which does not exist absent the breach. See response to GAF 36e. and 44e.

GAF 39d. and 48d., asserting that the Bonus/DPIP benefits costs should be adjusted because the percentage factor used by Connecticut Yankee is "unaccountably larger" than the historical factor evidenced by the records, is unsupported and wrong, as Ms. Jewell-Kelleher explained. Tr. 7239:23-7241:10 (noting higher percentage used because historical average payout is about 15 percent against base salary, lower-paid employees will be leaving and higher-paid employees are eligible for higher percentage bonuses).

GAF 39e. and 48e., asserting that non-incremental vacation accrual benefits costs should be removed, is wrong, as Ms Kelleher testified. Tr. 7276:15-19 ("vacation accrual costs are a

benefit offered by the company. And in the nonbreach world, those people wouldn't have existed at all and been gone before – by 1999.”).

40 & 49. These proposed alternative findings, asserting (based on Mr. Abbott’s opinions, Tr. 5506:14-5507:22, Tr. 5509:21-5510:2, Tr. 5512:5-10, Tr. 5552:1-5) and D661 that Connecticut Yankee’s regulatory fees are unreasonable and should be deducted from damages, are wrong. First, as explained by Maine Yankee’s Chief Nuclear Officer, Mike Meisner, who has dealt with NRC’s inspection regime “all of [his] life working with nuclear power and been involved in hundreds of [NRC] inspections,” Tr. 3104:24-3105:1, “Mr. Abbott made a mistake. I think he was too selective. He identified, out of this inspection manual I mentioned, one particular module and it was kind of a general inspection for operation of an ISFSI. And he failed to identify a number of others.” Tr. 3105:18-23 (Meisner). *See also* Tr. 3106:17-3110:9 (Meisner) (explaining NRC inspection manual, chapter 2690, associated with inspection programs for dry storage); Tr. 6887:18-6891:24 (Meisner) (commenting on Abbott testimony at Tr. 5970:11-5977:6). Mr. Heider agreed with Mr. Meisner. *See* Tr. 7147:11-7148:4.

Second, Mr. Abbott’s opinion that Connecticut Yankee’s estimated costs of $266,000 for NRC Annual Fees should be reduced by $63,000 based upon the most recent NRC final rulemaking of $203,000 for FY2004, Tr. 5552:1-5 , also is wrong, as explained by both Mr. Meisner and Mr. Heider. Tr. 6898:16-21 (Meisner). Mr. Heider explained that the annual fee value ($266,000 per year) included in Connecticut Yankee’s budget for 2002 was directly out of the code of federal regulations; that the number was $319,000 in 2003 and $203,000 in 2004; and that the average of those three numbers is about $263,000, which demonstrates that the $266,000 in Connecticut Yankee’s damages estimate was reasonable. Mr. Heider agreed with Mr. Meisner

that the general trend of NRC regulatory fees is up, although it may apparently vary between the various years. Tr. 7148:3-7149:1.

Mr. Heider also disputed Mr. Abbott's view (Tr. 5514:2-24) that CT Dep-Other fees were speculative because they were tied to the shipment of waste, testifying that the fees were for Connecticut Yankee's share of fees for an emergency planning program by the State of Connecticut for responding to events that could occur on Connecticut Yankee's site. Tr. 7152:11-7155:1.

41 & 50. These proposed alternative findings assert that Connecticut Yankee's M&S costs should be reduced based upon the government's proposed staffing adjustments, upon Mr. Abbott's opinion that certain costs (primarily costs of outside services, telephone and ISFSI electrical usage) are unreasonable, and upon Mr. Johnson's opinion that Dr. Wise improperly applied a sales tax factor. Connecticut Yankee concurred with the government's criticism regarding ISFSI electrical usage as one of the "agreed items." *See* CYPF 174g., noting and quantifying agreed change of $559,790, and allocating the deduction to ISFSI Operations damages. Connecticut Yankee also agreed to adjust its wet pool-related M&S costs associated with the removal of three engineer positions in year 2002 related to its final status survey. *See* CYPF 174c. Connecticut Yankee further agreed to adjust its ISFSI operations M&S costs associated with computer replacement costs in 2005 to reflect the costs of replacing two computers per year. *See* CYPF 174e. The remainder of the government's proposed reductions in damages based upon staffing reductions are wrong for the reasons set forth in response to GAF 44 and 47 below. Ms. Jewell-Kelleher explained Connecticut Yankee's telephone costs, Tr. 2524:18-2525:11, testifying that "in the future years, we eliminated the full telephone system and went to direct lines because we will obviously have much fewer employees." Finally, Ms.

Jewell-Kelleher refuted the government's assertions regarding Connecticut Yankee's telephone costs that Dr. Wise improperly applied a sales tax factor. Tr. 7283:2-7284:24.

42 & 51. These proposed alternative findings, asserting that certain miscellaneous costs (primarily for record document services; accounting services; IT services; dues and memberships; government relations; outside services-admin; internal, external and tax audit services; property taxes and taxes other than income) are unreasonable and should be deducted from damages, are wrong, except to the extent agreed as set forth below.

Mr. Abbott's assertions (Tr. 5530:19-5531:7) regarding record document services costs is generally unsupported and wrong, as Ms. Jewell-Kelleher testified, Tr. 7242:8-16, although Connecticut Yankee did make one "agreed change" to those costs because $72,444 of record document services costs were for storing documents related to this litigation. *See* CYPF 174h. Mr. Johnson's assertions regarding the costs accounting services (Tr. 6585:25-6587:16) are also unsupported and wrong, as Ms. Jewell-Kelleher explained. Tr. 7243:11-7245:2, 7245:20-7246:10 (regarding costs of tax accounting services); Tr. 7245:8-19 ("[Mr. Johnson] lowered those costs [of general accounting services] in the 2006 to 2010 time frame, not realizing the business operations activity. He took complete disregard for that."). The government's proposed reductions to dry storage payroll accounting (and its proposed reductions to wet pool-related costs) based on its proposed adjustments to staffing is unsupported and wrong for the reason outlined here and in response to GAF 44 and 47.

Mr. Abbot's opinion (Tr. 5531:8-21), that Connecticut Yankee's IT professional services were unreasonable, primarily because specialized software is unnecessary for routine ISFSI operations, is wrong, as Ms. Kelleher testified. Tr. 7246:11-7248:14 (Although [the] ISFSI is in a steady state, "we do have software and hardware that needs to be maintained in those years," and

identifying systems that have to be upgraded). With respect to Mr. Abbott's opinion on internet access, that Connecticut Yankee can get by with a lower speed connection at less cost, Tr. 5531:8-21, Ms. Kelleher explained why that also is wrong. Tr. 7251:8-16. *See also* Tr. 7326:3-7, Tr. 7328:24-73299:21 (Jewell-Kelleher) (refuting Mr. Johnson's assertions (Tr. 6587:17-6589:1) re reductions in estimated costs for IT services, noting that actual costs compare well to estimates).

Equally wrong, for reasons explained by Ms. Jewell-Kelleher, are Mr. Abbott's criticisms of Connecticut Yankee's outside services-admin costs, *see* Tr. 7252:6-7256:7, 7256: 8-23; Mr. Johnson's criticisms of Connecticut Yankee's dues and memberships costs, based on Mr. Abbott's opinion, *see* Tr. 7256:24-7258:1 (Jewell-Kelleher); Mr. Johnson's criticisms of Connecticut Yankee's government relations costs, *see* Tr. 7258:2-20, (Jewell-Kelleher); actuarial costs, *see* Tr. 7271:2-17 (Jewell-Kelleher);[5] internal audit costs, *see* Tr. 7258:23-7260:9 (Jewell-Kelleher); external audit costs, *see* Tr. 7260:10-7261:10 (Jewell-Kelleher); and tax audit costs, *see* Tr. 7261:11-7264:9 (Jewell-Kelleher).

Mr. Bennet refuted Mr. Johnson's opinion (Tr. 6585:8-24) that the costs of property taxes in 2011-2012 should be eliminated based on Connecticut Yankee's agreement with the Town of Haddam. Tr. 7013:16-7015:18 (Haddam settlement is not a property tax settlement; it requires that Connecticut Yankee pay a fee in addition to property taxes, and property tax is not premised on the presence of fuel). In addition, Mr. Bennet and Dr. Wise explained why Mr. Johnson's opinion (Tr. 6585:1-3), that Connecticut Yankee's "taxes other than income" (management fees the companies pay to the managers of their decommissioning trust funds) should be excluded

[5] The same reasoning applies to the assertions in GAF 51 re Government Relations, Dues and Membership and Actuarial costs allocated to Wet Pool-Related damages.

from damages is incorrect. Tr. 1678:6-23 (Bennet) (explaining FERC prudent investor rule, which requires professional management of trust funds); Tr. 3332:20-3334:9 (Wise) (the companies have legal responsibilities to have their investments professionally managed, and they incur fees to manage their money), Tr. 3359:23-3360:2 (Wise) (to the extent that the size of the trust is influenced by the flow of dollars in and out, the management fees are also influenced by those amounts, and those fees are costs included in damages). Finally, Mr. Abbott's opinion that IMAC costs should be removed from damages was rebutted by Mr. Meisner. Tr. 6919:4-6920:15 (Meisner) (re Connecticut Yankee's wet pool-related costs).

43. This proposed alternative finding, asserting that, based on Mr. Abbott's opinion (Tr. 5496:7-5502:15), $8 million should be deducted from Connecticut Yankee's claim based upon the difference between the costs of storing 82 SNF assemblies at the GE Morris storage facility and the one-time cost to move them back to Connecticut Yankee, is unsupported and wrong. Mr. Bennet explained that the settlement document for the Haddam building permit and zoning litigation expressly precludes moving the 82 fuel assemblies back to Connecticut Yankee's site. Tr.2347:11-2349:7); P1920 at page 5, ¶ 5.

44 & 47. These proposed alternative findings, asserting that Connecticut Yankee's damages should be reduced to remove unreasonable dry and wet storage staffing costs, ignore changes to Connecticut Yankee's damages claim to which it agreed at trial, or are wrong.

First, GAF 44, asserting that Connecticut Yankee's ISFSI staffing levels are too high, is unsupported and wrong. The sole basis for these proposed findings is Mr. Abbott's opinion that Connecticut Yankee's ISFSI staffing should be reduced to two full-time equivalent ("FTE") technical staff positions net of security and one half-time corporate executive. Tr. 5394:3-5400:6, Tr. 5406:19-5407:17. Mr. Abbott's opinion is not credible. He testified at trial that he

never has had any responsibility for operating an ISFSI. Tr. 5325:7-9. Moreover, at the time of his first report and his first deposition in this case, it was Mr. Abbott's "judgment" that a staff of five to seven FTEs, in addition to security staff, was a reasonable number of people to operate an ISFSI, that the number was "readily defined," and that five FTEs was consistent with decommissioning cost estimates performed by both him and ABZ and by others. Tr. 5937:22-5940:19. Although Mr. Abbott's current opinion (as of trial) is that that two people, plus security staff, is all that is needed to run an ISFSI, he conceded that has no knowledge of any ISFSI that is staffed by only two FTEs net of security. Tr. 5941:12-16 (he cannot point to a single dry ISFSI, in this country that actually operates with two staff, plus help from the security supervisors).

In addition, contrary to Mr. Abbott's testimony (Tr. 5396:14-5398:3), P1462YA and D266 (which relies on P1462YA; *see* D266 at 26 and 29, identifying "Reference 3" as P1462YA), do not support his opinion. Mr. Abbott failed to note that in addition to 2 Yankee personnel, P1462 shows at YDK007538 additional dry storage staffing of 3.1 FTEs from YNSD ("Yankee Nuclear Services Division"), plus 3.5 corporate FTEs, which results in a total of 8.5 FTEs for dry storage staffing. D688 and D689, do not support the government's position, as they are Connecticut Yankee's and Yankee Atomic's alternative GTCC-only on-site storage estimates in the non-breach world. *See also* Connecticut Yankee's reply to the government's response to CYPF 156b. In addition, Mr. Heider refuted Mr. Abbott's testimony that Connecticut Yankee's dry storage staffing levels should be 2 FTEs rather than the 8.5 included in Connecticut Yankee's damages. Tr. 2180:14-18; Tr. 2188:18-2189:25 *see also* Tr. 2197:1-6 (describing five ISFSI staff net of security); Tr. 2197:7-2200:5 (detailed description of each

ISFSI staff person's responsibilities); Tr. 2655:18-24 (Connecticut Yankee ISFSI staffing the same as for Yankee Atomic).

Second, proposed alternative finding 47, asserting that Connecticut Yankee's wet storage staffing should be reduced to a total of 18 positions, also is unsupported and wrong for similar reasons. The sole basis for these proposed findings is Mr. Abbott's opinion that it takes only 18 people, net of security to run a wet fuel pool. Tr. 5378:23-5381:3. Mr. Abbott's opinions again are not credible.

For example, Mr. Abbott testified that General Electric's Morris spent fuel storage facility "can be used as a standard for wet fuel storage," including staffing, Tr. 5655:24-25, because its operations consist solely of a wet pool, Tr. 5653:11-14. Mr. Abbott, however, did not consider P169 (contractor document), a 1991 Pacific Northwest Laboratories (PNL) study prepared for DOE entitled "Cost Estimates of Operating On-Site Spent Fuel Pools After Final Reactor Shutdown."[6] Tr. 5664:17-20. The PNL study used General Electric's Morris Operation – which has been operating virtually in a "storage-only mode" and whose operation and maintenance programs appear to be typical of those that would be encountered at other wet-storage facilities – "as a typical wet-storage facility." P169 at 1.2. Mr. Abbott agreed that the PNL study shows Morris wet pool staffing at 24 positions, net of security, Tr. 5667:6-5669:10 & P169, table 3.1, and acknowledged that at his deposition, he had conceded that he could not tell which of the Morris wet staffing positions should be eliminated to reduce the number from 24 to 18. Tr. 5669:11-19. Mr. Abbott also conceded that the PNL study proposed increasing the

[6] P169 (contractor document) was admitted into evidence, contrary to the government's assertions at page 157 in response to YAPF 142c. *See* Yankee Atomic's reply to the government's response to 157c.

Morris levels to 29 positions net of security to reflect changes in utility wet pool staffing levels anticipated after the study was prepared in 1991. Tr. 5669:20-5670:10 & P169 at 3.4, Table 3.1.

In addition, five decommissioning cost estimates that Mr. Abbott and ABZ prepared for other utilities, Tr. 5673:14-19, showed that, during periods when the only or the predominant activity is operation of the wet pool, wet storage staffing far exceeded the 18 positions net of security that Mr. Abbott claims is "all Connecticut Yankee needs to run its spent fuel pool." The wet staffing numbers in those studies range from a low of 29.25 to a high of 112. *See* Abbott Demonstrative 1; Tr. 5687:4-10 (agreeing that 50 positions, net of security, is what he determined would be necessary to run the wet pool at Duane Arnold); Tr. 5849:14-5850:5 (confirming wet storage staffing of 112, net of security, in ABZ Nine Mile Point decommissioning cost estimate); Tr. 5853:3-5854:14 (conceding that wet storage staffing of 29.25 in ABZ Vermont Yankee estimate exceeds his estimate of 18); Tr 5855:2-5856:13 (acknowledging 60 wet storage staff in ABZ estimate for Calvert Cliffs); Tr. 5858:8-5860:7 (acknowledging wet storage staffing of 48.5 in San Onofre decommissioning cost estimate, in the preparation of which he was substantially involved).

In addition, contrary to Mr. Abbott's contention (Tr. 5383:15-5384:1), a January 29, 1996 Yankee memorandum re Wet Spent Fuel Storage Evaluation (D603), does not support his wet staffing opinion. As Mr. Heider, who participated in the meeting associated with the memorandum and whose initials are on the bottom of Exhibit C to the memo, Tr. 2184:2-2185:22, testified: 1) Exhibit C to the memo recommends six people versus five people to fill an operating position, which would bring the 18 up to 20, Tr. 2184:15-17 (Heider) & D603 at YDK000662; 2) the analysis also includes three and a half people from the Yankee Nuclear Services Division that are providing technical support to the operation of the spent fuel pool,

which brings the total to 23 and a half, Tr. 2185:8-2186:1 (Heider), which Mr. Abbott acknowledged, Tr. 5864:10-5865:5; 3) there are numerous assumptions in D603 associated with licensing changes, Tr. 2186:3-5 (Heider) (citing YDK000652-53), which Mr. Abbott acknowledged, Tr. 5865:6-5866:8; 4) there also is an assumption in D603 that contractors or employees from sister utilities, for example, Vermont Yankee, which was approximately 30 or 40 miles away from the Yankee Atomic site, could be used to cover some of the positions, Tr. 2186:2-24 (Heider) & YDK000662, which Mr. Abbott also acknowledged, Tr. 5866:9-5867:6; and 5) D603 assumed that, to achieve the staffing levels noted below, a substantial investment of $3 million was required to modify the spent fuel building and operating systems to simplify operations and reduce the staffing level, a modification that was never made. Tr. 2186:25-2187:12 (Heider). As Mr. Heider further testified, Yankee Atomic implemented many of the concepts set forth in the memo, but it was never able to get near the 18 number. Tr. 2187:13-2188:2; *see also* 2184:6-8 (Heider) ("now that we've completed spent fuel operations at Yankee Rowe, I can say that we never operate[d] the spent fuel pool with 18 people."). The remaining evidence on which the government relies does not support this finding.[7] *See also* Connecticut Yankee's reply to the government's response to CYPF 157c.; Tr. 2651:13-2652:25 (Heider) (wet pool-related staffing levels that were on site and the staffing levels that were estimated were essentially the same).

Connecticut Yankee, however, after a re-review of the detailed staffing plans included in P1726CY, agreed at trial to adjust its damages claim downward to account for the removal of

---

[7] The statement in P1462YA (on which the government relies) regarding 18 wet staffing positions cites D603 as its source. See P1462YA at YDK007521 (citing "Reference 3"), YDK007532 (identifying Reference 3 as D603). DX266 (on which the government also relies) in turn also cites D603 as its source. See D266 at COF006444 (citing "Reference 3") and COF006447 (identifying reference 3 as D603).

three engineer positions in year 2002 and 2003 related to Connecticut Yankee's final status survey that are appropriately attributable to decommissioning and for M&S costs associated with these positions. *See* CYPF 174c; Tr. 2653:1-19 (Heider).

45. This proposed alternative finding, asserting that the costs of Connecticut Yankee's nuclear liability and nuclear property insurance as well as S&T, D&O and other non-nuclear insurance are unreasonable and should be deducted from Connecticut Yankee's damages claim, are unsupported and wrong. The sole basis for the government's proposed findings regarding nuclear liability and nuclear property insurance costs is Mr. Abbott's opinions. Tr. 5502:16-5504:24 (nuclear property insurance), Tr. 5504:25-5505:22 (nuclear liability insurance).

Mr. Abbott cited as support for his opinion regarding nuclear liability insurance D637, a June 28, 2000 SECY paper, recommending that "[o]ff-site [nuclear liability] coverage should be further reduced to $25 million when spent fuel is removed from the pool"). Tr. 5472:3-5473:20, 5504:25-5505:6. Mr. Bennet explained why Mr. Abbot is wrong, explaining that 10 CFR 140.11 requires Connecticut Yankee to procure nuclear liability insurance subject to exemptions, that Yankee Atomic had filed for an exemption to reduce its nuclear liability insurance from $100 million to $25 million (and it was likely that Connecticut Yankee would file for a similar exemption in the future), but that NRC had taken no action on that request. Tr. 6989:15-6991:13 (Bennet). The NRC subsequently denied Connecticut Yankee's request for an exemption by letter dated December 22, 2004 (attached hereto as Attachment 1).

Mr. Abbott's opinion that Connecticut Yankee has not adequately accounted for the ICRP credits related to nuclear liability insurance, Tr. 5504:25-5505:22, also is wrong for reasons explained by Mr. Bennet. Tr. 6991:15-6993:25 ("First, there's certainly no assurance of that credit. . . . Second, to the extent the credit arises, it arises from a period of time 10 years

earlier when premiums were paid for that policy. And . . . [Connecticut Yankee]do[es] not account for these ICRP credits in the cost estimates that [it] submit[s]to FERC").

Mr. Abbott's opinions regarding the addition of Connecticut Yankee's NEIL credits to its damages claim (Tr. 5502:16-5504:24) have been addressed in response to GAF 20. His opinion (Tr. 5502:16-5504:24) that Connecticut Yankee's damages claim should account for a NEIL termination credit of $4.3 million, which the company will receive when it is dissolved, was refuted by Mr. Bennet. Tr. 6988:16-6989:14. Mr. Abbott's opinions regarding Connecticut Yankee's (and Maine Yankee's) S&T insurance were refuted by Mr. Thomas. Tr. 7199:13-7201:6, 7226:17-7227:13.

The basis for the proposed alternative findings regarding D&O insurance costs is Mr. Johnson's opinion that any amount of claimed damages relating to D&O insurance is speculative, Tr. 6615:19-25, which is incorrect for reasons explained by Mr. Bennet. Tr. 6994:14- 6697:15. The proposed alternative finding that future costs for Connecticut Yankee's non-nuclear insurance coverage should be limited to the 2003 premium amounts and the damages claim reduced accordingly, which is based on Mr. Johnson's opinion, Tr. 6507:18-6510:25 also is wrong, as Mr. Bennet explained. Tr. 6697:16-6698:18.

52. This proposed alternative finding, asserting that Connecticut Yankee's annual steady-state wet pool operating costs should be approximately $5.7 million, Tr. 6015:4-11 (Abbott), is unsupported and wrong. The sole basis is Mr. Abbott's opinion, which is wrong for the following reasons. First, as Mr. Abbott testified, Connecticut Yankee's wet pool storage costs are in line with wet pool storage costs reported by other facilities in response to a survey he performed in the mid-1990's, which reported a range of wet pool storage costs from $2.5 million to $12 million. Tr. 6014:21-6018:21. Second, as Mr. Abbott also acknowledged 1) the lower

range of annual wet pool operating costs in his survey came from utilities whose fuel gave off very little or no heat because it had completely decayed; as a result, the pool systems had been turned off, and only a very small staff maintained a pool, and 2) none of the Yankees had completely decayed fuel in their pools. Tr. 6017:14-21, 6018:11-19. Third, Mr. Abbott agreed with the statement in P169, the PNL Cost Study, *supra*, that older facilities with relatively small pools would have more expensive pool costs, and that Connecticut Yankee had such a small pool. Tr. 6031:12-6032:12; P169 (contractor document), Table at 2.4 (showing range of pre-9/11 annual wet pool storage costs (net of security) in 1989 dollars of $2,270,000 to $6,000,000); at 2.5 ("the expensive outliers are all older facilities with relatively small pools."). Fourth, Mr. Abbott misinterpreted the Zion decommissioning cost study, which he used as a benchmark for calculating Connecticut Yankee's annual wet storage costs at $6.2 million. Tr. 6032:13-6033:1, 6033:22-6034:3. Specifically, Mr. Abbott failed to recognize that because Zion has only one spent fuel pool for both reactors, the wet fuel storage costs attributable to each reactor should be added together to obtain the annual costs of running Zion's spent fuel pool. Properly interpreted, Zion's annual wet pool costs in 2003 dollars amounts to $12 million, rather than $6.2 million as Mr. Abbott opined. *See* Tr. 6042:10-6049:25 (discussing TLG workpapers for 1999 Decommissioning Cost Estimates for Zion Nuclear Power Station Units 1 and 2 (February 1999) showing $7,564,677 annual cost to run Zion spent fuel pool in 1993 dollars, which, when adjusted to 2003 dollars and post-9/11 security needs, according to Mr. Abbott's formula, Tr. 6035:13-6036:2, equals approximately $12 million in annual wet pool costs).

53. This proposed alternative finding, asserting that Connecticut Yankee's annual steady-state ISFSI operating costs should be approximately $3 million, is unsupported and wrong. Mr. Abbott's opinion that once all of Connecticut Yankee's SNF has been transferred to

its ISFSI, the staffing level can be reduced to two full-time technical staff positions, net of security (which forms the foundation for the government's proposed reductions), also is wrong as set forth in response to GAF 44 above.

54. This proposed alternative finding is wrong for the reasons set forth in response to GAF 52 and 53 above.

55. This proposed alternative finding, asserts that Connecticut Yankee's wet pool-related damages should be reduced by construction delay costs because the delay was not caused by the government's breach. Mr. Abbott relied on the opinions of Mr. Blair in making this adjustment, Tr. 5427:8-22, and Mr. Blair identified the purported delay as Connecticut Yankee's ISFSI zoning and building permit issue with the Town of Haddam. Tr. 5182:9-5187:13. As set forth in response to GAF 32, this proposed alternative finding is unsupported and wrong.

**E. The Government's Proposed Alternative Findings That Connecticut Yankee's Damage Should Be Reduced to Eliminate Unsupported Costs Are Wrong Because Connecticut Yankee Provided the Government With Support.**

56. This proposed alternative finding, asserting that Connecticut Yankee's damages should be reduced to remove $2.1 million of Connecticut Yankee's post-9/11 physical security enhancement costs for 2003-2006 on the grounds that they were "unsupported" because the Nuclear Regulatory Commission purportedly has completed its efforts to make post-9/11 changes to security requirements at nuclear facilities, is wrong, as Mr. Meisner testified. Tr. 6882:17-6885:14 (noting cost impacts of recent NRC orders and stating that he anticipates that there will be other changes to security requirements at nuclear facilities as a result – continuing result of the 9/11 acts).

57. This proposed alternative finding, asserting that Connecticut Yankee's employee relocation benefits costs are unsupported, was refuted by Ms. Kelleher. *See* Tr. 7264:10-7266:8, 7268:2-11.

58. This proposed alternative finding, asserting that Connecticut Yankee's damages should be reduced to eliminate M&S costs based on adjustments to dry storage staffing and because such costs are unsupported, is wrong. The government's proposed reductions in damages based upon staffing reductions are wrong for the reasons set forth in response to GAF 44 and 47 above. Mr. Heider refuted Mr. Abbott's assertions (Tr. 5529:7-24) regarding Connecticut Yankee's 2003 dry cask storage project fabrication surveillance costs. Tr. 7165:9-7166:7. Finally, Mr. Johnson testified that, at least with respect to the costs of janitorial services, "I'm not sure I can explain to you, as I sit here, why [they're being excluded]." Tr. 6820:17-25.

59. This proposed alternative finding, asserting that Connecticut Yankee's ISFSI-related miscellaneous corporate legal and tax audit costs are unsupported, is wrong, as Ms. Jewell-Kelleher explained. Tr. 7261:11-7264:1 (tax audit costs); Tr. 7012:15-19 (Bennet) (legal costs).

60. See response to GAF 45.

61-64. Connecticut Yankee has addressed the contract's coverage of GTCC waste in CYPF 129-137. Moreover, even if GTCC waste were not covered by the contract and would not have been picked up by DOE, the costs of storing only GTCC waste would have been relatively small. Tr. 7161:6-22 (Heider); D494 (showing annual operating costs of $2 million and facility construction costs of $1 million).

65-68. Connecticut Yankee has addressed the government's arguments regarding failed fuel in response to GPF 260-272a.

**F. The Government's Position re Discounting Connecticut Yankee's Future Damages to Present Value is Incorrect.**

70. Dr. Wise refuted at trial the assertion in GAF 70 that a risk-free discount rate is only appropriate where there is no uncertainty. See Connecticut Yankee's reply to the government's response to CYPF 171.

75-76. These proposed alternative findings, asserting that it is improper to use an after-tax discount rate to calculate the Yankees' damages claims and that a pre-tax, risk-adjusted discount rate should be applied to discount the Yankees' damages to present value, is wrong, as Yankee Atomic's witnesses testified. For example, Ms. Kelleher refuted the assertion in 75a. that, because at varying times, Yankee Atomic has not paid taxes, it will not pay them in the future. *See* Tr. 7332:20-22 ("[R]egardless of how expenses have been treated for a tax purpose, the full damage claim is taxable."). Dr. Wise refuted the assertion in 75b., that when the claimed damages are spent, the Yankees will receive a tax deduction which will eliminate any tax paid on the award. *See* Tr. 7447:9-7448:10, 7455:3-7465:17 & Wise Demonstrative to accompany record P2043:1-4. Mr. Bennet refuted the assertion in 75c. *See* reply to GRYAPF 157.

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
CONNECTICUT YANKEE ATOMIC POWER COMPANY

Of Counsel:
Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH